UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
EQUAL OPPORTUNITY EMPLOYMENT
COMMISSION,

         Plaintiff,

    -against-

UNITED HEALTH PROGRAMS OF AMERICA,
INC. and COST CONTAINMENT GROUP,
INC.,

         Defendants.
---------------------------------X
---------------------------------X
ELIZABETH ONTANEDA, FRANCINE
PENNISI, and FAITH PABON,

         Plaintiffs-Intervenors,

    -against-

UNITED HEALTH PROGRAMS OF AMERICA,
INC. and COST CONTAINMENT GROUP,
INC.,

         Defendants.
---------------------------------X

**MEMORANDUM & ORDER**
14-CV-3673 (KAM)(JO)

**MATSUMOTO, United States District Judge:**

       The Equal Opportunity Employment Commission (the "EEOC")
brings this action on behalf of a group of former employees
("claimants" or "plaintiffs") of United Health Programs of America
Inc. ("UHP") and Cost Containment Group Inc. ("CCG")
(collectively, "defendants") who claim principally that they were
subjected to religious discrimination in their workplace in
violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.*[1] Claimants have moved for partial summary judgment on the discrete issue of whether certain practices and beliefs (referred to herein as "Onionhead" and "Harnessing Happiness") purportedly imposed on employees by supervisors in defendants' workplace constitute a religion. Defendants have cross-moved for summary judgment on all claims, the nature of which will be discussed in greater detail below. For the reasons stated herein, claimants' motion is GRANTED and defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

The facts provided below derive from the parties' Local Rule 56.1 statements, as well as from the deposition testimony and other exhibits attached by the parties in their cross-motions for summary judgment.[2] The facts below are undisputed unless otherwise

---

[1] Certain plaintiffs-intervenors are separately represented, but have joined the EEOC's briefing. Except where necessary for the discussion below, the court refers to both the plaintiffs-intervenors and the claimants as "claimants" or "plaintiffs."

[2] The parties have filed statements of undisputed material facts, oppositions, and a reply, pursuant to Local R. 56.1. (*See* ECF No. 77, Defendants' Statement of Undisputed Material Facts ("Def. 56.1"); ECF No. 80, Plaintiffs' Statement of Material Facts and Statement of Disputed Material Facts ("Pl. 56.1"); ECF No. 84, Defendants' Counterstatement to Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts and Objections and Responses to Statement of Disputed Material Facts ("Def. 56.1 Resp."); ECF No. 81, Plaintiffs' Responses to Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Pl. 56.1 Resp."); ECF No. 83, Defendants' Rule 56.1 Reply Statement ("Def. 56.1 Reply").) Deposition testimony (ECF No. 87, Tabs A-T) is referred to by the relevant exhibit's tab number and the deponent's surname. Each joint exhibit (ECF No. 86, Exs. 1-143, A-S) is referred to as "Jt. Ex." followed by its corresponding number or letter.

noted. The court has construed the facts in the light most favorable to the non-moving party with respect to each motion.

## I. *Factual Background*

### A. Defendants' Companies and Other Related Entities

Defendants operate a "small wholesale company that provides discount medical plans to groups of individuals" as well as a number of other for-profit and non-profit entities.[3] (Def. 56.1 ¶¶ 1-10.) Defendants' organizations, which at all relevant times employed fewer than 50 people, have conducted their business since 2006 out of a single office located in Long Island, New York. (Def. 56.1 ¶¶ 2-5.)

### B. The Claimants

Claimants all worked for defendants for different periods of time:

---

As noted above, the parties have cross-moved for summary judgment. Defendants have moved for summary judgment on all claims. (ECF No. 76, Defendants' Memorandum in Support of Motion for Summary Judgment ("Def. Mem.").) Plaintiffs have opposed defendants' motion and separately moved for partial summary judgment solely on the issue of whether the beliefs and practices referred to as Onionhead and Harnessing Happiness constitute a religion. (ECF No. 79, Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl. Mem.").) Both parties filed reply briefs. (ECF No. 82, Defendants' Reply in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Def. Reply"); ECF No. 85, Plaintiffs' Reply in Support of Plaintiffs' Motion for Partial Summary Judgment ("Def. Reply").)

[3] CCG is a holding company that houses UHP and other entities. (Def. 56.1 ¶¶ 1-10.) At all relevant times, claimants were employed by CCG, UHP, or an entity falling under CCG's umbrella. Because the distinction between the different corporate entities is generally not relevant to this action, the court refers to the entities collectively as "defendants" or as "CCG."

(1) Sandra Benedict: September 2011 - March 2012. (Pl. 56.1 ¶ 144.)

(2) Danielle Diaz: July 2010 – December 15, 2012. (*Id.* ¶ 163.)

(3) Jennifer Honohan: Approximately 1992 – February 3, 2012. (*Id.* ¶ 193.)

(4) Karen Josey: March 2011 – Approximately November or December 2011. (*Id.* ¶ 237.)

(5) Regina Maldari: October 2004 – May 2008. (*Id.* ¶ 333.)

(6) Elizabeth Ontaneda: 1992 – August 24, 2010. (*Id.* 56.1 ¶ 259.)

(7) Faith Pabon: October 2010 – March 2012. (*Id.* ¶ 283.)

(8) Cynthia Pegullo: 2004 – 2007 and then again from 2008 – April 2011. (Def. 56.1 ¶ 262.)

(9) Francine Pennisi: November 2004 – August 2010. (*Id.* ¶ 276.)

(10) Elizabeth Safara: December 2004 – August 2008. (*Id.* ¶ 296.)

C.  **Onionhead and Harnessing Happiness Programs**

Beginning around 2007, CCG Chief Executive Officer Robert Hodes ("Hodes") and Chief Operations Officer Tracy Bourandas ("Bourandas") determined that their previously effective corporate culture was deteriorating amid a difficult financial period for the company. (Def. 56.1 ¶¶ 37, 79-81.) Hodes and Bourandas hired Hodes's aunt, Denali Jordan ("Jordan" or

4

"Denali"), to provide assistance. (*Id.* ¶¶ 77-81.) Jordan considered herself a teacher and parent to Hodes, and they maintained a close relationship. She stayed at Hodes's home when working at defendants' office. (Pl. 56.1 ¶ 73.) Before Jordan began working with defendants, she developed a program called Onionhead (Pl. 56.1 ¶ 2),[4] the purpose and nature of which is strongly disputed by the parties. It is undisputed that defendants used the Onionhead program in the workplace after Jordan began to work with defendants. It is also undisputed that defendants provided administrative and financial support to Onionhead that was unrelated to defendants' other business. (Def. 56.1 ¶ 7.) Beyond the undisputed fact that Onionhead was utilized in defendants' workplace, however, the parties' respective views of when, how, and why Onionhead was implemented are practically irreconcilable and, as explained in greater detail throughout this memorandum and order, require a trial to resolve the disputed issues.

Defendants describe Onionhead as a multi-purpose conflict resolution tool, while plaintiffs characterize it as a system of religious beliefs and practices. (*Compare, e.g.*, Def.

---

[4] Jordan created Onionhead in 1990 (Jt. Ex. 2, ¶ 8), and incorporated it as Onionhead & Co. Inc. in 2007. (Def. 56.1 ¶ 11.) Initially incorporated as a for-profit venture, Onionhead became a non-profit organization in October 2011. (*Id.*)

56.1 ¶ 11 *and* Tab I, Jordan Dep. at 235, *with, e.g.*, Pl. 56.1 Resp. ¶ 11.) According to defendants, Jordan created Onionhead as a "tool to help children, including those with disabilities, identify, understand, and communicate emotions." (Def. 56.1 ¶ 12.) Although Onionhead was initially targeted toward children, gradually defendants contend that its purpose expanded to assist "people of all ages with addiction, abuse and domestic violence, family issues, marital problems, eldercare, death and dying, the full spectrum of autism and other cognitive disabilities or illnesses (such as Alzheimer's), and to generally develop better problem-solving and communication skills." (*Id.*) Onionhead practices include the use of "tools," many of which describe a "total of 150 different emotions," including cards, pins, dictionaries, workshop materials, magnets, journals, and a "Declaration of Virtues of Empowerment." (*Id.* ¶¶ 13, 20(a)-(e).) Onionhead materials often include images of an anthropomorphic Onion. (*E.g.*, Jt. Exs. A-O.)

Beginning around 2011, Jordan merged some of the concepts and principles underlying Onionhead into a program referred to as Harnessing Happiness,[5] which was designed to make

---

[5] Jordan and another individual founded Harnessing Happiness as a non-profit organization. (Jt. Ex. 2, ¶¶ 26-33.) The parties dispute whether the entity remains active. (*Compare* Def. 56.1 ¶ 33, *with* Pl. 56.1 Resp. ¶ 33.) It is undisputed, however, that defendants, as they had done with Onionhead, provided administrative and financial support for Harness Happiness. (Def. 56.1 ¶ 7.)

Onionhead more "suitable for adults." (Jt. Ex. 2, ¶¶ 26-27; Def. 56.1 ¶¶ 25-27.) Harnessing Happiness is now the "umbrella name" Jordan employs to describe the programs she offers. (Def. 56.1 ¶ 25.) Today, Onionhead falls under the Harnessing Happiness "umbrella."[6] (*Id.*)

Claimants maintain a widely divergent view of Onionhead and Harnessing Happiness. (Pl. 56.1 ¶¶ 1-45.) Claimants contend that Onionhead and Harnessing Happiness are a "system of religious beliefs and practices" with a corresponding "comprehensive system of multiple products and programs." (Pl. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 11.) Emails in the record regarding Onionhead and Harnessing Happiness, sent between Jordan and other supervisors and employees working for defendants, involve discussions about God, spirituality, demons, Satan, divine destinies, the "Source," purity, blessings, and miracles. (Jt. Exs. 8, 78-81, 89, 117.) In one email from 2011, Hodes groups Onionhead with "higher guidance teachings." (Jt. Ex. 117.) Claimants also emphasize that many of the materials associated with Onionhead and Harnessing Happiness — some of which, however, were not used at defendants' workplace

---

[6] The events underlying this action, which generally took place between 2007 and 2012, involve both Onionhead and Harnessing Happiness. The court refers to the programs collectively as Onionhead and/or Harnessing Happiness except where the distinction is relevant.

— contain spiritual and religious imagery and iconography. (Pl. 56.1 ¶¶ 1-41.) For example, one Onionhead document is referred to as the *Declaration of Virtues for Empowerment*. (Jt. Ex. K.) The document contains a list of 12 virtues, and provides: "Because the road to Heaven is paved with the power of what is good in us, we have devised The Declaration of Virtues for Empowerment . . . . Onionhead's goal is to help transform negative thought forms into positive thought forms, thereby co-creating a new loving, wondrous garden for us all to thrive in." (*Id.*) Another document, used in office workshops conducted by defendants while the majority of claimants were employed (Def. 56.1 Resp. ¶ 24), is referred to as the *Onionhead Keys and Codes to Living Good.* (Jt. Ex. M.) The document contains the following examples of religious and spiritual language:

- "Keys and codes have been a part of the Divine Plan from the beginning of time. Every sacred tribe and religion have codes hidden within their scripts, books and scrolls. It was, and still is, a way to integrate our heavenly nature into our human nature."

- "The Onionhead program is designed to transform negative thoughts and behaviors into positive thoughts and behaviors. . . . Choice, not chance, determines human destiny

8

and only moral code determines the state of Heaven on Earth."

- "Our soul is our constant reminder of our higher self. It stays with us in order to keep us on the track of what is right and righteous."

(*Id.*)

### D.   **Implementation of Onionhead at CCG**

As noted above, Jordan first began working with defendants in 2007. Jordan's first visit to defendants' office was in October 2007, and she stayed for five days. (Pl. 56.1 ¶ 88.) She was introduced to and met with the employees during three separate group meetings. (*Id.*) When Jordan initially arrived, defendants' upper managers referred to her as a "spiritual advisor," though she stated that she disliked the term.[7] (Jt. Ex. 97 (email from Jordan stating that "I was called a spiritual advisor").) Jordan testified that when she first arrived at CCG, she viewed "a lot of disharmony." (Tab I, Denali Dep. at 21.) She also testified that she believed a disproportionate number of the employees "had cancer" and that she "had not been exposed to that before." (*Id.*) Jordan testified that she "attempted to change the

---

[7] Defendants contend that Jordan was a management and wellness consultant for defendants, while plaintiffs contend that she was an employee and supervisor employed by defendants. (*Compare, e.g.*, Def. 56.1 ¶¶ 82-83, *with* Pl. 56.1 Resp. ¶¶ 82-83.)

atmosphere and to try to create a camaraderie and a unification in the people." (*Id.* at 22; *see also id.* at 24 ("I felt that my role was to create more harmony, period.").) After Jordan's initial visit in October 2007, CCG brought her back in February 2008 and approximately every month or two afterward. (Pl. 56.1 ¶ 93.) Her monthly visits sometimes lasted several days, and she was paid approximately $330,000 annually for her work. (*Id.* ¶¶ 94-96.)

Because claimants were employed at different times, their individual experiences with Onionhead, Harnessing Happiness, and Jordan differed, sometimes significantly. Based on the record, however, certain experiences were allegedly shared by most or all of the claimants. For example, virtually all of the claimants characterize Onionhead-related workshops, prayers, and meetings implemented in the workplace as effectively mandatory (though defendants contend that they were entirely voluntary). (Pl. 56.1 ¶¶ 100, 109-14; Def. 56.1 ¶¶ 49, 51; Pl. 56.1 Resp. ¶ 52.) Claimants also describe being required to attend one-on-one meetings with Jordan (which defendants do not explicitly dispute or counter with admissible evidence). (Pl. 56.1 ¶ 98, Def. 56.1 Resp. ¶ 98.) During both the workshops and the one-on-one meetings with Jordan, claimants describe being requested to share personal information about themselves. (*E.g.*, Pl. 56.1 ¶ 98.) At times,

Jordan offered unsolicited advice about their personal lives. For example, two claimants testified that Jordan suggested to them that they leave their husbands. (*Id.* ¶¶ 181, 251.) Defendants offer no evidence to the contrary but, instead, object that the fact is no material, is based on hearsay, and is self-serving. The court notes that deposition testimony can be sufficient to create genuine disputes of material fact for purposes of summary judgment.[8] *See Hamilton v. A C & S, Inc.*, No. 94-CV-4397, 1998 WL 633682, at *4 (S.D.N.Y. Sept. 15, 1998) ("A litigant's deposition testimony is sufficient to raise an issue of fact precluding summary judgment.").

Many claimants also offer evidence (and defendants again offer no contrary evidence) of a number of other workplace practices they shared in common. Some claimants describe being told to burn candles and incense to "cleanse the workplace." (*Id.* ¶¶ 265, 373-74.) Some claimants also describe being told that they should not use overhead lighting "in order to prevent demons from

---

[8] Defendants strongly dispute that many of the practices discussed here occurred. In resolving defendants' motion for summary judgment, however, the court must view the facts in the light most favorable to claimants. Defendants also assert running boilerplate objections (without explanation or legal support) to claimants' testimony. For example, defendants argue that claimants' statements that they were told "demons" were entering the workplace through the overhead lighting are hearsay. (Def. 56.1 Resp. ¶ 142.) Plainly, however, statements like the ones regarding "demons" are not being offered for the truth of the matter asserted.

entering the workplace through the lights." (*Id.* ¶¶ 142, 206, 262.) Claimants also describe instances in which they were required to engage in chanting and prayer in the workplace. (*E.g.*, Tab H, Honohan Dep. at 113; Tab N, Ontaneda Dep. at 213; Tab R, Safara Dep. at 60-61; Tab O, Pabon Dep. at 119, 125; Tab J, Josey Dep. at 119.)

Each claimant contends that she was ultimately terminated by defendants either because she rejected Onionhead beliefs or because of her own non-Onionhead religious beliefs. Claimants further offer uncontroverted evidence that certain other employees who participated in Onionhead activities or adhered to Onionhead beliefs were given progressive discipline when they erred instead of being terminated. (Pl. 56.1 ¶¶ 379-91.) Although defendants concede that a number of the claimants were terminated (Def. Mem. at 36 n.27), they contend that others voluntarily resigned. Defendants further contend that none of the claimants were qualified for their positions at the time of their terminations, and that any terminations (or other adverse employment actions) were imposed for legitimate, non-discriminatory reasons.

The individual circumstances of each claimant will be discussed below as relevant to their particular claims.

## II. **_Procedural Background_**

On June 7, 2011 Ontaneda and Pennisi filed charges of discrimination and retaliation against defendants with the EEOC. (Jt. Exs. 61-62.) On July 27, 2012, Pabon also filed a charge against defendants with the EEOC. (Jt. Ex. 63.) On March 13, 2014, the EEOC issued a letter of determination stating that Ontaneda, Pabon, and Pennisi — along with a "class of additional claimants," whose names were not specified — had been discriminated against on the basis of religion, and attached a proposed conciliation agreement. (Jt. Ex. 64.) The following month, on April 22, 2014, the EEOC sent a letter to defendants indicating that conciliation efforts had been unsuccessful and that further efforts to conciliate would be futile. (Jt. Ex. 65.)

Actions for violations of Title VII can be brought either by aggrieved individuals or by the EEOC. Here, the EEOC brought this enforcement action on June 11, 2014, under 42 U.S.C. § 2000e-5(f). Aggrieved individuals have the "right to intervene in a civil action brought by the [EEOC]." 42 U.S.C. § 2000e-5 (f)(1). On July 2, 2014, the court granted, on consent, Ontaneda, Pennisi, and Pabon's motions to intervene in the instant action. (July 2, 2014 Docket Entry; ECF Nos. 4, 7.) On October 9, 2014, the EEOC filed the operative amended complaint. (Jt. Ex. 67.) The EEOC identified

13

Benedict, Diaz, Honohan, Josey, Maldari, and Pegullo as claimants on January 12, 2015. (Def. 56.1 ¶ 316.) The EEOC identified Safara as a claimant on February 28, 2015. (*Id.*)

## LEGAL STANDARD

Summary judgment is appropriate "only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citing Fed. R. Civ. P. 56)). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *See Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). The standard remains the same in the context of cross-motions. "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)

## DISCUSSION

As relevant here, Title VII prohibits employers from

14

discriminating against employees on the basis of religion. 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ."). "Title VII has been interpreted to protect against requirements of religious conformity and as such protects those who refuse to hold, as well as those who hold, specific religious beliefs." *Lampros v. Banco do Brasil, S.A.*, No. 10-CV-9576, 2012 WL 6021091, at *6 n.3 (S.D.N.Y. Dec. 4, 2012) (quoting *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993)), *aff'd,* 538 F. App'x 113 (2d Cir. 2013). Title VII also prohibits employers from retaliating against employees for engaging in protected activity. *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . .").

Claimants here assert claims under a variety of Title VII theories including disparate treatment, hostile work environment, failure to accommodate, and retaliation. There are

effectively two groups of claims. The first group of claims is premised on reverse religious discrimination: that defendants subjected claimants to discrimination by imposing religious practices and beliefs on claimants. The second group of claims fall within the more traditional religious discrimination and retaliation rubric: claimants assert that they were discriminated against and retaliated against on the basis of *their own* religious beliefs. Claims falling in the first group, the reverse religious discrimination claims, can be broken down as follows:

(1) Benedict, Diaz, Honohan, Josey, Ontaneda, Pennisi, Pabon, and Pegullo contend that they were terminated because they opposed Onionhead practices and beliefs.

(2) All claimants claim that they were subjected to a hostile work environment based on coerced adherence to Onionhead practices and beliefs.

Claims falling in the second group, the more straightforward religious discrimination and retaliation claims, are as follows:

(3) Benedict, Diaz, Honohan, Josey, Ontaneda, Pennisi, Pabon, and Pegullo claim that they were subjected to religious discrimination on the basis of their religious beliefs.

(4) All claimants assert that they were subjected to a hostile

16

work environment on the basis of their religious beliefs.

(5) All claimants allege that defendants failed to accommodate
their religious beliefs.

(6) Benedict, Diaz, Honohan, Josey, Ontaneda, Pennisi, Pabon,
and Pegullo allege that they were retaliated against after
engaging in protected activity.[9]

In resolving the parties' respective motions, the court
first addresses claimants' partial motion for summary judgment,
which requires resolving the issue of whether Onionhead/Harnessing
Happiness constitutes a religion for purposes of Title VII. The
court subsequently addresses defendants' motion for summary
judgment, which requires an analysis of each of the six
aforementioned theories of Title VII liability asserted in this
action.

## I.  *Claimants' Motion for Partial Summary Judgment*

As noted earlier, Title VII prohibits employers from
discriminating on the basis of religion. 42 U.S.C. § 2000e-2(a)(1).

---

[9] Plaintiffs-intervenors Ontaneda, Pennisi, and Pabon also assert claims under
the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*
Because the standard for addressing claims under the NYSHRL is identical to the
standard governing the Title VII claims, the court does not separately analyze
Ontaneda, Pennisi, and Pabon's NYSHRL claims. *See Hyek v. Field Support Servs.,*
*Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) ("Claims brought under the NYSHRL are
analyzed identically and the outcome of an employment discrimination claim made
pursuant to the NYSHRL is the same as it is under . . . Title VII." (internal
quotation marks and citation omitted)).

Aside from protecting employees from discrimination on the basis of *their* religion, Title VII also protects employees from discrimination because they do not share their employer's religious beliefs. *See Mandell v. Cty. of Suffolk*, 316 F.3d 368, 378 (2d Cir. 2003) ("An employer discriminating against any non-Catholic violates the anti-discrimination laws no less than an employer discriminating only against one discrete group . . . ."). A religious discrimination claim premised on an employer's preference for a particular religious group is often referred to as a "reverse religious discrimination" claim. *See Noyes*, 488 F.3d at 1168-1169; *Shapolia*, 992 F.2d at 1038. Claimants here bring both conventional religious discrimination claims (contending that they were discriminated against because of their religious beliefs) as well as reverse discrimination claims (contending that they were discriminated against because CCG discriminated against employees who objected to or failed to adhere to Onionhead practices and beliefs, and treated differently employees who did share and adhere to Onionhead practices and beliefs).

In most cases where reverse religious discrimination claims are asserted, the employer's religious beliefs are fairly easy to ascertain. In *Shapolia*, for example, the plaintiff, a non-Mormon, alleged that a Mormon supervisor gave him a negative

18

evaluation, which contributed to his eventual termination, because he did not share the supervisor's religious beliefs. *See* 992 F.2d at 1035, 1037; *see also Noyes*, 488 F.3d at 1165 ("[Plaintiff] alleges that a supervisory employee at her former employer, Kelly Services, Inc., was a member of a small religious group, the Fellowship of Friends, and that he repeatedly favored and promoted other Fellowship members."). Here, however, defendant contends that Onionhead is not a religion. (Def. Mem. at 3-9.) Accordingly, before evaluating plaintiffs' claims premised on reverse religious discrimination, the court must determine whether Onionhead is a religion for purposes of Title VII.

### A. Defining Religious Belief Under Title VII

"The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981); *Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 92 (E.D.N.Y. 1987) ("Defining 'religion' for legal purposes is an inherently tricky proposition."). Because of the intrinsic difficulties associated with evaluating whether a particular practice or belief is religious in nature, there is "no consensus on how to define religion" for purposes of employment discrimination cases. Donna D. Page, *Veganism and Sincerely Held*

19

*"Religious" Beliefs in the Workplace: No Protection Without Definition*, 7 U. Pa. J. Lab. & Emp. L. 363, 371 (2005). Neither the Supreme Court nor the Second Circuit has addressed how to define religion for purposes of a Title VII action.

The court begins with the text of Title VII. Title VII provides that the "term 'religion' includes all aspects of religious observance and practice." 42 U.S.C. § 2000e(j). EEOC guidelines further define

> religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views. . . . The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee.

29 C.F.R. § 1605.1. The EEOC adopted its expansive definition of religion based on two Supreme Court decisions, *United States v. Seeger*, 380 U.S. 163 (1965) and *Welsh v. United States*, 398 U.S. 333 (1970), which defined religion broadly for purposes of addressing conscientious-objector provisions to the selective service law.[10]

---

[10] In *Welsh*, the Court explained that if "an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time," his beliefs qualify as religious beliefs that would entitle him to an exemption from the draft. 398 U.S. at 340. The EEOC's guideline, which derives from *Seeger*, is entitled to deference under *Skidmore*

Delineating the meaning of "religion" for purposes of
Title VII often requires resort to First Amendment[11] cases, where
non-traditional religions and religious practices are a frequent
source of litigation. *See Genas v. State of N.Y. Dep't of Corr.
Servs.*, 75 F.3d 825, 832 (2d Cir. 1996) ("Title VII was designed
to protect employees from the workplace effects of many of the
same forms of discrimination that are forbidden by the Constitution
— discrimination on the basis of race, color, religion, gender,
and national origin."); *see also EEOC v. Abercrombie & Fitch
Stores, Inc.*, 731 F.3d 1106, 1117 (10th Cir. 2013) (recognizing
reliance placed on First Amendment cases in defining religion for
purposes of Title VII), *rev'd on other grounds*, 135 S. Ct. 2028
(2015); *Reed v. Great Lakes Cos., Inc.*, 330 F.3d 931, 934 (7th
Cir. 2003) (Posner, J.) (finding in part based on "analogy to cases
under the free-exercise clause of the First Amendment" that
antipathy toward atheists is prohibited by Title VII); *EEOC v.*

---

*v. Swift & Co.*, 323 U.S. 134 (1944), because EEOC guidelines "reflect a body of
experience and informed judgment to which courts and litigants may properly
resort for guidance." *Crawford v. Metro. Gov't of Nashville & Davidson Cty.,
Tenn.*, 555 U.S. 271, 276 (2009) (internal quotation marks and citation omitted).
[11] The First Amendment, as relevant here, provides: "Congress shall make no law
respecting an establishment of religion, or prohibiting the free exercise
thereof . . . ." U.S. Const. amend. I. The first clause, referred to as the
Establishment Clause, bars "governmental preference for one religion over
another." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844,
879 (2005). The second clause, referred to as the Free Exercise Clause, "bars
government action aimed at suppressing religious belief or practice." *Church of
the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 559 (1993) (Souter,
J., concurring).

*Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002) (relying on First Amendment jurisprudence in evaluating the breadth of protection afforded under Title VII for a Seventh-Day Adventist).[12]

In *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476 (2d Cir. 1985), *aff'd and remanded*, 479 U.S. 60 (1986), the Second Circuit explicitly considered First Amendment principles in evaluating whether the plaintiff, a member of the Worldwide Church of God, could establish a *prima facie* case of religious discrimination against his employer under Title VII. *See id.* at 481-82 ("We see no reason for not regarding the standard for sincerity under Title VII as that used in free exercise cases.");

---

[12] Former West Virginia Senator Jennings Randolph, the proponent of Section 701(j) of Title VII — which provides the above-mentioned definition of "religion" — discussed the term "religion" during floor debate, explaining:

> The term "religion" as used in the Civil Rights Act of 1964 encompasses, as I understand it, the same concepts as are included in the first amendment – not merely belief, but also conduct; the freedom to believe, and also the freedom to act. I think in the Civil Rights Act we thus intended to protect the same rights in private employment as the Constitution protects in Federal, State, or local governments."

118 Cong. Rec. 705 (1972) (statement of Sen. Randolph). Commentators, too, have recognized that in determining "whether a given belief or action is religious . . . for purposes of Title VII, courts have sought guidance from cases defining 'religion' as the term is used in the free exercise clause of the first amendment." Randall J. Borkowski, *Defining Religious Discrimination in Employment: Has Reasonable Accommodation Survived Hardison?*, 2 Seattle U. L. Rev. 343, 347 (1979) (collecting cases) (footnotes omitted).

*Eatman v. United Parcel Serv.*, 194 F. Supp. 2d 256, 268 (S.D.N.Y. 2002) ("A court's limited role in determining whether a belief is 'religious' is the same under Title VII as it is under the Free Exercise Clause of the First Amendment.").

To determine whether a given set of beliefs constitutes a religion for purposes of either the First Amendment or Title VII, courts frequently evaluate: (1) whether the beliefs are sincerely held and (2) "'whether they are, in [the believer's] own scheme of things, religious.'" *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) (quoting *Seeger*, 380 U.S. at 185); *see also Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) ("[T]he inquiry is whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious." (internal quotation marks and citation omitted)); *Eatman*, 194 F. Supp. 2d at 268 (same, in Title VII context).

Evaluating the first factor, sincerity - particularly when the belief system is non-traditional — is inherently fact-intensive. *See Patrick*, 745 F.2d at 157 ("Sincerity analysis is exceedingly amorphous, requiring the factfinder to delve into the claimant's most veiled motivations and vigilantly separate the issue of sincerity from the factfinder's perception of the religious nature of the claimant's beliefs. This need to dissever

23

is most acute where unorthodox beliefs are implicated."); *Jackson*, 196 F.3d at 321 (reversing grant of summary judgment where there were genuine issues of material fact regarding whether a plaintiff's religious beliefs were sincerely held). Courts must be mindful to "differentiat[e] between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Patrick*, 745 F.2d at 157.

That an individual or entity purportedly holding the beliefs rejects the characterization of the beliefs as religious is not dispositive. In *Warner v. Orange Cty. Dep't of Prob.*, 115 F.3d 1068, 1075 (2d Cir. 1996), for example, the Second Circuit found an Alcoholics Anonymous program that a convict was required to attend as a condition of his probation was religious in nature, over the objection of prison officials who characterized the program as therapeutic rather than religious. In *Malnak v. Yogi*, 592 F.2d 197, 214 (3d Cir. 1979), the court determined that a public school's offering of a course called the Science of Creative Intelligence Transcendental Meditation violated the Establishment Clause of the First Amendment over the objection of the school that the course was secular in nature.[13]

---

[13] Significantly, under the *sui generis* circumstances of this action, the court is uncertain whether an employer's beliefs must be "sincerely held" in order to qualify as religious for purposes of a reverse religious discrimination claim

In analyzing the second factor — whether a set of beliefs are, in the believer's "own scheme of things, religious," *Seeger*, 380 U.S. at 185 — courts look to whether the belief system involves "ultimate concern[s]." *Int'l Soc. For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 440 (2d Cir. 1981); *Sherr*, 672 F. Supp. at 92 ("The Supreme Court and Second Circuit have each declared religion to involve the 'ultimate concerns' of individuals . . . ."). "A concern is ultimate when it is more than intellectual." *Barber*, 650 F.2d at 440 (internal quotation marks and citation omitted). "A concern is more than intellectual when a believer would categorically disregard elementary self-interest in preference to transgressing its tenets." *Id.* (internal quotation marks and citation omitted). Moreover, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others." *Thomas*, 450 U.S. at 714. "A religious

under Title VII. In the usual Title VII and First Amendment case, placing the burden on a plaintiff to establish that her beliefs are sincerely held is sound because it prevents individuals from seeking refuge on religious grounds for beliefs that the plaintiff herself does not subjectively recognize as religious. Placing the same burden on a plaintiff to prove that her employer's religious beliefs are sincerely held (particularly when the employer argues otherwise) is significantly less sound, and may erect an unnecessarily high barrier to relief for plaintiffs seeking to establish reverse religious discrimination claims when the employer's purported religion is nontraditional and the employer denies that its beliefs and practices are religious. In the First Amendment Establishment Clause scenario, for example, a plaintiff need not establish that the government actor sincerely holds the beliefs the plaintiff alleges to be religious. *E.g.*, *Patrick*, 745 F.2d at 157.

belief can appear to every other member of the human race preposterous," yet still be entitled to protection. *Stevens v. Berger*, 428 F. Supp. 896, 899 (E.D.N.Y. 1977); *see also United States v. Ballard*, 322 U.S. 78, 87 (1944) ("The religious views espoused by [the criminal defendants] might seem incredible, if not preposterous, to most people. But . . . those doctrines are [not] subject to trial . . . .").[14]

Defendants, relying principally on Third Circuit caselaw, contend that a narrower definition of religion applies. In *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025 (3d Cir. 1981), on which defendants rely, the Third Circuit applied three

> "useful indicia" to determine the existence of a religion. . . . First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

---

[14] An expansive conception of religion is perhaps particularly appropriate in the context of a religious discrimination claim brought under Title VII. Although a broad reading of religion in the First Amendment realm "would bar the government on establishment clause grounds from providing even the most essential public services to religious organizations," *Barber*, 650 F.2d at 439 n.12, no such concerns arise in the Title VII context involving non-government employers. Moreover, a broad reading of religion under Title VII is consonant with the "broad remedial purposes of Title VII," *Kane v. Douglas, Elliman, Hollyday & Ives*, 635 F.2d 141, 142 (2d Cir. 1980) (citing *Love v. Pullman Co.*, 404 U.S. 522, 527 (1972)); *see also Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1656, (2015) (noting EEOC's "responsibility to eliminate unlawful workplace discrimination"); *EEOC v. Sterling Jewelers Inc.*, 801 F.3d 96, 102 (2d Cir. 2015) (recognizing that "the purpose behind Title VII" is to "eliminat[e] discrimination in the workplace")

*Id.* at 1032. The Second Circuit, however, has rejected the "narrow definition of 'religious belief' promulgated by the Third Circuit." *Patrick*, 745 F.2d at 156 (reversing grant of summary judgment where district court had relied on *Africa*, and holding that a more "expansive conception of religious belief" applied).[15]

As the legal principles outlined above make plain, an "expansive conception of religious belief" is appropriate, at least in this circuit. *Patrick*, 745 F.2d at 158; *United States v. Allen*, 760 F.2d 447, 449-50 (2d Cir. 1985) (recognizing that in "recent years, the concept of religion has certainly broadened" and explaining that courts apply an "expansive definition of religion"). In accordance with the generous parameters defining religion, courts regularly determine that non-traditional beliefs can qualify as religions. In *Warner*, the Second Circuit found that the twelve-step Alcoholics Anonymous program had "a substantial religious component" because: (1) participants were told to pray to God; (2) meetings opened and closed with prayer; and (3) the

---

[15] Further, only two decisions of courts in this circuit appear to have ever relied on the Third Circuit's narrow definition of religion, one of which was affirmed on different grounds, *New Creation Fellowship of Buffalo v. Town of Cheektowaga*, N.Y., No. 99-CV-460, 2004 WL 1498190, at *32 (W.D.N.Y. July 2, 2004), *aff'd sub nom. New Creation Fellowship of Buffalo v. Town of Cheektowaga*, 164 F. App'x 5 (2d Cir. 2005), and one of which was subsequently reversed in relevant part. *Altman v. Bedford Cent. Sch. Dist.*, 45 F. Supp. 2d 368, 378 (S.D.N.Y. 1999), *aff'd in part, vacated in part, rev'd in part*, 245 F.3d 49 (2d Cir. 2001).

program placed a "heavy emphasis on spirituality and prayer, in both conception and in practice." 115 F.3d at 1075. In *Patrick*, the Second Circuit reversed a grant of grant summary judgment to a prison that prohibited a prisoner from practicing his professed religion, referred to as the Five Percenter faith. *See* 745 F.2d at 160. The prisoner described the Five Percenter faith as devoted to "spiritual enlightenment" through study of "the Bible, Elijah Mohammed's Body of Lessons and Plus Lessons, and the Egyptian Book of the Dead." *Id.* at 155. Five Percenters also "conceiv[ed] of [their] ideals by reference to the realm of mathematics." *Id.* Although Five Percenters worshipped Allah, the faith was "marked by informality," without any fixed places of worship. *Id.* In reversing the grant of summary judgment principally because the sincerity of the plaintiff's beliefs were in dispute, the court emphasized the right of citizens "to explore diverse religious beliefs in accordance with the dictates of their conscience" and that "unorthodox beliefs forbidden elsewhere have consistently found tolerance and acceptance on our shores." *Id.* at 155, 157; *cf*. *Torcaso v. Watkins*, 367 U.S. 488, 495 n.11 (1961) (characterizing "Buddhism, Taoism, Ethical Culture, [and] Secular Humanism" as religions).

Lower courts in this circuit have faithfully adhered to

the Second Circuit's expansive definition of religion, including in the First Amendment context. In *Berger*, 428 F. Supp. at 896, a husband and wife seeking welfare benefits on behalf of their four minor children refused to comply with a state law regulation followed by the Suffolk County Department of Social Services requiring that they provide a copy of their children's social security cards. *Id.* at 897. They explained that "the use of social security numbers was a device of the Antichrist, and that they feared the[ir] children, if numbered in this way, might be barred from entering Heaven." *Id.* The court concluded, after a detailed analysis of the complex biblical history and literature that the plaintiffs marshalled to support their views, that the plaintiffs' "belief must be characterized as religious for purposes of this case." *Id.* at 902-905. The court's holding was grounded in the principles of religious freedom and tolerance discussed earlier:

> Delicacy in probing and sensitivity to permissible diversity is required, lest established creeds and dogmas be given an advantage over new and changing modes of religious belief. Neither the trappings of robes, nor temples of stone, nor a fixed liturgy, nor an extensive literature or history is required to meet the test of beliefs cognizable under the Constitution as religious.

*Id.* at 900.

In *Sherr*, 672 F. Supp. at 81, the plaintiffs, two couples, refused to consent to inoculation of their children, which

was mandatory for the children to attend school. *Id.* at 83-84. According to one of the family's complaints, their beliefs required all persons to "live in harmony with the mutual world and its order." *Id.* at 92. The complaint provided that "[a]ll things are part of one intimate universe, or whole." *Id.* Testifying about his beliefs, one parent explained that he viewed "God as being pervasive everywhere" and "saw [him]self as God in expression or life in expression." *Id.* at 93. "Immunization in my eyes," the plaintiff testified, "in the framework of my religious beliefs and in my wife's, I might add, interferes with the health of the organism." *Id.* Emphasizing that the plaintiffs' beliefs were "replete with references to 'God'" and that the plaintiffs' very willingness to engage in a protracted legal battle reflected that their beliefs were "rooted in matters of 'ultimate concern,'" the court held that the plaintiffs' views could fairly be "classified as religious." *Id.* at 93.

Courts outside this circuit, too, have applied a definition of religion consistent with the views adopted in the cases outlined above. *See, e.g.*, *Malnak*, 592 F.2d at 1198-99 (Third Circuit holding that Transcendental Meditation class involving mantras and chanting was "religious in nature"); *Toronka v. Cont'l Airlines, Inc.*, 649 F. Supp. 2d 608, 612 (S.D. Tex. 2009) (finding

religious a plaintiff's "belief in the power of dreams," which he characterized as "a moral and ethical belief" rooted in the "traditional religious convictions of his African origin").

On the other hand, not all non-traditional belief systems are religious. In *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 79 (2d Cir. 2001), the Second Circuit held that a school's celebration of Earth Day — notwithstanding school-sponsored prayers worshipping the Earth — did not violate the First Amendment. Similarly, in *Allen*, 760 F.2d at 477, the court addressed, *inter alia*, an Establishment Cause defense to a group of antinuclear protesters' convictions for damaging property at an Air Force base during a protest. *Id.* at 448-49. The protesters argued that "there has arisen a national religion of nuclearism . . . in which the bomb is the new source of salvation" and that the new religion focused "on the acceptance of nuclear weapons as sacred objects." *Id.* at 449 (internal quotation marks omitted). The court held that the protesters' concerns reflected disagreements principally grounded in "political judgment, not religious belief." *Id.* at 450.

B.  **Onionhead is a Religion for Purposes of Title VII**

With the abovementioned principles in mind, the court concludes that Onionhead qualifies as a religion for purposes of

31

Title VII. First, as to sincerity, there is a genuine factual dispute regarding the sincerity of defendants' beliefs that is underscored by the difficulty here of ascribing religiosity to beliefs argued by their purported adherents to be secular. Moreover, the court finds disputed factual issues regarding whether the defendants' actions of bringing Jordan and the Onionhead/Harnessing Happiness beliefs, practices and materials into defendants' workplace establishes that the defendants sincerely believed in Jordan's teachings. *See Patrick*, 745 F.2d at 159 ("This Court has consistently held where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable . . . ." (collecting cases)). Second, as to whether the beliefs are religious, the court finds as a matter of law that they are. *See Barber*, 650 F.2d at 440 ("We think it is clear that Krishna Consciousness is a 'religion'. . . .").

    *i.   Sincerity*

       Defendants argue that "there is no evidence that anyone associated with this matter sincerely held beliefs" related to Onionhead. (Def. Mem. at 8.) The undisputed, documentary evidence alone, however, is at least sufficient for a trier of fact to find

32

that Jordan and Hodes held sincere beliefs regarding Onionhead/Harnessing Happiness. For example:

- In approximately October 2007, the CEO of CCG, invited Jordan and paid her to come into his offices to work with his employees and conduct meetings and workshops. Hodes was a nephew of Jordan and they shared a close relationship. Jordan stayed in Hodes's home during her periods of working at defendants' offices. Hodes was aware of his aunt's sincerely held beliefs as reflected in emails he and other managers received from Jordan. (E.g., Jt. Ex. 79-81, 105, 117.)

- On July 23, 2009, Jordan wrote an email to management (including Hodes and Bourandas) and 27 other CCG employees (including Pegullo, Pennisi, and Honohan) explaining that she wanted to "run an Onionhead workshop," as a "vehicle towards Onionhead reaching the world." (Jt. Ex. 8.)

- In a December 1, 2010 email, Jordan wrote to CCG supervisors Lane Michel and Bourandas complaining about Hodes' management. (Jt. Ex. 89.) In the email, she wrote that "Onionhead CANNOT BREATHE IN THE LAND OF DECEPTION, DECEIT, DISRUPTION, AND DESTRUCTION." (*Id.* (emphasis in original)) She implored Michel and Bourandas to oust Hodes: "The demon is fighting for control and if you two do not take charge,

your Divine destiny as King and Queen is destroyed and the kingdom will be lost." (*Id.*)

- On November 28, 2011, Jordan wrote again to Hodes describing a plan to donate certain unspecified Onionhead cards to schools. (Jt. Ex. 79.) In the email, Jordan wrote that donating the cards was "important [] because Onionhead is extremely pure . . . . Adults seem very far away from Source. Because these cards are for younger children, I suspect[] we may have a chance to protect them. . . . Purity is the most important issue for the recovery of our planet. It is all I live for." (*Id.*)

- In an undated email to Hodes, Bourandas, RickProtas, and other CCG employees, Jordan shared feedback she had received during a conference at which Onionhead had been discussed. (Jt. Ex. 80.) She described the "miracles that our little guy has performed" and wrote: "God is pleased with our perseverance. We must never give up." (*Id.*)

- In an undated email to Bourandas, Hodes, and other CCG employees, Jordan described Onionhead cards, an Onionhead dictionary, and a new Onionhead website. (Jt. Ex. 81.) She explained that users of Onionhead materials "will see the world shift. Onionhead is now a school . . . a school for

solutions. But in fact . . . we are the GRAIL[16] SCHOOL . . . .
we are in a race with time." (*Id.*)

- A jury could find from documentary evidence that Hodes held
sincere beliefs in precepts of Onionhead and Harnessing
Happiness. (Jt. Ex. 117.) In a December 16, 2010 email
responding to Jordan's statement that she was growing a sixth
finger (*see* Jt. Ex. 120), Hodes likened Jordan's experience
to a science fiction program in which a man "gains
intellectual power while growing a six[th] finger, but uses
it for destruction instead of light." (*Id.*) Hodes wrote that
the sixth finger "may represent the beginning of an
evolution," and that the man who "uses the higher intelligence
for destruction instead of good may represent those who have
taken [Jordan's] technology (Onionhead and higher guidance
teachings) and used or are using them for destructive or dark
purposes instead of light." (*Id.*)

A reasonable jury could find that by inviting Jordan
into the workplace, paying her to meet and conduct workshops,
authorizing her to speak to employees about matters related to
their personal lives, disseminating Onionhead/Harnessing Happiness

---

[16] The term "grail" has religious connotations. Webster's defines grail as "the cup or platter which according to medieval legend was used by Christ at the Last Supper." *Grail*, *Webster's Third New International Dictionary* 986 (2002).

material and directing employees to attend group and individual meetings with Jordan, Hodes and his upper management held sincere beliefs in Onionhead and Harnessing Happiness. Although defendants are correct that Jordan, in an affidavit, stated that she does not believe and never has believed in Onionhead as a religion (Jt. Ex. 2, ¶¶ 17, 19, 30), undisputed documentary evidence conflicts with her statement and indicates that a reasonable jury could find otherwise. To the extent that establishing an employer's beliefs are sincerely held is a requirement for purposes of a reverse discrimination claim under Title VII (*but see supra* note 13) a reasonable jury could find that Jordan, Hodes, and several of defendants' managers or supervisors held sincere beliefs regarding Onionhead.

ii. *Religious Nature of Beliefs*

Turning to the more difficult question about whether the nature of the beliefs qualifies as religious, the court concludes that the beliefs are religious within the meaning of Title VII.

Here, as an initial matter, the above-described emails reflect references — in the specific context of discussions about Onionhead — to God, spirituality, demons, Satan, divine destinies, miracles, "higher guidance teachings," and a grail. (Jt. Exs. 8, 78-81, 89, 117.) Jordan herself stated that she had been referred

to as a "spiritual advisor" for some time while working for defendants (though she disliked the term). (Tab B, Benedict Dep. at 85; Tab M, Maldari Dep. at 62-63, 103; Tab Q, Pennisi Dep. at 59-63; Tab R, Safara Dep. at 52; Jt. Ex. 97 (email from Jordan stating that "I was called a spiritual advisor").)

Additional documentary evidence lends further support to the conclusion that Onionhead is a religion. The *Onionhead Dictionary of 150 Emotions: Teen and Adult Edition* (Jt. Ex. G) — which was, defendants concede, used in workshops at CCG while Honohan, Pegullo, Pabon, Josey, Diaz, and Benedict were employed (Pl. 56.1 at ¶ 20; Def. 56.1 Resp. at ¶ 20) — contains references to divinity, spirituality, souls, and heaven. The dictionary contains, *inter alia*, the following statements:

- "We enter and leave this world with only our souls, therefore, we must learn to live THROUGH our souls."

- "When light and love control our lives, we are Masters. Our Divine spark is re-ignited and we re-claim our authenticity and electricity."

- "A spiritual person often appears as a fool to the eyes of the world, because their ways and rules are very different from the world at large . . . . [T]he destiny of heaven on earth begins and ends with our own personal behavior."

- "In its full sense, [love] denotes something deeply spiritual . . . . One single act of love bears the imprint of heaven on earth."

(Jt. Ex. G.)

Another Onionhead document is referred to as the *Declaration of Virtues for Empowerment*, though it is not clear whether this document was available in the workplace. (Jt. Ex. K.) The document lists 12 virtues, and an acrostic formed from the first letters of each of the virtues spells out "Garden of Eden." (*Id.*) The document provides: "Because the road to Heaven is paved with the power of what is good in us, we have devised The Declaration of Virtues for Empowerment . . . . Onionhead's goal is to help transform negative thought forms into positive thought forms, thereby co-creating a new loving, wondrous garden for us all to thrive in." (*Id.*) The document also contains the following statements:

- "The virtue of respect elevates us from a human presence to an angelic performance."

- "When we 'opt' to view things from a place of possibilities, we are truly showing our commitment to the Universal Plan."

- "[Faith] holds within it the pulse of the Universe and the promise of the Heavens. . . . . Faith is the constant

reminder that there is a union between ourselves and the Universal Realm. Remember: The virtue of faith is a belief that needs no evidence."

(*Id.*) A similar document, called *The 13 Codes of Caring for Teens and Adults*,[17] describes one code, "Creative," as follows: "To be creative is to be incredibly connected to the Creator." (Jt. Ex. L.)

A further document, referred to as the *Onionhead Keys and Codes to Living Good* — which defendants appear to concede was used in workshops while Honohan, Pegullo, Pabon, Josey, Diaz, and Benedict were employed (Pl. 56.1 at ¶ 41; Def. 56.1 Resp. at ¶ 41) — contains, but is not limited to, the following religious and spiritual language:

- "Keys and codes have been a part of the Divine Plan from the beginning of time. Every sacred tribe and religion have codes hidden within their scripts, books and scrolls. It was, and still is, a way to integrate our heavenly nature into our human nature."

- "The Onionhead program is designed to transform negative thoughts and behaviors into positive thoughts and

---

[17] Certain claimants testified that "Keys and Codes" workshops were conducted in the workplace. (*See* Tab I, Josey Dep. at 127; Tab H, Honohan Dep. at 27.)

behaviors. . . . Choice, not chance, determines human destiny and only moral code determines the state of Heaven on Earth."

- "Our soul is our constant reminder of our higher self. It stays with us in order to keep us on the track of what is right and righteous."

(Jt. Ex. M.)

Testimonial evidence from claimants further underscores the religiosity of Onionhead and Harnessing Happiness. Claimants describe Jordan and others repeatedly referencing God and other spiritual matters in the workplace, often in a manner directly connected to Onionhead. Maldari testified that Jordan, referring to CCG employees, stated that "God loves us all" and spoke about "demons and angels." (Tab M, Maldari Dep. at 68, 71-72, 85, 102, 160.) Maldari also testified that she and other employees "were told [by Hodes] that we were chosen." (*Id.* at 73-74.) Safara testified that Jordan sent emails including spiritual texts that she felt compelled to read. (Tab R, Safara Dep. at 66.) Pennisi testified that Onionhead "makes you believe in things religiously that you may not have believed in before . . . . [I]t made you question maybe something that you thought all your life was how it was supposed to be when you were in religious class or things like that." (Tab Q, Pennisi Dep. at 118.) Pennisi also testified that

she believed Onionhead was "the way of [Jordan's] life." (*Id.* at 192 ("[Jordan's] way of explaining Onionhead was always some sort of religious experience . . . ."); *see also id.* at 193 (explaining that Jordan described Onionhead as "here to help everybody, you know, connect, whether it be emotionally or within feelings or spiritually, religiously, it was set to be under one — one thing.").) Diaz described Harnessing Happiness content as involving references to angels. (*See* Tab E, Diaz Dep. at 80.)

Many of the claimants also described being told to pray in the workplace. (*E.g.*, Tab M, Maldari Dep. at 67, 79-80, 103-07; Tab B, Benedict Dep. at 157-559 (describing prayers being read from a set of cards referred to as Universal Truth Cards); Tab R, Safara Dep. at 60-61 ("[Jordan] would just sit there and we would have to sit there and hold hands and close our eyes and she'd like chant and she would just, you know, pray to these spirits, whoever they were, to keep us safe . . . .").)

The Onionhead system of beliefs and practices described above is "more than intellectual." *Barber*, 650 F.2d at 440. It can fairly be characterized as involving the kinds of "ultimate concern[s]" signifying religiosity described by the Second Circuit in *Barber*. The chants and prayers, mentions of God, transcendence, and souls, and the strong emphasis on spirituality very closely

resemble the twelve-step Alcoholics Anonymous program found by the Second Circuit to be religious in *Warner*. *See* 115 F.3d at 1075 (describing how participants were told to pray to God, meetings opened and closed with prayer, and highlighting the "heavy emphasis on spirituality and prayer, in both conception and in practice"). Onionhead's system of beliefs also appears no more or less religious than the arguably less coherent systems of beliefs held to be religious in *Sherr* and *Berger*. *See Sherr*, 672 F. Supp. at 92 (parents refused to submit their children to mandatory vaccinations because they believed vaccination interfered with their beliefs that "[a]ll things are part of one intimate universe, or whole" and that all persons must "live in harmony with the mutual world and its order"); *Berger*, 428 F. Supp. 897 (plaintiffs believed "the use of social security numbers was a device of the Antichrist" and "feared the[ir] children, if numbered in this way, might be barred from entering Heaven").

As discussed earlier, defendants rely on a narrower definition of religion than the definition adopted by the Second Circuit. *See Patrick*, 745 F.2d at 156 & n.4, 158 (describing and disagreeing with the "narrow definition of 'religious belief' promulgated by the Third Circuit" and emphasizing the Second Circuit's adoption of an "expansive conception of religious

belief"). Their contention that Onionhead was merely a "conflict resolution tool" (Def. Reply at 3) is belied by the ample documentary and testimonial evidence detailed above. Accordingly, the court concludes that Onionhead is a religion for purposes of Title VII.

## II. *Defendants' Motion for Summary Judgment*

Having concluded that Onionhead is a religion, the court turns next to the individual claims asserted by claimants. Before analyzing the merits of the claims, however, the court must first resolve a dispute regarding whether certain claimants are entitled to participate in this action.

### A. Pre-Suit Requirements

Defendants contend that the EEOC failed to fulfill certain administrative requirements with respect to Benedict, Josey, and Safara. (Def. Mem. 1-3.)

Before filing an action under Title VII, the EEOC must comply with a set of administrative obligations prescribed by statute. The EEOC must, before filing:

> (1) receive a formal charge of discrimination against the employer; (2) provide notice of the charge to the employer; (3) investigate the charge; (4) make and give notice of its determination that there was reasonable cause to believe that a violation of Title VII occurred; and (5) make a good faith effort to conciliate the charges.

*EEOC v. Sterling Jewelers Inc.*, 801 F.3d 96, 100 (2d Cir. 2015) (citing 42 U.S.C. § 2000e-5(b)). In *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1656 (2015), the Supreme Court held that federal courts are permitted to review whether the EEOC has complied with its pre-suit administrative obligations. In *Mach Mining*, an employer argued that the EEOC had failed to conciliate in good faith before filing suit. *Id.* at 1650-53. The parties disputed whether courts were permitted to review the EEOC's conciliation efforts at all, and, if courts could conduct a review of the conciliation efforts, what the appropriate scope of judicial review would be. *Id.* at 1649. First, the Court determined that judicial review of the conciliation process was appropriate. *Id.* at 1652-53. Second, however, the Court held that "the scope of that review is narrow, reflecting the abundant discretion the law gives the EEOC to decide the kind and extent of discussions appropriate in a given case." *Id.* at 1656. "A sworn affidavit from the EEOC stating that it has [attempted to conciliate] but that its efforts have failed will usually suffice to show that it has met the conciliation requirement." *Id.*

More recently, in *Sterling Jewelers*, 801 F.3d at 99, the Second Circuit extended the holding of *Mach Mining*, which addressed only conciliation, to cover the EEOC's investigative efforts. In

*Sterling Jewelers*, the Second Circuit addressed an employer's argument that the EEOC's pre-suit investigation of discrimination allegations had been insufficient. *Id.* at 100. The court held that the "sole question for judicial review is whether the EEOC conducted an investigation." *Id.* at 101. "[C]ourts may not review the *sufficiency* of an investigation — only whether an investigation occurred." *Id.*

Defendants argue that the EEOC failed to comply with steps three (investigation), four (reasonable cause determination), and five (conciliation) with regard to Benedict, Josey, and Safara before filing suit. (Def. Mem. at 1-3; Def. Reply at 18-20.) It is undisputed that the EEOC did not speak with Benedict, Josey, or Safara during the course of the investigation. (Def. 56.1 at ¶¶ 316-17.) The EEOC first sent letters to Benedict, Josey, and Safara notifying them of the lawsuit and asking whether they were interested in participating in December 2014 and January 2015, months after this action was filed in June 2014. (ECF No. 1; Jt. Exs. 70-72.)

The EEOC argues that it investigated religious discrimination and retaliation against a class of employees at CCG's single facility in 2007, and that the class identified in the investigation encompassed all current claimants, including

Benedict, Josey, and Safara. (Pl. Mem. at 39-40.) Citing *Mach Mining LLC*, 135 S. Ct. at 1652, 1655-56, the EEOC asserts that it complied with its "minimal" obligations that it "tell the employer about the claim – essentially, what practice has harmed which person or class – and must provide the employer with an opportunity to discuss the matter in an effort to achieve voluntary compliance." (*Id.* at 39.) The EEOC further contends that its pre-suit investigation of class allegations did not require that it interview each member of that class during the investigation so long as the members of the claimant class fall within the contours of the scope of the allegations in the suit. *Id.* (citing *Sterling Jewelers*, 801 F.3d at 102 n.2, 103-04). The EEOC thus asserts it can file suit on behalf of anyone "encompassed by the scope of the claims identified in the investigation, including individuals interviewed later." (*Id.* at 40 (citations omitted).) Effectively, the EEOC argues that it is permissible to identify new claimants after filing a Section 706 action so long as the new claimants' allegations are reasonably related to the allegations of the already-identified claimants, while defendants contend that the five-step administrative process must be followed with respect to each claimant in an action under Section 706.

The court concludes that, at least under the

circumstances present in the instant case, the EEOC was not precluded from identifying new claimants (whose claims were effectively identical to the claims of the pre-existing claimants) after filing this action. Courts have permitted the EEOC to add new claimants identified during discovery even when the EEOC is asserting claims under Section 706 of Title VII rather than exclusively under Section 707, which permits "pattern or practice" actions. *See EEOC v. Mr. Gold, Inc.*, 223 F.R.D. 100, 103 (E.D.N.Y. 2004) (permitting the EEOC to add additional claimants identified during discovery in a hybrid 706/707 action, but affirming magistrate judge's decision to place a deadline on the addition of new claimants); *see also EEOC v. Evans Fruit Co., Inc.*, 872 F. Supp. 2d 1107, 1111 (E.D. Wash. 2012) ("The undersigned is not persuaded . . . that the EEOC must specifically identify, investigate and conciliate each alleged victim of discrimination before filing suit."); *EEOC v. Bass Pro Outdoor World, LLC*, 1 F. Supp. 3d 647, 664 (S.D. Tex. 2014) ("[T]he EEOC is not obligated to provide the identities of all § 706 class members." (internal quotation marks and citation omitted)).

Defendants have cited no binding authority requiring dismissal of claimants first identified after the EEOC files a Section 706 action. Defendants rely heavily on *EEOC v. CRST Van*

47

*Expedited Inc.*, 679 F.3d 657, 674 (8th Cir. 2012). In *CRST*, the EEOC filed a Section 706 action on behalf of a single named individual. *Id.* The EEOC waited two years after filing suit to name 67 additional allegedly aggrieved persons, whose allegations the EEOC admitted it had not investigated until after the complaint was filed. *Id.* at 669, 673. For years after the complaint was filed, the employer-defendant did not know if the "Section 706 lawsuit involved two, twenty or two thousand allegedly aggrieved persons." *Id.* at 669 (internal quotation marks and citation omitted). The district court held, *inter alia*, that under the circumstances, dismissal of the complaint as to the 67 individuals was appropriate. *Id.* at 677. Reviewing the dismissal for abuse of discretion, the Eight Circuit affirmed. *Id.* The court held that the EEOC failed to adequately investigate because "the EEOC did not investigate the specific allegations of *any* of the 67 allegedly aggrieved persons . . . until *after* the Complaint" was filed. *Id.* at 675-76 (emphasis in original) (internal quotation marks and citation omitted).

The EEOC's attempt in *CRST* to add 67 claimants to an EEOC action filed two years earlier and naming a single individual is a far cry from the situation presented in this action, where the EEOC's investigation undisputedly encompassed seven of the ten

claimants and the additional three claimants' allegations arise out of the same alleged course of conduct, in the same office, by the same individuals, and during a time period already covered by the charges in the initial complaint.[18] Even in *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 802, 816 n.14 (S.D.N.Y. 2013), another decision involving an action under Section 706 upon which defendants rely, the court explicitly acknowledged that the EEOC need not always "identify each and every potential claimant before filing a lawsuit." Accordingly, and particularly in light of the narrow scope of review courts are permitted in reviewing the sufficiency of EEOC investigations, *see Sterling Jewelers*, 801 F.3d at 101-04, the court concludes that dismissal of Benedict, Josey, and Safara would be inappropriate, and denies defendants' request for their dismissal on procedural grounds.

---

[18] The Second Circuit recently distinguished *CRST* on a similar basis. In *Sterling Jewelers*, the Second Circuit characterized *CRST* as a case addressing the "EEOC's fail[ure] to take *any* steps to investigate." 801 F.3d at 102 (emphasis added). In *Sterling Jewelers*, even where the investigative file revealed that the EEOC had only interviewed a single claimant (out of 19 claimants across nine states), the court held that the investigation — which had uncovered company-wide policies, witness statements, and, *inter alia*, personnel documents — was sufficient. *Id*. *Sterling Jewelers* does not definitely resolve the issues presented by the pre-suit investigation in this action, however, because each claimant in *Sterling Jewelers* had apparently been identified before the EEOC filed its action. Still, defendants' attempt to distinguish *Sterling Jewelers* on the ground that it involved nationwide pattern-or-practice class claims under Section 707 is unavailing because *Sterling Jewelers* involved claims under both Section 706 and 707. *See EEOC v. Sterling Jewelers, Inc.*, No. 08-CV-706, 2010 WL 86376, at *1 (W.D.N.Y. Jan. 6, 2010) ("[T]he EEOC commenced this gender discrimination action pursuant to Sections 706 and 707 . . . .").

The court next considers the merits of the defendants' motion for summary judgment. First, the court addresses the reverse religious discrimination claims. Second, the court addresses the conventional religion-based discrimination and retaliation claims.

**B.    Reverse Religious Discrimination**

Claimants Benedict, Diaz, Honohan, Josey, Ontaneda, Pennisi, Pabon, and Pegullo bring reverse religious discrimination claims based on disparate treatment and a hostile work environment.[19] Disparate treatment claims for employment discrimination under Title VII are assessed under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, a plaintiff must establish a *prima facia* case of discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). The plaintiff's burden in establishing a *prima facie* case is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (internal quotation marks and citation omitted). If the plaintiff successfully establishes

---

[19] In the reverse religious discrimination context, a plaintiff need not establish that she is a member of a "protected class," as is required in a more straightforward Title VII discrimination claim. *See Shapolia*, 992 F.2d at 1038 ("First, use of the 'protected class' factor in this case would be misleading because it suggests some identifiable characteristic of the plaintiff in order to give rise to Title VII protection. However, in this case, it is the religious beliefs of the employer, and the fact that [the plaintiff] does not share them, that constitute the basis of the claim. Where discrimination is not targeted against a particular religion, but against those who do not share a particular religious belief, the use of the protected class factor is inappropriate.").

a *prima facie* case, the burden shifts to the defendants to establish a "legitimate, nondiscriminatory reason" for its actions. *See Hicks*, 509 U.S. at 506-07.

Should the employer meet its burden, "the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination." *United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013). Defeating summary judgment requires only that a plaintiff present evidence from which a reasonable jury could find "that the defendant was in fact motivated *at least in part* by the prohibited discriminatory animus." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522-23 (2013) ("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

      i.    *Claimants'* Prima Facie *Cases of Reverse Religious Discrimination*

The parties agree that a modified version of the framework established in *McDonnell Douglas* governs claimants' *prima facie* case on the reverse religious discrimination claims. (Def. Mem. at 9; Pl. Mem. at 8.) *See Furnco Constr. Corp. v.*

*Waters*, 438 U.S. 567, 577 (1978) (observing that *McDonnell Douglas*'s suggested *prima facie* case framework "was never intended to be rigid, mechanized, or ritualistic"). Where a claimant avers that she was discriminated against because she rejected her employer's religious beliefs, she must establish that: (1) she was qualified for the position at the time of her termination; (2) her employer subjected her to an adverse employment action; and (3) some additional evidence supports the inference that the adverse action was taken because of a discriminatory motive based on the employee's failure to adopt or follow the employer's religious beliefs. *See Shapolia*, 992 F.2d at 1038; *see also Noyes*, 488 F.3d at 1168. The Second Circuit has provided that the *prima facie* case requirement is a "low threshold." *Holcomb*, 521 F.3d at 139.

### (a)   Qualification

In establishing qualification for a position, claimants must show that they were qualified for their positions at the time their employment ended. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, No. 15-2037, 2016 WL 4434396, at *6 (2d Cir. Aug. 22, 2016). A claimant may "satisfy this burden by showing that she possesses the basic skills necessary for performance of the job." *Id.* (internal quotation marks and citation omitted). "Therefore, especially where discharge is at issue and the employer has already

hired the employee, the inference of minimal qualification is not difficult to draw." *Id.* (internal quotation marks and citation omitted); *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001), *as amended* (Apr. 20, 2001) ("[B]y hiring the employee, the employer itself has already expressed a belief that she is minimally qualified.").

Defendants argue that claimants were required to be "*satisfactorily performing their jobs* at the time of their terminations." (Def. Reply at 7-8 (emphasis added).) The Second Circuit has explicitly distinguished between establishing performance that is satisfactory to the employer (which is not required for a *prima facie* showing) and establishing qualification for purposes of Title VII. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *as amended* (June 6, 2001) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer."). Accordingly, to the extent defendants argue that claimants must have been performing in a manner that satisfied them, they are incorrect as a matter of law.

Here, defendants contend that none of the claimants were qualified. The court disagrees, and finds, based on evidence in the record that the claimants were hired by and worked for

defendants, that a reasonable jury could find that each claimant was qualified. Jordan stated that Benedict "did a good job" on the "jobs that [she] did commit to"; "[i]t was more what she wasn't available for that created the challenges." (Tab I, Jordan Dep. at 109.) Honohan worked for defendants for over 20 years. (Def. 56.1 at ¶ 157.) In 2007, Honohan received a performance review that rated her exceptional (the highest level possible) in nearly all of the 20 different areas evaluated. (Jt. Ex. 112.) Although defendants claim that Josey caused billing errors (Def. Mem. at 12), Josey contends that supervisor April Levine — who terminated Josey — refused to show Josey evidence of the errors. (Pl. 56.1 Resp. ¶ 189.) Genuine issues of material fact preclude a determination at this stage of the litigation that Josey was not qualified.

Finally, defendants discuss purported disobedience by Diaz, Ontaneda, Pennisi, Pabon, and Pegullo (Def. Mem. at 11) that do not speak to their basic qualifications for their positions. "While performance may in some cases be so poor as to render a plaintiff unqualified, 'the qualification prong must not be interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its

decision.'" *Payne v. New York City Police Dep't*, 863 F. Supp. 2d 169, 180 (E.D.N.Y. 2012) (quoting *Gregory*, 243 F.3d at 696 & n. 7). On the record before the court, a reasonable jury could find that each plaintiff was qualified for her position.

### *(b)* *Adverse Employment Action*

Claimants must next establish that they suffered an adverse employment action. An adverse employment action is defined as a "materially adverse change in the terms and conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotations omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks and citation omitted). A mere inconvenience or alteration of job responsibilities does not constitute an adverse employment action. *See Sanders*, 361 F.3d at 755.

Defendants concede that Diaz, Honohan, Josey, Pegullo, and Pennisi were terminated (Def. Mem. at 36 n.27), which constitutes an adverse employment action. *See Terry*, 336 F.3d at

55

138. Defendants contend, however, that Benedict, Ontaneda, and Pabon were not subjected to an adverse employment action. (Def. Mem. at 9-11.) First, the circumstances of Benedict's departure from defendants' employment raise a genuine issue of material fact as to whether she was subjected to an adverse employment action. The parties dispute whether Benedict was terminated or whether she quit. Benedict, who worked for defendants from September 2011 until March 2012, contends that CCG initially permitted her to work from her home in New Jersey for three weeks per month. (Tab B, Benedict Dep. at 72.) Jordan transferred Benedict from working for defendants to working for Onionhead while Benedict was employed by defendants, and her job included "evangelizing and marketing" Onionhead. (Pl. 56.1 ¶¶ 153-54.) According to Benedict, Jordan received a message from the universe or from God that Benedict needed to move her family to Long Island. (Tab B, Benedict Dep. at 163.) Benedict claims that Jordan told Benedict that she should allow Jordan and Hodes to be her family and that Hodes was the father of Benedict's daughter. (*Id.* at 38, 127, 162—63.) Defendants dispute Benedict's stated reasons for refusing to move to Long Island. After Benedict refused to move to Long Island, which defendants contend was a job requirement all along (Def. 56.1 ¶ 111), supervisor Lane Michel and Jordan told her that she was

being terminated. (Tab B, Benedict Dep. at 121.) Under the circumstances, a reasonable jury could find that Jordan was subjected to an adverse employment action by being terminated. *See Fornah v. Cargo Airport Servs., LLC*, No. 12-CV-3638, 2014 WL 25570, at *12 (E.D.N.Y. Jan. 2, 2014) ("There are copious factual disputes surrounding the discontinuance of Plaintiff's employment with Defendant. Plaintiff claims that she was terminated . . . on the same day that she refused the transfer to the night shift position . . . .").

Second, Ontaneda claims that Hodes expelled her from a private office where she had been working as an account manager and sent her to "the pit," a large open square area with cubicles in the center of the office. (Tab N, Ontaneda Dep. at 225; Pl. 56.1 ¶ 272.) In the "pit," Ontaneda testified that she was told to work alongside customer service representatives and take customer service calls, for which she lacked training. (Pl. 56.1 ¶¶ 56, 271-72.) A reasonable jury could find that the transfer was an adverse employment action. *See Dillon v. Morano*, 497 F.3d 247, 254-55 (2d Cir. 2007) ("[T]ransfer from an 'elite' unit to a 'less prestigious' unit could constitute adverse employment action . . . ."). The circumstances of the end of Ontaneda's

employment also present a genuine dispute of material fact as to whether she was terminated or whether she resigned.

Finally, in response to Pabon's application for unemployment insurance, CCG informed the Department of Labor that they terminated Pabon. (Jt. Ex. 115 (defendants checked "misconduct discharge" box as the "reason for separation" on an unemployment form for Pabon, and left the "voluntarily quit" box blank).) A reasonable jury could disagree with defendants' present view that "Pabon . . . resigned or otherwise abandoned [her] employment." (Def. Mem. at 10.)

Each plaintiff has made a *prima facie* showing that she suffered, or that a reasonable jury could find that she suffered, an adverse employment action.

### (c) Motivated by Discrimination

The final element of claimants' *prima facie* case, an inference of discrimination, is a "flexible one that can be satisfied differently in differing factual scenarios." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). The inference can be taken from circumstances including the employer's criticism of the plaintiff's performance in religiously degrading terms, more favorable treatment to employees subscribing to the religious beliefs of the employer, or the "sequence of events

leading to the plaintiff's [adverse employment action]." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (internal quotation marks and citation omitted).

Viewing the evidence in the light most favorable to claimants, a reasonable jury could find that the purported adverse actions were motivated, at least in part, by religious discrimination. Plaintiffs assert the following facts:

- Benedict claims that her termination by defendants from her duties for both defendants and Onionhead was based on her refusal to adhere to Jordan's "religious dictate" that she move to Long Island and allow Jordan and Hodes to be her family. (Pl. 56.1 ¶¶ 147, 156-162.)

- Diaz testified that although she participated in Onionhead for a time, she began to withdraw after the late-night spiritual activity at the spa weekend and Jordan's suggestion that Diaz leave her husband to cure her headache. (Tab E, Diaz Dep. at 48, 50, 133-34.) Diaz testified that a week before her termination, Diaz spoke to co-workers and her trainees about Jordan's preaching and that she was not comfortable with it and felt it was a cult. (*Id.* at 142-46.) When supervisor Levine discovered Diaz was making what were

considered "disparaging" comments[20] about Onionhead, Diaz was terminated. (Pl. 56.1 at ¶¶ 187, 190, 192.)

- Honohan testified that she resisted Onionhead for much of her employment, and refused Jordan's repeated requests for a picture of her child[21] because she did not care for Jordan's teachings, her meetings, or her workshops. (Tab H, Honohan Dep. at 36; Pl. 56.1 ¶¶ 225-26.) Shortly before Honohan's employment ended, Jordan sent an email indicating that on February 3, 2012, "planets are aligned" in a manner similar to the time of the "dawning of Christ" and the "dawning of Islam," and that a "new era" was coming, "an era of truth or consequences." (Pl. 56.1 ¶ 229.) Honohan was terminated on February 3, 2012. (*Id.* ¶ 232.)

- Josey testified that she initially participated in Onionhead, and Jordan told her that she he had a "good aura." (Tab J, Josey Dep. at at 90.) Josey also testified that Jordan "held a lot of weight when it came to people and their employment" and that Josey did not want to go against the grain. (*Id.* at 88.) Josey claims that group meetings discussing highly

---

[20] Under the employment policy in place at the time of Diaz's termination, "insubordination" and "disrespectful conduct" are grounds for termination. (Jt. Ex. 6.)

[21] Jordan sought pictures of employees' children for Jordan to hang on Jordan's office wall. (Jt. Ex. 36-37)

personal topics in the workplace were mandatory. (*Id.* at 71–72.) Josey also claims that she had approximately three or four one-on-one meetings with Jordan. (*Id.* at 82.) In a highly personal, one-on-one meeting (in which Josey claims Jordan "pulled [Josey] into [a] room"), Jordan told Josey to leave Josey's husband, which was something Josey's "mother ha[d] never even told [her]." (*Id.* at 87–88.) Josey did not leave her husband and began to withdraw from spiritual activity in the workplace, after which she claims that she was terminated. (Pl. 56.1 ¶¶ 251–52.)

- In July 2010, Ontaneda and Pennisi, in a group with other employees, told Jordan and Levine that they were Catholic and did not want to be involved in Onionhead. (Pl. 56.1 ¶ 269.) Defendants offer no contrary evidence but object that the depositions are speculative, self-serving, and conclusory. (Def. 56.1 Resp. ¶ 269.) While they were being removed from the private office they shared and were sent to the "pit" with nine other employees to take customer service calls, Jordan was allegedly staring at them and yelling that "the demons must be so angry right now" and "all the demons are going to get out of here and we're going to win." (*Id.* ¶ 273.) Defendants offer no contrary evidence, but lodge evidentiary

objections. (Def. 56.1 Resp. ¶ 273.) Ontaneda and Pennisi both testified that they were terminated the following month, during Jordan's first trip back to New York after their statements during a group meeting with Jordan and Levine regarding their religious objections to Onionhead practices in the workplace. (Pl. 56.1 ¶¶ 279, 281.)

- Pabon testified that she was terminated shortly after Jordan's memo to Bourandas and Levine describing Pabon's "insubordination" during a spa weekend retreat with defendants' employees, the main purpose of which was described by Jordan as "spiritual enlightenment." (Tab O, Pabon Dep. at 96.) During the weekend, Jordan led chanting and discussions of religious and spiritual matters, and Pabon refused to participate in a late night spiritual activity involving prayer. (Pl. 56.1 ¶¶ 284-97.) Defendants offer no contrary evidence.

- Pegullo testified that she was initially in the Onionhead inner circle and was given the title "Messenger" by Jordan, who said Pegullo was a messenger from God, and gave her the Biblical name of "Leah." (Pl. 56.1 ¶¶ 302-03.) Pegullo was named "Employee of the Month" in May 2008. (*Id.* ¶ 306.) It is not disputed that Jordan assigned Pegullo to work on Onionhead

duties at defendants' office. (*Id.* ¶¶ 307-09.) A few days after Pegullo shared an email she and others received in which Jordan expressed her desire, couched in spiritual language, to oust Hodes from the company because he had demons (Pl. 56.1 ¶ 319), Pegullo was terminated. Before she was terminated, Pegullo and other employees told Hodes that Jordan made them uncomfortable and shared with Hodes Jordan's email regarding demons. Pegullo also shared Jordan's emails with her supervisor with whom she had discussed problems with Jordan and how the workplace changed. (Pl. 56.1 ¶¶ 321-23.)

ii. *Legitimate, Non-Discriminatory Reasons*

Because plaintiffs have presented sufficient evidence to establish a prima facie case of reverse religious discrimination, the burden shifts to defendants to articulate a legitimate, non-discriminatory reasons for the employment actions. "The defendant's burden is not a particularly steep hurdle." *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 304 (E.D.N.Y. 2014) (internal quotation marks and citation omitted).

In their memorandum, defendants offer deposition testimony that:

- Benedict was terminated because she refused to "be[] in the office to do her work," which defendants claim was a job requirement, instead of telecommuting three weeks per month.

- Diaz was terminated because she lied about having another job.

- Honohan's employment ended because "her data entry tasks became obsolete in light of CCG's switch to an electronic accounting/payroll system and because she was unwilling to enhance her accounting skills and/or assume additional human resources duties."

- Josey's employment ended because Levine "discovered [Josey] had not been doing her job."

- Ontaneda and Pennisi's employment ended because of their "collective decision not to report on the same day, without [sufficient] explanation."

- Pabon's employment ended "after she refused to accept constructive criticism from her supervisor regarding her inappropriate behavior at the spa weekend, effectively stated that she would not make any effort to address the stated concerns, and then walked out of the meeting."

- Pegullo was terminated because she "inappropriately shared a personal e-mail . . . with multiple people in the office, causing disruption."

(Def. Mem. at 11-12.) The court finds, even in light of the low threshold for articulating a legitimate, non-discriminatory explanation for an employment action, that there are disputed issues of material fact as to the reasons for claimants' terminations.

### iii. Evidence of Pretext

Although the parties have proffered conflicting evidence as to whether the defendants had legitimate nondiscriminatory reasons for their employment actions, the court will examine evidence regarding pretext. "To avoid summary judgment at this stage, [a] plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that religious discrimination played a role in the adverse actions taken against plaintiff." *St. Juste*, 8 F. Supp. 3d at 313; *see also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (in Title VII retaliation context, where higher but-for causation requirement applies, mentioning that plaintiffs may prove causation by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered

legitimate, nonretaliatory reasons for its action"). Claimants'
proffer of evidence regarding pretext, however, is sufficient for
a reasonable jury to find that religious discrimination played a
role in the purported adverse employment actions they suffered:

- Although defendants proffered testimony that Benedict was
  terminated because she would not adhere to the requirement
  that she be present in the office rather than telecommute,
  Benedict contends that she was successfully telecommuting to
  work for multiple months, and that multiple other employees
  also telecommuted or lived away from Long Island, including
  Hodes, Jordan, and supervisor Lane Michel. (Pl. 56.1 ¶ 149.)
  According to Benedict, as she began to resist Jordan's
  directive that she move to Long Island, defendants made her
  work unpleasant. Defendants told Benedict in March 2012 that
  if she did not move, she would be terminated. Once Benedict
  made clear that she would not be moving, she told Jordan she
  would apply for unemployment. Jordan told Benedict that
  Jordan "would damn [Benedict] to hell" if Benedict "applied
  for unemployment." (Tab B, Benedict Dep. at 120-27.)

- Defendants offer testimony that Diaz was terminated because
  she lied about training for another job. Diaz testified that
  she was terminated after telling employees she was

uncomfortable with Jordan's practices. (Def. 56.1 ¶¶ 183-87.) Jordan learned from Diaz that she had been terminated and Diaz asked Jordan for help with unemployment and to stay in touch with her. (Def. 56.1 ¶¶ 151-53; Tab E, Diaz Dep. at 195-200.) Jordan sent Diaz a check from Harnessing Happiness after her termination for $333 and wrote "For Resurrection" on the memo line. (Pl. 56.1 ¶ 190; Tab E, Diaz Dep. at 200-01.)

- Although defendants submit testimony that Honohan's job became obsolete and she was unwilling to assume additional duties (Def. 56.1 ¶ 172), plaintiffs assert that after another individual who participated in and did work for Onionhead began to perform many of Honohan's human resources responsibilities (Tab S, Sarpa Dep. at 22-29; Pl. 56.1 Resp. ¶ 172), they did not become more complex. (Pl. 56.1 ¶¶ 233.)

- Although defendants submit testimony that Josey was terminated because she had failed to complete certain work, defendants do not dispute that they have not provided evidence of Josey's purportedly incomplete work or a record of any accounting errors that resulted from Josey's purported shortcomings. (Pl. 56.1 ¶¶ 253-54; Def. 56.1 Resp. ¶¶ 253-54.)

- Although defendants provide testimony that Ontaneda and Pennisi's employment ended because they failed to report to work, plaintiffs presented undisputed evidence that at least one other employee who participated in Onionhead was not terminated in spite of her repeated absenteeism, her insubordinate manner to Levine and Bourandas, and two events during which she exhibited loud, inappropriate behavior at work. (Pl. 56.1 ¶¶ 379-83.) Further, Ontaneda and Pennisi's purported terminations occurred during Jordan's first return to the office after both Ontaneda and Pennisi voiced their opposition to Onionhead.

- Although defendants presented testimony that Pabon quit after she refused to accept constructive criticism about her behavior at the spa weekend, defendants informed the Department of Labor that Pabon was terminated. (Pl. 56.1 ¶ 299.) Further, defendants admit that they did not terminate Grace Durso — an employee who participated in Onionhead — despite multiple undisputed instances of insubordination and loud behavior. (Pl. 56.1 ¶ 379; Def. 56.1 Resp. ¶ 379.)

- Although defendants characterize Jordan's email that Pegullo forwarded as "personal" and state that Pegullo caused "disruption" by sharing the email, it is not clear from the

68

record whether Pegullo forwarded Jordan's email to anyone except Hodes and her former supervisor. (Pl. 56.1 ¶ 323.) Jordan sent her emails to others in the office including Bourandas, Lane Michel, and Guylene Sookhu. (Jt. Ex. 85, 89; Tab P, Pegullo Dep. at 206, 282-85.)

The court must examine the totality of the record and cannot isolate each piece of evidence. *See Friedman v. Swiss Re Am. Holding Corp.*, 643 F. App'x 69, 72 (2d Cir. 2016) (finding that district court failed to consider "the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer," and instead "viewed each piece of evidence in isolation" (internal quotation marks and citation omitted)). Considering the unique circumstances of this case together with the claimants' individual *prima facie* cases as well as their evidence of pretext, a reasonable jury could find that that defendants' proffered reasons were pretextual.

Defendants contend that Jordan was not directly involved in many of the claimants' terminations. *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1171 (7th Cir. 1998), on which defendants rely to establish that Jordan's lack of direct involvement in their terminations precludes liability (Def. Mem. at 13, 18, 23), instead

supports claimants. In *Sattar*, the court held that the plaintiff's purported harasser was not directly linked to his discharge, which was effectuated by two other individuals. *Id.* at 1171. The court ultimately granted summary judgment to the employer. *Id.* The court's explanation for its holding, however, is significant here. The court explained that the plaintiff had failed to establish a link between her harasser and her discharge because "[n]othing indicates [the individuals involved in the plaintiff's termination] harbored any animus toward [the plaintiff]," that the harasser "was some kind of Svengali controlling their actions" or that the harasser "infected" the decision to terminate the plaintiff *Id.*

In essence, claimants here assert the precise type of direct or indirect involvement by Jordan in employment decisionmaking that the *Sattar* court held might be sufficient to link a harasser's conduct to a termination. Jordan's purported role in Pabon's departure provides perhaps the most straightforward example. After the spa weekend, Jordan wrote a memo to Bourandas and Levine about Pabon:

> I am sorry to report that what I had hoped would help the situation, through the trip with [Pabon], did not work. On the weekend she was insubordinate, rude, [and] gossipy . . . . We cannot have someone working at cross purposes to us. I would suggest firing her today, but I am concerned that the others, who were on this trip would

70

> see it as a direct result of the trip. Therefore I think
> we should be truthful with her and then tell her that
> she is on a two week probation. This will tell the final
> tale. Thank you for your patience in this matter. One
> thing great about this company, when we fire someone, we
> know we gave it everything, and I mean everything we
> could to help the person.

(Jt. Ex. 47.) Further, Benedict testified that Jordan was, at least

for a time, her "boss," and that Jordan appeared in a conference

room to discuss her termination. (Tab B, Benedict Dep. at 121,

126.) Defendants also placed Jordan just below Hodes (and next to

Bourandas) on a corporate hierarchy chart. (Jt. Ex. 90.) Defendants

brought Jordan into the office to conduct group and individual

meetings, for which employees were directed to sign up. Defendants

also received and acted upon Jordan's personnel recommendations.

A reasonable jury could find that Jordan exercised a sufficient

degree of control over employment decisionmaking (including

hiring, discipline, and termination) to justify imputing her

motives to defendants. *See Vasquez v. Empress Ambulance Serv.,

Inc.*, No. 15-3239-CV, 2016 WL 4501673, at *3-4 (2d Cir. Aug. 29,

2016) (applying "cat's paw" theory of liability — in which an

employee is fired or subjected to adverse action by a supervisor

who has no discriminatory motive, but "who has been manipulated by

a subordinate who does have such a motive and intended to bring

about the adverse employment action" — in Title VII retaliation

context). Accordingly, defendant's motion for summary judgment on the claimants' reverse religious discrimination disparate treatment claim is denied.

**C.** **Reverse Religious Discrimination – Hostile Work Environment**

Title VII bars employers from requiring employees to work in a hostile or abuse environment. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

*i. Timeliness*

Defendants argue that hostile work environment claims asserted by Maldari, Ontaneda, Pennisi, and Safara are time-barred. (Def. Mem. at 26.) Plaintiffs counter that claims asserted by Maldari, Ontaneda, Pennisi, and Safara are timely under the continuing violation doctrine. (Pl. Mem. at 27-28.)

Generally, and as relevant here, an individual must file a charge with the EEOC within 300 days of an alleged unlawful employment practice. *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994). An exception exists, however, where a defendant has allegedly engaged in a continuous policy of discrimination. "Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, *all claims of acts of*

*discrimination under that policy will be timely* even if they would be untimely standing alone." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 155–56 (2d Cir. 2012) (emphasis added) (internal quotation marks, citation, and alteration omitted). The continuing violation doctrine's operation in a multi-plaintiff case is particularly relevant here. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court held that multiple plaintiffs' Fair Housing Act claims under a purported "continuing pattern, practice, and policy of unlawful racial steering" were timely because "at least one [incident] (involving [a single plaintiff]) [was] asserted to have occurred" within the limitations period. *Id.* at 381; *see also Conn. Light & Power Co. v. Sec'y of U.S. Dep't of Labor*, 85 F.3d 89, 96 (2d Cir. 1996) (applying *Havens* in employment context).[22]

The earliest charges in this action were filed by Ontaneda and Pennisi on June 7, 2011. (Def. 56.1 ¶ 313.) Ontaneda and Pennisi's charges — which were made within 300 days of their

---

[22] Plaintiffs argue that Maldari and Safara "cannot piggyback onto Ontaneda's and Pennisi's Charges because their employment with UHP/CCG ended in 2008, which is more than 300 days before the filing of such charges." (Def. Mem. at 27 n.17.) The continuing violation doctrine is not so limited, however. *See Chin*, 685 F.3d at 155–56 ("Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, *all claims of acts of discrimination under that policy will be timely* even if they would be untimely standing alone." (emphasis added) (internal quotation marks and citation omitted)).

termination — referenced the "'Onionhead' way of life," and described a "cult-like quasi religious movement," "prayer sessions" in the workplace, and termination and retaliation based on a refusal to participate in the religious activities. (Jt. Exs. 61-62.) The allegations in the charges filed by Ontaneda and Pennisi mirror the allegations of other claimants central to this case and put defendants on notice of the possibility of additional Title VII claims by others based on the same conduct.

Defendants argue that because certain components of Onionhead or Harnessing Happiness were not in place during the tenures of Maldari, Safara, Ontaneda, and Pennisi, they cannot establish a "continuing violation because there is not one component of the alleged '[Onionhead]-related religious practices' that occurred within their respective tenures with UHP/CCG." (Def. Mem. at 26-27; Def. Reply at 9.) As noted, however, Ontaneda and Pennisi explicitly complained about Onionhead practices in their EEOC charges, which were filed within 300 days of their termination. As to Maldari, although she conceded that during her employment with defendants, she did not hear the terms "Onionhead" or "Harnessing Happiness" (Tab M, Maldari Dep. at 51-54) and her employment with CCG ended fairly early in Jordan's tenure, she

described a work environment similar in many respects to the one described in Ontaneda and Pennisi's complaint.

Maldari testified to being given a book by Bourandas of quotes and a journal to record her thoughts about how the quotes affected her each day, prayer in the workplace, working by lamplight, directed hand-holding, hugging, and kissing of coworkers, a shrine-like room in a utility closet into which she was "summoned," and one-on-one as well as group meetings in which she felt prodded to discuss her personal life. Jordan started meetings in the quiet room with general questions about the sales department, then directed the employees to hold hands while she said a prayer over them, and told them that God loved them and to be patient, kind and express love. Jordan also walked around the office talking about demons and angels, and referring to employees as angels chosen to work there. The CEO, Hodes, also told employees that they were chosen and he hugged and kissed them. (*See id.* at 53-58, 64-68, 71-74, 85-86, 111-12.) Maldari also testified that she was driven to tears in a group meeting in the conference room with Jordan after Jordan asked Maldari questions regarding Maldari's "children, [her] ex-husband, [and her] life." (*Id.* at 78.) Similarly, Safara testified that Jordan sent out emails including spiritual texts that she felt obligated to read, that

Safara felt obligated to pray in the workplace, and that Jordan discussed spirits and demons and told employees to dim lights in order to "keep[] the spirits happy." (Tab R, Safara Dep. at 41, 54, 60, 66.) Whether Maldari and Safara *understood* the above-described practices to be connected to Onionhead is irrelevant, because there is a strong nexus between the practices complained of by each claimant and the workplace environment complained of in Pennisi and Ontaneda's EEOC charge.

Accordingly, the court concludes that all of the claimants' hostile work environment claims are timely. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) ("We also hold that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period.").

*ii. Merits*

"In order to make out a hostile work environment claim, a plaintiff must demonstrate: (1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created

the hostile work environment to the employer." *Shan v. New York City Dep't of Health & Mental Hygiene*, 316 F. App'x 23, 24 (2d Cir. 2009) (internal quotation marks and citation omitted); *Ennis v. Sonitrol Mgmt. Corp.*, No. 02-CV-9070, 2006 WL 177173, at *8 (S.D.N.Y. Jan. 25, 2006) (same).

In establishing the first element, a plaintiff must show both that the misconduct was severe or pervasive enough to create an objectively hostile or abusive working environment and that she subjectively perceived the environment to be hostile or abusive. *See Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (stressing that "a plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive" (emphasis in original)). The religious hostility must be directed at the individual "because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Significantly, for purposes of the hostile work environment claim premised on reverse religious discrimination, the requirement that the harassment be based on religion "can be satisfied regardless of whether the harassment is motivated by the religious belief or observance – or lack thereof – of either the harasser or the targeted employee." EEOC Compliance Manual Section 12-III-A-2-a. Courts must look to the totality of

the circumstances in determining whether a workplace environment is sufficiently hostile or abusive to be actionable, but certain factors guide the analysis:

> These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris*, 510 U.S. at 23. Although isolated incidents will usually fall short of establishing a hostile work environment, a single incident can create a hostile work environment if the incident is sufficiently "severe." *See Redd*, 678 F.3d at 175-76.

The second element of a hostile work environment claim requires a plaintiff to provide a specific basis for imputing to the employer the conduct that created the hostile work environment. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996). "An employer is presumptively liable for [] harassment in violation of Title VII if the plaintiff was harassed not by a mere coworker but by someone with supervisory (or successively higher) authority over the plaintiff, although in certain circumstances an affirmative defense may be available." *Redd*, 678 F.3d at 182. "No affirmative defense is available, however, when

the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

"The Second Circuit has cautioned that the existence of a hostile work environment is a mixed question of law and fact. These kinds of questions are especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 185 (S.D.N.Y. 2013) (internal quotation marks, citation, and alterations omitted).

### (a)   Pervasive or Severe

Here, the court concludes that a reasonable jury could find that the purportedly "hostile work environment was . . . sufficiently severe *or* sufficiently pervasive . . . to have altered [claimants'] working conditions." *Redd*, 678 F.3d at 175.

Plaintiffs here describe repeated and consistent coercive efforts by supervisors to impose Onionhead beliefs on them. Pennisi testified that she attended at least 20 workshops. (Tab Q, Pennisi Dep. at 85; Tab B, Benedict Dep. at 97 (at least nine workshops); Tab N, Ontaneda Dep. at 90-91 (workshops once a month for three years).) Honohan explained that between December 2010 and December 2011, she believed that every single employee of

CCG attended Onionhead workshops. (Tab H, Honohan Dep. at 28; *see also* Tab N, Ontaneda Dep. at 92 ("During my time there everybody attended.").) Ontaneda further stated that Onionhead was mentioned in every one of the workshops she attended. (Tab N, Ontaneda Dep. at 93.) Honohan explained that "[y]ou had to attend" and that "you were told which group you were going to be in, what day it was meeting, what time, and you showed up." (Tab H, Honohan Dep. at 30; *see also* Tab N, Ontaneda Dep. at 90 ("Q: You went to every single [workshop]? A: Yeah, I had to. Q: Why do you say you had to? A: Because they were mandatory. Q: How do you know they were mandatory? A: We were told. We were sent emails and given times that we had to go to the workshop.").)[23]

Numerous religious practices purportedly permeated the office environment. Virtually every claimant described prayer, sometimes mandatory, in the workplace. (*E.g.*, Tab H, Honohan Dep. at 113; Tab N, Ontaneda Dep. at 213; Tab R, Safara Dep. at 60-61; Tab O, Pabon Dep. at 119, 125; Tab J, Josey Dep. at 119.) Pegullo testified that when "Denali felt that there was an evil spirit" she would have to "use sage, incense, and candles, and garlic" to

---

[23] Defendants' statement in their memorandum of law that "OH and HH workshops were indisputably voluntary" (Def. Mem. at 29) is not merely stretching the record. It is an affirmative misrepresentation of the evidence to argue that the workshops were "indisputably" voluntary.

perform a "cleansing" of the workplace. (Tab P, Pegullo Dep. at 126-27.) Employees were expected to hold hands, hug, kiss and express love, at workplace meetings with Jordan and encounters with Hodes. (*E.g.*, Tab M, Maldari Dep. at 58, 74-75, 79, 86, 88; Tab H, Honohan Dep. at 61.) Diaz, describing one night of the work-sponsored spa weekend, which occurred on March 17 and 18, 2012, explained that "[a]t the end of the meeting we all had to hold hands in a circle. We had to lift up our hands three times and chant love, love, love. That was a big thing at the end. Everybody had to hug and kiss as usual and say it to Denali." (Tab E, Diaz Dep. at 63, 122-23.) The claimants reported feeling "uncomfortable" and that the practices were inappropriate for an office, and religious in nature. The employees were expected to use pins and candles regularly and directed to think about feelings and meaning. (*E.g.*, Tab N, Ontaneda Dep. at 95; Tab P, Pegullo Dep. at 126, 168, 249; Tab E, Diaz Dep. at 46, 87-88.)

Finally, some claimants have explicitly testified to damage to their psychological well-being. *See Harris*, 510 U.S. at 23 {"The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive."). Ontaneda described how she observed people exit one-on-one meetings with Jordan in tears.

(Tab N, Ontaneda Dep. at 218 ("All I know is that when people came out of those sessions, they would come out hysterical[ly] crying.") Maldari claims that she was one of the individuals who left a meeting with Jordan, which involved probing questions about her personal life, in tears. (Tab M, Maldari Dep. at 78.) Pegullo explained that she is "so depressed and . . . out of it sometimes" because she was "so hurt that [she] was influenced by Denali." (Tab P, Pegullo Dep. at 175-76.) Josey described how she believed she had cried "a couple of times" during workshops and that she had "seen women cry in there." (Tab J, Josey Dep. at 77.)

The court must consider the totality of the circumstances in evaluating whether a reasonable jury could believe that claimants were subjected to a hostile work environment. The Second Circuit has instructed that evidence of hostility or harassment need not be directed at a particular plaintiff to be relevant to her claim. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) ("The mere fact that Schwapp was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim. Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory

comment or joke by a fellow employee or supervisor also can impact the work environment." (citations omitted)). Under the record outlined above, a reasonable jury could find that claimants' "workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment." *Shan*, 316 F. App'x at 24.

### (b)   Imputing

Turning to the second element of plaintiffs' hostile work environment claims, a jury could find by a preponderance of the evidence in the record that there is a basis for imputing liability to defendants. As discussed earlier, an "employer is presumptively liable for [] harassment in violation of Title VII if the plaintiff was harassed not by a mere coworker but by someone with supervisory (or successively higher) authority over the plaintiff, although in certain circumstances an affirmative defense may be available." *Redd*, 678 F.3d at 182. A "supervisor" is someone who can effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013) (internal quotation marks and citation omitted).

Here, it is undisputed that Bourandas, Levine, and Hodes were supervisors. (Def. Reply at 11.) The parties strongly dispute, however, whether Jordan was a supervisor. Jordan was imbued with certain indicia of, at the very least, *apparent* supervisory responsibilities. For example, a corporate hierarchy chart in the record contains four tiers, with Hodes at the top in the first tier, the second tier occupied only by Bourandas and Jordan, and nine supervisors including Levine in the third tier. (Jt. Ex. 90.) Levine, a supervisor, testified that when she needed to make "difficult" decisions and would need a "sounding board," she would consult with Bourandas, Jordan, or "any other manager," though Levine also testified that she did not consider Jordan a manager. (Tab L, Levine Dep. at 64-65.) Honohan testified that Jordan instructed employees to come to Jordan with "complaints" rather than Hodes. (Tab H, Honohan Dep. at 107-08, 110; *see also* Tab G, Hodes Dep. at 332 ("[C]ertainly over the years [employees have] been able to complain to Denali.").) Benedict testified that she "took direction from" Jordan. (Tab B, Benedict Dep. at 59.) Benedict explained that Jordan and Lane Michel, another supervisor, both informed her that she would be terminated if she did not move to Long Island. (*Id.* at 121.) Jordan also had authority to reassign Benedict from her duties on behalf of

defendants to work on behalf of Onionhead and Harnessing Happiness at defendants' office. (Tab B, Benedict Dep. at 35, 126; Pl. 56.1 ¶ 153.) At the very least, there is a factual dispute regarding whether Jordan qualifies as a supervisor within the meaning of Title VII. *See Vance*, 133 S. Ct. at 2450 (recognizing that there may be circumstances "where the issue of supervisor status cannot be eliminated from the trial (because there are genuine factual disputes about an alleged harasser's authority to take tangible employment actions)"); *Lolonga-Gedeon v. Child & Family Servs.*, 144 F. Supp. 3d 438, 441 (W.D.N.Y. 2015) ("[A]n issue of fact exists as to Wright's status as a supervisor, and the Court cannot resolve it as a matter of law.").[24]

Although, as noted above, employers are "presumptively liable for all acts of harassment perpetrated by an employee's supervisor, . . . the employer can avoid liability if it can prove that: (1) the employer exercised reasonable care to prevent and promptly correct any harassment by such a supervisor, and (2) the employee unreasonably failed to avail [her]self of any corrective

---

[24] Defendants assert that Jordan did not participate in termination decisions by emphasizing that she "recommended to Bourandas and Levine that Pabon receive counseling" instead of being terminated. (Def. 56.1 Resp. ¶ 70.) Defendants' argument inadvertently undermines their position. If Jordan had the power to make recommendations to Bourandas and Levine in favor of counseling, it suggests she played a role, at least, in termination decisions. *See Vance*, 133 S. Ct. at 2446 n.8 (recognizing that "tangible employment actions can" be "subject to approval by higher management").

or preventative opportunities provided by the employer or to avoid harm otherwise." *Duviella v. Counseling Serv. of E. Dist. of New York*, No. 00-CV-2424, 2001 WL 1776158, at *10 (E.D.N.Y. Nov. 20, 2001) (describing the *Faragher/Ellerth* defense). In establishing whether an employer exercised reasonable care, proof "that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, [but] the need for a stated policy suitable to the employment circumstances may appropriately be addressed." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

Here, although it is defendants' burden to establish the *Faragher/Ellerth* defense, they have failed to produce a written policy of any kind that was in place any time before August 2011. (Def. 56.1 ¶¶ 45-47; Pl. 56.1 Resp. ¶¶ 45-47; Def. 56.1 Resp. at p. 49 n.2, ¶ 392.) *See Fierro v. Saks Fifth Ave.*, 13 F. Supp. 2d 481, 491 (S.D.N.Y. 1998) ("[I]n determining whether an employer has met the first element of the *Faragher/Burlington* affirmative defense . . . the employer's promulgation of an 'an antiharassment policy with complaint procedure' is an important, if not dispositive, consideration." (quoting *Faragher*, 524 U.S. at 807)). Further, it is undisputed that defendants conducted no training for supervisors or human resources regarding discrimination

86

issues. (Def. 56.1 Resp. at ¶ 397.) The court simply cannot determine as a matter of law whether defendants "exercised reasonable care to prevent and promptly correct any harassment by such a supervisor." *Duviella*, 2001 WL 1776158, at *10 (internal quotation marks and citation omitted). Defendants have therefore failed to establish the first element of the *Faragher/Burlington* affirmative defense.

Accordingly, genuine disputes of material fact preclude entry of summary judgment against claimants on the hostile work environment claims premised on reverse religious discrimination.[25] Having addressed the group of claims premised on reverse religious discrimination, the court next addresses the conventional religion-based discrimination and retaliation claims.

D. **Conventional Religious Discrimination and Retaliation Claims**

Claimants assert that they were discriminated against on the basis of their *own* sincerely held beliefs, as distinct from their failure to adhere to Onionhead beliefs. As discussed earlier, claimants assert four types of claims under the traditional religious discrimination rubric:

(1) Benedict, Diaz, Honohan, Josey, Ontaneda, Pennisi, Pabon,

---

[25] The court notes that claimants have not asserted claims for failure to accommodate or retaliation under a reverse religious discrimination theory.

and Pegullo claim that they were subjected to religious discrimination on the basis of their religious beliefs.

(2) All claimants aver that they were subjected to a hostile work environment on the basis of their religious beliefs.

(3) All claimants claim that defendants failed to accommodate their religious beliefs.

(4) Benedict, Diaz, Honohan, Josey, Ontaneda, Pennisi, Pabon, and Pegullo claim that they were retaliated against after engaging in protected activity.

For the reasons that follow, the court concludes that no reasonable jury could find that the claimants (with the exception of Pennisi) were discriminated against on the basis of their personal religious beliefs. Just as the court was obligated to view the totality of the circumstances in addressing claimants' reverse religious discrimination claims, the court must examine the totality of the circumstances and cannot isolate the evidence in addressing claimants' conventional religious discrimination and retaliation claims. *See Friedman*, 643 F. App'x at 72 (holding that district court neglected to evaluate "the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer,"

and instead "viewed each piece of evidence in isolation" (internal quotation marks and citation omitted)).

Each of the four varieties of claims at issue require claimants to establish a causal link between *their* religious beliefs and the discrimination or retaliation. Title VII, as relevant here, provides that employers may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's . . . religion*." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). The retaliation claims require that claimants' protected activity (here, their expressed opposition to Onionhead based on their asserted religious beliefs or their request for accommodation based on their religious beliefs) be the but-for cause of their terminations. *See Nassar*, 133 S.Ct. at 2533 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .").

As an initial matter, in support of their conventional religious discrimination and retaliation claims, claimants' briefing principally directs the court to the exact same evidence supporting their reverse religious discrimination claims. (Pl. Mem. at 32-33, 35, 38-39.) Aside from pointing the court to the

very limited references in the deposition testimony to claimants'
own religious practices and beliefs (*e.g.*, Pl. Mem. at 32 (citing
Pl. 56.1 ¶¶ 375-76)), claimants have, with the notable exception
of Pennisi, failed to present a sufficient evidentiary link between
their personal religious beliefs or lack thereof, and the purported
discrimination and retaliation to defeat summary judgment. As the
deposition excerpts below establish, each claimant, with the
exception of Pennisi, either: (1) testified during her respective
deposition that she was not discriminated against or retaliated
against on the basis of her *own* beliefs and/or (2) failed to
provide testimony or other evidence indicating that she had been
discriminated against on the basis of her *own* beliefs.

    *i.   Diaz*

    Diaz testified as follows:

Q: Do you practice a particular religion?

A: I'm Catholic.

Q: Did [Jordan] ever try to dissuade you from being
Catholic?

A: I wouldn't say that she told me not to be Catholic.

But she tried to *push her beliefs a lot on us*.

(Tab E, Diaz Dep. at 47 (emphasis added).) Diaz only discussed her
Catholicism on one other occasion in her deposition. (*Id.* at 88.)

Diaz's testimony resembles much of the additional testimony of other claimants discussed below, insofar as she distinguished between reverse discrimination ("she tried to push her beliefs . . . on us") and conventional discrimination, which to be actionable would require that she be treated differently on the basis of her own religious beliefs. *See Lampros*, 2012 WL 6021091, at *6 n.3 ("Title VII has been interpreted to protect against requirements of religious conformity and as such protects those who refuse to hold, as well as those who hold, specific religious beliefs." (quoting *Shapolia*, 992 F.2d at 1036)).

*ii. Benedict*

Q: What religion are you?

A: I don't really go by any religion.

. . .

Q: [W]hatever religious beliefs you have, have you ever expressed them in the workplace.

. . .

A: No.

. . .

Q: Did you ever request any accommodation during your employment because of a conflict between your employment and your religious beliefs?

A: No.

(Tab B, Benedict Dep. at 9, 14, 16.)

### iii. *Honohan*

Q: Did anyone – Rob [Hodes], Tracy [Bourandas], Denali [Jordan], April [Levine] – ever seem to have a problem with you being Catholic?

A: No.

(Tab H, Honohan Dep. at 96-97.)

### iv. *Josey*

Q: Did your co-workers know that you were a Christian?

A: I didn't really discuss my religion with co-workers . . .

Q: Did any of your co-workers or anybody at UHP ever ask you about your religion?

A: Not that I can remember. . . .

Q: Are you aware of anybody who ever requested an accommodation for their religious beliefs?

. . .

A: Not that I can remember.

(Tab J, Josey Dep. at 125-26.)

### v. *Maldari*

Q: Do you have a religion?

A: I'm Catholic.

...

Q: Did anyone ever criticize you for being Catholic?

A: No.

. . .

Q: [Y]ou don't recall any conversation or any statement Denali made that was denigrating [to] [C]atholicism?

A: Correct

(Tab M, Maldari Dep. at 80-82.)

### vi. Ontaneda

Q: [D]id you ever tell [Bourandas] that you were Catholic?

. . .

A: I would say so, yes.

Q: Did she seem to have any problem with that?

A: No.

. . .

Q: In what ways were your Catholic beliefs not accommodated by [CCG]?

A: For me personally, I didn't have issues with that.

(Tab N, Ontaneda Dep. at 28-29, 222.)

*vii. Pabon*

A: I was brought up with no religion at all.

Q: Do you practice any religion currently?

A: No.

(Tab O, Pabon Dep. at 63-64.)

Although claimants contend that Pabon had sincerely held beliefs that conflicted with Onionhead (Pl. 56.1 ¶ 376), they direct the court to no testimony from Pabon indicating that she was discriminated against or retaliated against because of *her* sincerely held religious beliefs or lack thereof.

*viii.   Pegullo*

Pegullo testified that she "do[esn't] practice religion" and that she "can't say [she is] spiritual," but she also stated that she "do[es] have [her] beliefs." (Tab P, Pegullo Dep. at 132.) Claimants point to no evidence in the record, however, indicating that Pegullo was terminated or retaliated against on the basis of *her* beliefs.

*ix. Safara*

Q: [D]o you believe that you were discriminated against at UHP or treated differently at UHP or treated differently at UHP because of your Lutheran background.

94

A: No. I don't think it was basically like, oh, she's
Lutheran, let's try to push this on her. . . . *[T]hey*
*only believed what they believed and they thought*
*everyone should believe it*.

(Tab R, Safara Dep. at 58-59 (emphasis added).)

Safara's testimony underscores the nature of claimants'
assertions regarding Onionhead, and echoes Diaz's testimony
excerpted above. With the exception of Pennisi, none of the
claimants present evidence that they were treated differently or
retaliated against because of *their* beliefs or religion, or lack
thereof.

> *x.    Pennisi*

Pennisi, however, made explicit allegations that she
held strong Catholic beliefs and that she was discriminated against
as well as retaliated against on the basis of her Catholic beliefs.
She asserts four claims deriving from discrimination and
retaliation purportedly based on her Catholicism: (1) failure to
accommodate; (2) retaliation; (3) disparate treatment; and (4)
hostile work environment. The court addresses Pennisi's claims in
turn.

## (a)  *Failure to Accommodate*

"To establish a prima facie case of religious discrimination based on failure to accommodate, a plaintiff must prove that: (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *St. Juste*, 8 F. Supp. 3d at 315 (internal quotation marks and citation omitted). "*After an employee or prospective employee notifies the employer or labor organization of his or her need for a religious accommodation*, the employer or labor organization has an obligation to reasonably accommodate the individual's religious practices." 29 C.F.R. § 1605.2(c)(1) (emphasis added).

Here, Pennisi's failure to accommodate claim fails because she testified that she never sought any accommodation on the basis of her Catholicism:

Q: Did you ever ask anybody at UHP in management, Rob [Hodes], Tracy [Bourandas] or April [Levine], for any kind of a religious accommodation?

A: No.

Q: Did you ever ask Denali for a religious accommodation?

A: No.[26]

(Tab Q, Pennisi Dep. at 196.) Claimants appear to contend that Pennisi sought an accommodation on the basis of her Catholicism in July 2010 during a manager's meeting. (Pl. Mem. at 35.) Because the meeting occurred over 300 days prior to June 7, 2011, when she filed her charges with the EEOC (Tab Q, Pennisi Dep. at 190 (manager's meeting occurred in mid-July 2010); Jt. Ex. 61 (Pennisi EEOC charge filed June 7, 2011), her request is time-barred and not subject to the continuing violation doctrine. *See Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134-35 (2d Cir. 2003) ("[A]n employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation.").

### (b) *Retaliation*

"To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse

---

[26] Pennisi did apparently ask for Good Friday off on at least one occasion, a request which was granted. (Tab Q, Pennisi Dep. at 20-21.)

action." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (citation omitted).

Here, Pennisi engaged in protected activity of which defendants were aware when she complained in a July 2010 meeting to Jordan and others that Onionhead beliefs conflicted with her Catholicism. (Tab Q, Pennisi Dep. at 191-92.) *See Lewis v. New York City Transit Auth.*, 12 F. Supp. 3d 418, 449 (E.D.N.Y. 2014) (recognizing that "protesting a discriminatory employment practice . . . constitute[s] [a] protected activit[y]"); *see also Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) ("Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity."). Pennisi claims that she was terminated, which constitutes an adverse employment action, during Jordan's first return to the office after she voiced her religious objections to Onionhead. Her purported termination occurred in August 2010, approximately one month after she engaged in protected activity in July 2010. *See Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) (prima facie retaliation case established where approximately one month had elapsed between protected activity and adverse employment action). As discussed earlier (*see* supra

Discussion Part II.B.iii), a reasonable jury could find that defendants' purportedly legitimate non-discriminatory reason for allegedly terminating Pennisi was pretextual. A reasonable jury could conclude that Pennisi was retaliated against on the basis of her religious beliefs.

### (c) Disparate Treatment

For similar reasons, a reasonable jury could find that Pennisi was discriminated against on the basis of her religion (a claim governed by the traditional *McDonnell Douglas* burden-shifting framework outlined *supra*). "[A]ll plaintiffs who seek to make out a prima facie case of religious discrimination must show that (1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief;[27] and (3) they were disciplined for failure to comply with the conflicting employment requirement." *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (internal quotation marks and citation omitted).

As described above, Pennisi and others provided testimony that they believed Onionhead-related activities were

---

[27] Claimants argue that the second requirement described in *Baker* did not survive *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028 (2015). Here, there is no need to address the viability of the second requirement because Pennisi testified that she informed Jordan of her Catholicism. (Tab Q, Pennisi Dep. at 191-92.)

mandatory. (Tab Q, Pennisi Dep. at 89, 93-94, 125, 136.) Pennisi testified that she informed CCG that Onionhead conflicted with her Catholicism, and was terminated soon after. Although defendants contend that Pennisi was terminated for failing to report to work, a reasonable jury could find that their asserted justification for her termination was pretextual.

### (d) Hostile Work Environment

As noted above, to "state a hostile work environment claim, a plaintiff must plead facts tending to show that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment *because of the plaintiff's* . . . *protected characteristic*." *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

Pennisi's claim that she was subjected to a hostile work environment falls short because she cannot establish the third requirement, that her work environment was hostile because of her religion. She claims that she informed defendants that she was Catholic in the July 2010 meeting and was terminated in August

2010. By claimants' own admission, Jordan was absent during much of the time between the July 2010 meeting and Pennisi's purported August 2010 termination. Accordingly, the vast majority of the allegations Pennisi levels against defendants in support of her hostile work environment claim occurred before she claims that defendants knew of her religion. She does not establish that she was subjected to a hostile work environment because of her religion in the brief window between when she claims defendants learned of her religion and when she was terminated. By contrast, as discussed earlier, her reverse hostile work environment may proceed because the reverse hostile work environment claim is not dependent on defendants' knowledge of her sincerely held Catholic beliefs.

**CONCLUSION**

Accordingly, claimants' motion for partial summary judgment is GRANTED. Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Specifically:

(1) Defendants' motion for summary judgment on Benedict, Diaz, Honohan, Josey, Ontaneda, Pennisi, Pabon, and Pegullo's reverse religious discrimination claims is DENIED.

(2) Defendants' motion for summary judgment on all claimants' hostile work environment claims premised on reverse religious discrimination is DENIED.

(3) Defendants' motion for summary judgment is DENIED with respect to Pennisi's disparate treatment and retaliation claims premised on her Catholicism, but is GRANTED with respect to Pennisi's hostile work environment and failure to accommodate claims premised on her Catholicism.

(4) Defendants' motion for summary judgment is GRANTED against all other claimants on their claims that they suffered discrimination based on claimants' religious beliefs or lack thereof.

The parties are directed to prepare a joint letter to the court indicating their preparedness for trial within seven days of this memorandum and order.

**SO ORDERED.**

Dated:    September 30, 2016
          Brooklyn, New York

                                   _____/s/_____
                                   Kiyo A. Matsumoto
                                   United States District Judge