UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

        Plaintiff,

    -against-

UNITED HEALTH PROGRAMS OF AMERICA,
INC. and COST CONTAINMENT GROUP,
INC.,

        Defendants.
----------------------------------X
----------------------------------X
ELIZABETH ONTANEDA, FRANCINE
PENNISI, and FAITH PABON,

        Plaintiffs-Intervenors,

    -against-

UNITED HEALTH PROGRAMS OF AMERICA,
INC. and COST CONTAINMENT GROUP,
INC.,

        Defendants.
----------------------------------X

**Memorandum and Order**
14-CV-3673 (KAM)(JO)

**MATSUMOTO, United States District Judge:**

      Plaintiff United States Equal Employment Opportunity

Commission ("EEOC") commenced this action against defendants

United Health Programs of America, Inc., and Cost Containment

Group, Inc. (collectively, "defendants"), pursuant to Title VII

of the Civil Rights Act of 1964 ("Title VII") on behalf of a

group of defendants' former employees – Danielle Diaz, Jennifer

Honohan, Regina Maldari, Cynthia Pegullo, Elizabeth Safara,

Sandra Benedict, and Karen Josey (the "claimants"). Three claimants – plaintiff-intervenors Elizabeth Ontaneda, Francine Pennisi, and Faith Pabon ("plaintiff-intervenors," and, collectively with EEOC, "plaintiffs") – intervened in this action seeking relief pursuant to Title VII and the New York State Human Rights Law ("NYSHRL"). The case went to trial and was submitted to a jury, which returned a verdict partially in plaintiffs' favor and partially in defendants' favor and awarded plaintiffs a total of $5,102,060 in compensatory and punitive damages. Pending before the court are plaintiffs' motion for injunctive relief, equitable relief, back pay, and entry of judgment, as well as plaintiffs' motion for attorneys' fees and costs. For the reasons and in the manner discussed below, plaintiffs' motions are granted in part and denied in part.

## BACKGROUND

The court presumes familiarity with the factual and legal background of this matter, as recited in its summary judgment Memorandum and Order, *EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377 (E.D.N.Y. 2016) ("*Onionhead I*"), and motions *in limine* Memorandum and Order (ECF No. 131, Memorandum and Order re Motions *in Limine*), and provides background only as necessary to resolve the instant motions.

In their pleadings, plaintiffs claimed that they were subjected to, *inter alia*, religious discrimination, reverse

religious discrimination, retaliation, and hostile work environment in defendants' workplace in violation of Title VII and NYSHRL. Supervisors in defendants' workplace purportedly imposed certain practices and beliefs, often referred to as "Onionhead" and "Harnessing Happiness," on plaintiffs.[1] On September 30, 2016, the court, *inter alia*, denied defendants' motion for summary judgment on plaintiffs' reverse religious discrimination claims and hostile work environment claims premised on reverse religious discrimination, and concluded that Onionhead/Harnessing Happiness qualifies as a religion for the purposes of Title VII. *Onionhead I, Inc.*, 213 F. Supp. 3d at 398-402.

On April 2, 2018, the parties began a three-week jury trial on plaintiffs' claims that defendants subjected nine claimants to a hostile work environment based on employer-imposed religious practices, subjected eight claimants to disparate treatment (including wrongful termination) based on claimants' rejection of defendants' religious practices, and subjected one claimant to disparate treatment (including wrongful termination) and retaliation based on that claimant's personal religious beliefs. For the purposes of trial and based on the court's memorandum and order on summary judgment, the

---

[1] The events underlying this action involve both Onionhead and Harnessing Happiness. The court refers to the programs collectively as Onionhead or Onionhead/Harnessing Happiness, except where the distinction is relevant.

parties stipulated that certain of defendants' alleged practices were religious, including, among other things: texts, beliefs, concepts, and practices concerning Onionhead, including meetings and workshops; statements by Chief Executive Officer ("CEO") Hodes and his aunt, Denali Jordan ("Denali"), that employees are "chosen"; praying in the workplace; and emails referencing God, spirituality, and demons. (ECF No. 184, Jt. Stip. Regarding Practices Deemed Religious; Trial Tr. at 15-16.)

On April 25, 2018, the jury returned a unanimous verdict in favor of all plaintiffs on all of their hostile work environment claims under Title VII and the NYSHRL, and plaintiff-intervenor Pabon's wrongful termination claim under Title VII and the NYSHRL. The jury returned a verdict in favor of defendants on the remainder of the claims. The jury awarded plaintiffs a total of $5,102,060, consisting of compensatory and punitive damages. The jury awarded a total of $3,011,000 in compensatory damages as follows: $225,000 to Benedict; $190,000 to Diaz; $570,000 to Honohan; $180,000 to Josey; $308,000 to Maldari; $590,000 to Ontaneda; $180,000 to Pegullo; $248,000 to Pennisi; $80,000 to Safara; and $440,000 to Pabon. The jury awarded a total of $2,091,060 in punitive damages as follows: $400,000 to Diaz; $900,000 to Ontaneda; $160,000 to Pegullo; $381,000 to Pennisi; and $250,000 to Pabon.

On June 8, 2018, plaintiffs filed the instant motions. They seek: (1) injunctive relief; (2) an award of backpay and prejudgment interest for plaintiff-intervenor Pabon; and (3) judgment on plaintiffs' modified damages award. Plaintiffs also seek: (1) attorney's fees and costs for plaintiff-intervenors' attorney; and (2) EEOC's taxable costs.

**DISCUSSION**

I. <u>**Injunctive Relief**</u>

    A. <u>Legal Standard</u>

Under Title VII, injunctive relief may be an appropriate remedy when the court determines that an employer "has intentionally engaged in or is intentionally engaged in such unlawful employment practice charged in the complaint[.]" 42 U.S.C. § 2000e-5(g)(1). Generally, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 32 (2008); *accord EEOC v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012). "Once a violation of Title VII has been established, the district court has broad, albeit not unlimited, power to fashion the relief it believes appropriate." *Bridgeport Guardians Inc. v. City of Bridgeport*, 933 F.2d 1140, 1149 (2d Cir. 1991). "The bounds of the court's discretion are set by the purposes of Title VII, which are to prevent discrimination and achieve equal employment

5

opportunity in the future[.]" *Berkman v. City of New York*, 705
F.2d 584, 594 (2d Cir. 1983).

In determining whether to award an injunction, the
court considers "the balance of equities and consideration of
the public interest." *Winter*, 555 U.S. at 32. The moving party
must demonstrate that "there exists some cognizable danger of
recurrent violation." *United States v. W.T. Grant Co.*, 345 U.S.
629, 633 (1953). "Courts will grant injunctive relief against
an employer when there is evidence of widespread and continuous
retaliation or harassment that indicates that the threat of
future bad acts is high." *Lewis v. Am. Sugar Refining, Inc.*,
No. 14-cv-2302 (CRK), 2018 WL 4179053, at *3 (S.D.N.Y. Aug. 15,
2018) (citing *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1215 (2d
Cir. 1993) and *KarenKim*, 698 F.3d at 100-02). A court may grant
injunctive relief even where a defendant has ceased the
offending conduct upon consideration of "the bona fides of the
[defendant's] expressed intent to comply" with the law, "the
effectiveness of the discontinuance," and "the character of the
past violations." *W.T. Grant*, 345 U.S. at 633. However, there
must be "something more than the mere possibility [of recurrent
violations] which serves to keep the case alive." *Id.*

B. Application

Plaintiffs seek permanent injunctions ordering that
defendants: (1) refrain from future religious discrimination and

harassment; (2) refrain from pressuring or requiring employees to participate in Onionhead, Harnessing Happiness, and the other practices previously deemed religious by the court; and (3) terminate their professional relationship with Denali Jordan ("Denali") and bar her from defendants' premises. (ECF No. 210-1, Memorandum of Law in Support of Plaintiffs' Motion for Injunctive and Equitable Relief and Entry of Judgment ("Pl. Mem. Relief & Damages") at 8.)[2] Plaintiffs also seek a five-year injunction requiring defendants to: provide anti-discrimination and anti-harassment training to employees by an outside monitor or other entity approved by the EEOC; revise their anti-discrimination and equal employment opportunity ("EEO") policies; retain an outside monitor to ensure compliance and investigate complaints of religious discrimination and harassment; comply with reporting requirements to ensure ongoing compliance with the law; and provide their employees with notice of this action and its outcome. (*Id.*)

Defendants argue plaintiffs have not satisfied their burden and therefore injunctive relief is not warranted. (ECF No. 212, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Injunctive and Equitable Relief and Entry of Judgment ("Def. Opp. Relief & Damages") at 9-33.)

---

[2] Citations to page numbers refer to those generated by the court's Electronic Case Filing ("ECF") system.

Specifically, defendants argue that injunctive relief is improper because plaintiffs cannot prove that defendants "intentionally created a hostile work environment" and that plaintiff-intervenor Pabon's discrimination claim alone cannot support injunctive relief. (*Id.* at 9.) They also argue there is no threat of a recurring violation. (*Id.* at 10-18.) Further, defendants contend that, even if plaintiffs can establish that injunctive relief is warranted, plaintiffs' requested relief is not narrowly tailored. (*Id.* at 18-33.)

The court grants in part and denies in part plaintiffs' request for injunctive relief, as discussed below.

### 1. *Injunctive Relief is Warranted*

#### a. Title VII Permits Injunctive Relief

As an initial matter, the court notes that defendants misconstrue Title VII. Without citing any case law, defendants contend that injunctive relief is only available where an employer intentionally discriminated against an employee, e.g., by intentionally creating a hostile work environment or intentionally discriminating against an employee. (ECF No. 212, Def. Opp. Relief & Damages at 9.) However, Title VII provides that a court may grant injunctive relief where an employer "intentionally engaged in [] an unlawful employment practice," 42 U.S.C. § 2000e-5(g), including in mixed motive cases where the employer "would have taken the same action in the absence of

the impermissible motivating factor," 42 U.S.C. § 2000e-5(g)(2)(b) (citing 42 U.S.C. § 2000e-2(m)).  Thus, where, as here, a jury finds that the defendant employer violated Title VII by maintaining a hostile work environment, the court is permitted to award injunctive relief consistent with the purposes of Title VII.  *See Bridgeport Guardians*, 933 F.2d at 1149 ("Once a violation of Title VII has been established, the district court has broad . . . power to fashion the relief it believes appropriate."); *see also Meegan v. City of Buffalo*, No. 79-cv-467, 1980 WL 18660, at *6 (W.D.N.Y. July 24, 2980) ("[A] showing of intent to discriminate is not necessary under Title VII.") (collecting cases).  Indeed, the Supreme Court has noted that courts have "not merely the power by the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albermarle Paper Co. v. MoodAlbermarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (citation and internal quotation marks omitted).

Similarly, defendants essentially argue that injunctive relief is inappropriate because the jury verdict did not state the specific legal theory on which the jury found defendants liable for maintaining a hostile work environment. (ECF No. 212, Def. Opp. Relief & Damages at 9.)  Taking this argument to its logical conclusion would require the use of a

9

special verdict or jury instructions charging only one theory of liability in order for the court to award injunctive relief. The court finds no support for defendants' position in Title VII or relevant case law. It is irrelevant for the purposes of awarding injunctive relief, therefore, that the jury instructions allowed the jury to find for plaintiffs on their hostile work environment claims on the basis that defendants intentionally committed, knew of, or should have known of the conduct giving rise to a hostile work environment and that the jury verdict did not specify which of those options applied to defendants. (*See* ECF No. 197, Final Jury Instructions at 28-33.) For example, in *KarenKim*, the jury found that the defendants were "liable for maintaining a 'sexually hostile work environment,'" but the jury verdict did not specify the exact basis for liability, i.e., whether KarenKim intentionally created, knew of, or should have known of the hostile work environment. *KarenKim*, 698 F.3d at 97, 100. (*See also* ECF No. 217-2, Verdict Sheet in *EEOC, et al. v. KarenKim, Inc., et al.* (N.D.N.Y., No. 08-cv-1019).) Nonetheless, the Second Circuit found that injunctive relief was appropriate to ensure that the defendant's former employee was "no longer in a position to sexually harass KarenKim employees." *KarenKim*, 698 F.3d at 100. Similarly, here, the jury found defendants liable for

maintaining a hostile work environment, so the court may, in its discretion, award plaintiffs injunctive relief.

> b.  Likelihood of Recurring Title VII Violations

Plaintiffs have demonstrated a likelihood that Title VII violations will reoccur.

First, evidence at trial established that the nature of defendants' past conduct, which was widespread and longstanding, supports a finding that violations are likely to reoccur.  *See W.T. Grant*, 345 U.S. at 633 (explaining that the court may consider, *inter alia*, "the character of past violations" when determining whether to award injunctive relief); *Malarkey*, 983 F.2d at 1215 (noting the relevance of whether past violations were "isolated" or "widespread"); *United States v. Blue Ribbon Smoked Fish, Inc.*, 179 F. Supp. 2d 30, 50 (E.D.N.Y. 2001) ("The probability of future violations may be inferred from past unlawful conduct."), *aff'd,* 56 F. App'x 542 (2d Cir. 2003).  The jury found defendants liable for Title VII violations in the form of maintaining a hostile work environment for over five years with respect to nine claimants and wrongfully terminating plaintiff-intervenor Pabon on the basis of religion.  Defendants' attempt to minimize the nature of defendants' violations by focusing only on the jury's verdict as to plaintiff-intervenor Pabon is inappropriate, as discussed above, and inconsistent with the evidence.  Similarly,

defendants' attempt to persuade the court to ignore record evidence supporting the jury's findings regarding the hostile work environment claims simply because "there were no individual findings by the jury as it related to each allegation of what constituted a hostile work environment," is unpersuasive.  (ECF No. 212, Def. Opp. Relief & Damages at 11.)  The evidence in the record and the nature of the jury's award of damages underscore the severe nature of defendants' Title VII violations and the pervasiveness of the hostile work environment.

Defendants' highest-ranking officers and managers, including CEO Hodes, Chief Operating Officer ("COO") Tracy Bourandas, and Customer Service Manager April Levine, and other individuals with supervisory authority enforced and permitted Title VII violations – wrongful termination and hostile work environment – to occur.  Denali, CEO Hodes' aunt, with whom he shared a "very close relationship," introduced, enforced, and oversaw various violative practices.  (Trial Tr. at 2034.) Denali, one of the creators of Onionhead, was hired by CEO Hodes and COO Bourandas ostensibly as a "consultant."  (*See, e.g.*, Trial Tr. at 1921-23, 2034-35, 2091.)  Nonetheless, many claimants testified that they understood Denali's role as that of a "spiritual advisor," and COO Bourandas introduced Denali,as a "boss[]," whom the plaintiffs understood to exercise influence over hiring, discipline, and terminations.  (Trial Tr. at 186,

191, 417, 687, 867, 1135-36, 1251-52, 1573, 1661; *see also* Trial
Tr. at 654 ("I got the sense that as a condition of my
employment, I needed to behave according to Denali's
suggestions."), 1014 (Pabon explaining that she was "under the
impression" that Denali was part of "management"); Jt. Ex. 15
(Denali writing in an email, "Where I feel the confusion
started, aside from me using the word God so often, is that I
was called a spiritual advisor.").)

CEO Hodes and COO Bourandas afforded Denali broad
authority to design and implement programmatic and religiously
suggestive décor changes as well as hold mandatory staff
meetings, during which Onionhead and Harnessing Happiness
principles were taught.  (Trial Tr. 1923-26, 1931, 1937-38,
2095, 2100-01, 2153-55.)  COO Bourandas approved and the company
funded a weekend retreat represented to be a "spa weekend,"
which Denali and Customer Service Manager April Levine ran, and
during which Denali conducted mandatory activities and meetings,
including those of a religious nature.  (Trial Tr. 1906, 2225;
*see, e.g.*, Jt. Ex. 55, Spa Weekend Invite.)  Claimants Diaz and
Pabon attended the spa weekend.  (Trial Tr. at 1686.)  CEO Hodes
allowed Denali to have input regarding personnel decisions,
office assignments and décor, and company goals and priorities.
(Trial Tr. 1970, 2095-2100.)  Further, CEO Hodes approved
Denali's salary, which totaled nearly one million dollars over

13

five years.  (*See, e.g.*, Trial Tr. 2092-93, 2100-01; Jt. Ex. 20,
Wonderland Consulting Invoices; Jt. Ex. 227, Wonderland
Consulting 1099 Form.)  As a result, Denali wielded significant
power over employees and the work environment.

Denali used her authority to implement numerous
workplace practices that the court previously determined to be
religious in nature, including changing the office décor to
include buddhas, angels, Onionhead paraphernalia with religious
references such as winged and haloed figures, and introducing
the use of lamp lighting, incense, and candles; creating a
meditation room that housed religious texts; requiring employees
to utilize Onionhead materials, such as pins and Universal Truth
Cards; sending spiritual emails to employees referring to
creation, spirits, and demons; conducting spiritual meetings and
prayer in the workplace, including employee prayer chains;
discussing the presence of demons in the workplace; encouraging
employees to kiss, hug, and express feelings of love to one
another; and requesting employees to share information about
their intimate partners and photographs of their children.
(*See, e.g.*, Trial Tr. 200-01, 209, 221-22, 233, 236-37, 250-51,
352-53, 428-31, 610-13, 854-55, 892-98, 976, 989, 1136-38, 1154-
56, 1158, 1218, 1462-64, 1476, 1540-41, 1921-24, 1949-51; Jt.
Ex. 6, Keys and Codes to Living Good Workshop at 1; Jt. Ex. 184,
January 19, 2011 Email from Denali (discussing buddha and

Denali's spiritual experiences in email to employees); Jt. Ex.
185, Undated Email from Denali (including discussions between
Hodes and Denali, with employees copied, regarding, among other
things, "good and evil" and "the spirit"); Pl. Ex. 28, February
1, 2012 Email Forwarded by Levine; Jt. Ex. 34, December 31, 2011
Email from Denali ("For those of you who have children, can you
please bring me a picture of them to hang on my office wall.
Thanks love denali[.]"); Jt. Ex. 35, January 23, 2012 Email from
Denali ("For those of you who have not done this.  PLEASE PLEASE
put the pictures of your children on my desk to hang on my wall.
Thank you love denali[.]").)  Denali also asked employees to
"cleanse" the office and the home where she and CEO Hodes stayed
when they visited New York from California in advance of their
arrival by lighting candles, chanting, and praying in those
spaces.  (Trial Tr. 697-702.)

        In addition to hiring and giving Denali authority
within defendants' company, members of defendants' management
team directly encouraged, contributed to, and engaged in the
Title VII violations by participating in and authorizing the
enforcement of religious practices in the workplace.  For
example, COO Bourandas admitted that she made the decision to
introduce Onionhead and Harnessing Happiness, and related
practices, and to authorize the creation of reading and
meditation rooms.  (Trial Tr. at 1951, 1953.)  She also enforced

employee participation in Onionhead activities, including
ensuring that employees signed up for Onionhead workshops,
conducting workshops herself, and distributing Onionhead
materials to employees.  (Trial Tr. at 231, 874, 1467-68, 1943.)
Eventually, Bourandas became part of Onionhead's leadership,
including serving as its President, CEO, and Executive Director
at points, and including serving as CEO as recently as October
2017.[3]  (Trial Tr. at 2020-24.)

CEO Hodes, Denali's nephew, was aware that COO
Bourandas and Denali were conducting Onionhead workshops in the
office with employees; was aware that after Denali arrived the
overhead lights were not being used and lamps, candles, and
incense were being burned in the office; described employees,
including claimant Honohan, as having "bad energy"; told
claimant Ontaneda she had a "black cloud" over her head; and
told employees that they were "chosen."  (Trial Tr. 261-62, 456-
57, 1489-92.)  Hodes' actions echo those of Denali; for example,
claimants Maldari and Pegullo testified that Denali discussed
the presence of "bad energy" at defendants' office, and Ontaneda
testified that Denali described defendants' employees as
"chosen."  (Trial Tr. at 423, 698, 1548; Jt. Ex. 184, January
19, 2011 from Denali (Denali describing employees as "chosen").)

---

[3] Onionhead was originally incorporated as a for-profit entity in May 2007,
and it became a 501(c)(3) non-profit entity in October 2011.  (Trial Tr. at
1679, 2022; ECF No. 175, Second Amended Joint Pre-Trial Order at 14.)

Customer Service Manager April Levine, who directly supervised many of the claimants, instructed employees to participate in Onionhead and other meetings with Denali and to read Denali's spiritual messages sent by email or other means. (Trial Tr. at 1251, 1259, 1946-47, 2265-66; Pl. Ex. 28, February 1, 2012 Email Forwarded by Levine (Levine instructing employees to read Denali's email, which writes, *inter alia*, "Friday, Feb.3rd, the [sic] planets are aligned in such a way that has only happened twice before in history….the dawning of Christ and the dawning of Islam. Friday will be big.").) Overall, the trial evidence demonstrates that defendants' highest-ranking officials, Bourandas and Hodes, as well as individuals with supervisory authority, Levine and Denali, were aware of and perpetuated practices that created, contributed to, and maintained a hostile work environment. Thus, the court finds that there is a likelihood that violations will reoccur.

These same individuals who created, contributed to, and maintained a hostile work environment are also responsible for Pabon's wrongful termination. Pabon testified that she was fired by Denali after refusing to participate in Onionhead-related activities at a company-sponsored spa weekend funded by defendants and run by Denali and Levine. (Trial Tr. at 1011-12, 1015-16; *see also* Jt. Ex. 182, Letter from Human Resources Director (stating Pabon's "employment was terminated for

insubordination for her refusal to attend a meeting when her Supervisor requested her attendance"); ECF No. 207, Jury Verdict at 3; Trial Tr. 1906, 2225.) Pabon also testified that, in connection with Pabon's termination, Denali had called her "an evil person filled with demons." (Trial Tr. at 1015.) The ongoing participation in the creation and maintenance of the hostile work environment by defendants' CEO, COO, managers, and supervisors, and Denali's continued employment, along with defendants' failure to prevent or otherwise correct the hostile work environment and Pabon's wrongful termination, support the court's finding that there is a likelihood of recurring violations.

The length of time during which these practices persisted also support a finding that there is a likelihood of recurrence. Many of the practices described above spanned multiple years. For example, claimants Maldari and Diaz, whose dates of employment by defendants did not overlap and respectively spanned from October 2004 through May 14, 2008 and July 2010 through December 20, 2012, described being subjected to similar religious practices, including being preached at; being forced to work by lamp lighting because of demons allegedly coming out of the overhead light fixtures; being required to participate in meetings that were personal and spiritual in nature and where employees engaged in prayer;

hearing employees described as angels; being moved to different offices to get rid of bad energy and demons; and being subjected to discussions of religion in the workplace. (Trial Tr. at 1219-20, 1462-64, 1469-73, 1476; *see* ECF No. 190-2 (providing dates of employment).)

Second, to date, defendants continue to employ and maintain professional relationships with individuals who were instrumental in implementing and encouraging practices that created, maintained, and contributed to a hostile work environment and Pabon's termination. As of the trial, defendants continued to employ CEO Hodes, COO Bourandas, and April Levine. (*See* Trial Tr. at 1732, 2033, 2122-23.) As described above, these individuals all perpetuated and enforced practices that contributed to a hostile work environment. Furthermore, Denali, who was by all accounts a driving force behind Onionhead and the related religious practices and who terminated Pabon, continues to provide "consulting services" to defendants and "all of [their] affiliated companies." (*See* Trial Tr. at 2034; *see also* ECF No. 183, Joint Stipulation to be Read to the Jury.)

Defendants make two arguments as to why Denali's presence should not be of concern, neither of which is persuasive. First, defendants contend that the nature of Denali's consulting services has changed. However, Denali's

19

services remain broad, thereby allowing her to maintain significant influence over the workforce. As described by COO Bourandas, Denali's current services pertain to "customer relations (i.e., handling complaints and strategizing ways to retain customers)." (*See* ECF No. 214, Declaration of Tracy Bourandas in Support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Injunctive Relief and Entry of Judgment ("Bourandas Decl.") ¶ 5.) Providing services as to the general area of "customer relations" still enables Denali to consult on matters involving defendants' customer service representatives, even if Denali does not work directly with the representatives, and company organization and personnel – two areas with respect to which Denali previously assisted.

Second, defendants argue that Denali's continued engagement is irrelevant because she lives in California and is incapable of traveling due to health issues. (ECF No. 212, Def. Opp. Relief & Damages at 11.) However, during the entire time period relevant to plaintiffs' claims, Denali lived in California and only visited defendants' office for one-week periods every month or couple of months. (*See, e.g.*, Trial Tr. 1777-78, 2042, 2136.) Nonetheless, even while Denali was in California, she continued to communicate with employees over the phone and via email, and employees were expected to continue following her directives, including compliance with Onionhead

and Harnessing Happiness practices.  (*See, e.g.*, Trial Tr. at
430, 690, 697, 702-03, 1140, 1221-22, 1481.)  Additionally, the
CEO of the company has, since 2005 continued to live primarily
in California and visit the office for about one week per month,
and defendants do not represent that his remote working
relationship impedes his authority and relationship with the
company.  (Trial Tr. 2041-42.)  Thus, the fact that Denali is
currently in California and purportedly unable to travel is not
dispositive of her ability to influence defendants and their
employees, especially given that she continues to maintain a
professional relationship with defendants.

> Defendants' lackluster anti-discrimination practices
and policies also weigh in favor of finding a likelihood that
violations will occur in the future.  Even though defendants
disseminated anti-discrimination policies to employees,
dissemination of those policies was inconsistent and defendants
never conducted employee trainings regarding those policies or
advising employees about what they should do if they believed
they were being discriminated against or harassed, or if they
did not receive a response to their complaints.  (Trial Tr. 175,
1173-74, 2016, 2351.)  Moreover, versions of the employee
handbook from 2007, 2011, and 2012 illustrate the obvious
shortcomings of defendants' prior policies, such as requiring
employees to report discrimination to their supervisors and

failing to address harassment in the workplace. (*See* Jt. Ex.
53, 2007 Handbook at 8; Jt. Ex. 10, 2011 Handbook at 8; Jt. Ex.
11, 2012 Handbook at 7.) Defendants' strengthened and expanded
anti-discrimination and anti-harassment policies, issued on the
eve of trial, provide the court with only minimal comfort given
that defendants have been aware of claimants' allegations of
discrimination for years prior to trial. (*See* ECF No. 213-1,
Declaration of Amy Traub in Support of Defendants' Memorandum of
Law in Opposition to Plaintiffs' Motion for Injunctive an
Equitable Relief and Entry of Judgment ("Traub Decl."), Exhibit
A ("Defendants' Dec. 2017 Handbook") at 9-12.)

Relatedly, Hodes and Bourandas were both made aware of
employees' complaints and concerns regarding Denali and the
practices she implemented, and they failed to take responsive or
corrective action. For example, CEO Hodes admitted that he was
aware that claimants and other employees had complaints and
concerns regarding Denali, including allegations of religious
discrimination, both directly from those individuals and
plaintiff-intervenors' attorney, Anthony Mango, and from the
EEOC. However, upon receiving complaints about Denali, which
were not explicitly religious in nature, Hodes simply had a
meeting where employees could air their grievances, and then he
did not take any corrective action. (Trial Tr. at 2035-37.)
Hodes and Bourandas again failed to take action in the wake of

receiving letters from Mango and the EEOC on behalf of claimants raising issues pertaining to religious discrimination and hostile work environment.  (Trial Tr. at 2090-91, 2101-02.)

COO Bourandas admitted that some claimants complained to her about certain practices implemented by Denali, including burning incense and the use of Onionhead materials, yet she allowed the complained-about practices to continue and continued to engage Denali's services and enforce Denali's authority and practices.  (*See, e.g.*, Trial Tr. 1956-57, 1960, 1974; Pl. Ex. 92 (Letter from plaintiff-intervenors' attorney to Bourandas and Hodes); Jt. Ex. 1 (Pennisi EEOC Charge).)  Although defendants argue that they took some remedial action, to the extent they did so, it was minimal and ineffective.  For example, defendants argue that they created sign-up sheets for Onionhead workshops to clarify that they were voluntary not mandatory, but claimants testified that the workshops were voluntary only in name.  (*See, e.g.*, Trial Tr. at 932 (Josey describing sign-up sheets as a "formality"), 1246 (Diaz explaining workshops were not voluntary even after sign-up sheets were introduced).)

Defendants' failure meaningfully to respond to prior complaints of religious discrimination weighs in favor of finding a likelihood of recurring violations, especially in light of defendants' continued professional relationship with and CEO Hodes' close familial relationship with Denali.  *See*

*KarenKim*, 698 F.3d at 101 ("Connors's past refusal to adequately respond to multiple complaints about Manwaring's conduct suggests that, so long as Manwaring remains in a romantic relationship with KarenKim's owner and highest officer, KarenKim will not take adequate remedial measures in response to any future harassment on the part of Manwaring.").

Similarly, defendants' continued refusal to accept responsibility or acknowledge wrongdoing, despite the jury verdict, further supports an inference that there is a likelihood of future violations. (*See* ECF No. 212, Def. Opp. Relief & Damages at 9 (minimizing defendants' liability for maintaining a hostile work environment), 10 (describing the jury verdict as "implicitly" finding a "alleged hostile work environment"); *see also id.* at 20 (arguing injunction against Denali unwarranted because "she did not believe she was imposing religion on employees" because "she did not believe that Onionhead or Harnessing Happiness was a religion").) *See E.E.O.C. v. Exel, Inc.*, No. 19-cv-3132 (SJC), 2014 WL 12538889, at *2 (N.D. Ga. Mar. 13, 2014) (including the defendant's failure to admit wrongdoing as support for finding that Title VII violation was likely to recur). Defendants' failure to take corrective action and to acknowledge their wrongdoing during and after violating Title VII, including after a jury verdict finding Title VII violations, supports a finding that defendants

have failed to provide any evidence that the Title VII violations are unlikely to recur.

Finally, the parties dispute, and the record evidence is not entirely clear as to, what extent, if at all, any of the violative practices continue at defendants' office to date. Regardless of whether defendants have ceased the offending conduct, the court finds that in light of defendants' past violations, continued employment of Hodes, Bourandas, and Levine, and continued affiliation with Onionhead and Denali, injunctive relief is warranted. *See W.T. Grant*, 345 U.S. at 633; *KarenKim*, 698 F.3d at 100-01. (*See* ECF No. 214, Bourandas Decl. ¶¶ 4, 6 (explaining Onionhead items are no longer displayed in the office but are still located in an employee's office and a "locked warehouse" and noting that employees will receive Onionhead materials if they "specifically request" those materials).)

### 2. Scope of Permanent Injunctive Relief

Plaintiffs ask that the court order a permanent injunction ordering defendants to: (1) refrain from religious discrimination and harassment; (2) refrain from pressuring or requiring participation in activities deemed religious by the court; and (3) terminate their professional relationship with Denali Jordan. (ECF No. 210-1, Pl. Mem. Relief & Damages at 8.) Notwithstanding defendants' argument that a permanent injunction

25

is not warranted here, defendants do not specifically object to plaintiffs' request that defendants' refrain from religious discrimination and harassment, and the parties have largely reached an agreement regarding the scope of the injunction as to defendants' imposition of practices deemed religious by the court.  (ECF No. 212, Def. Opp. Relief & Damages at 19 n.7; ECF No, 210-1, Pl. Mem. Relief & Damages at 16 n.28; ECF No. 210-2, Proposed Order Granting Injunctive Relief ("Proposed Order") at ¶ 2.)  Defendants object to plaintiffs' third request for permanent injunctive relief, regarding Denali, in its entirety. (*See* ECF No. 212, Def. Opp. Relief & Damages at 18-23.)  The court addresses plaintiffs' specific requests below.

With respect to the first prong of plaintiffs' request for permanent injunctive relief, plaintiffs request an order stating: "Defendants and their managers, officers, agents, contractors, parent organizations, successors, purchasers, assigns, subsidiaries, affiliates, any corporation or entity into which defendants may merge or with which defendants may consolidate, and any persons or entities acting on defendants' behalf are hereby enjoined from (a) engaging in religious harassment, including without limitation by creating or maintaining a hostile work environment based on religion; and (b) subjecting employees to religious discrimination including disparate treatment based on their rejection of imposed

religious practices in the workplace." (ECF No. 210-2, Proposed Order at ¶ 1.) Given the nature of the unlawful employment practices here, this language is appropriate and the court orders as much, with the modification to subsection (b): "subjecting employees to religious discrimination including, but not limited to, disparate treatment based on their rejection of imposed religious practices in the workplace."

Next, plaintiffs request an order enjoining defendants and their managers, officers, agents, contractors, parent organizations, successors, purchasers, assigns, subsidiaries, affiliates any corporation or entity into which defendants may merge or with which defendants may consolidate, and any persons or entities acting on defendants' behalf from

- Requiring or pressuring any employee to: read Onionhead or Harnessing Happiness texts, beliefs, concepts, and documents; attend Onionhead or Harnessing Happiness meetings and workshops; pray in the workplace; wear Onionhead pins; hug, kiss, hand-hold, or express love related to work; use Universal Truth Cards; use candles in the work place; chant in the workplace; read or respond to emails referencing God, spirituality, demons, Satan, divine destinies, the "Source," purity, blessings, miracles, "higher-guidance teachings," and a grail;

- Telling employees that they are "chosen" or that "God loves us all;" and

- Subjecting employees to any discussion related to angels or demons (which shall not apply to comments made in passing, like "she was like an angel" or "I had an angel on my shoulder").

(ECF No. 210-2, Proposed Order at ¶ 2.)  The court grants this request for relief.

Plaintiffs request permanent injunctive relief regarding defendants' professional relationship with Denali. Specifically, they request that the court order the following:

> Defendants and their managers, officers, agents, contractors, parent organizations, successors, purchasers, assigns, subsidiaries, affiliates, any corporation or entity into which Defendants may merge or with which Defendants may consolidate, and any persons or entities acting on Defendants' behalf are enjoined from: (a) employing, retaining, or compensating Denali Jordan as an employee, independent contractor, consultant, or in any other capacity; (b) permitting Denali Jordan to engage in any activities or provide any services to Defendants, whethefr paid or unpaid; and (c) permitting Denali Jordan to enter Defendants' building at 160 Eileen Way, Syosset, New York 11791, the surrounding premises, or any other building where defendants either regularly conduct business (hereinafter the "workplace").

(*Id.* ¶ 3.)

Defendants argue that this injunction is overbroad and insufficiently tailored to the violations at issue in this action.  The court disagrees.  Courts have found to be appropriate injunctions enjoining employers from employing individuals found liable for Title VII violations and from allowing such individuals to enter the employer's premises in circumstances analogous to those in the instant action.  *See, e.g.*, *KarenKim*, 698 F.3d at 101.  For example, in *KarenKim*, the Second Circuit found that the district court abused its

discretion in denying injunctive relief directed at ensuring that an individual sexual harasser who was employed by the defendant and in a romantic relationship with the defendant's owner and highest officer was "no longer in a position to sexually harass KarenKim employees." *Id.* at 100. Unlike here, in *KarenKim* the defendant had already fired that individual; nonetheless, the Second Circuit found that insufficient to prevent further harassment given that his romantic relationship with defendant's owner "was the primary reason why [the harasser's] conduct went unchecked for years," and "render[ed] it likely that that he will remain a presence at [the defendant's] store" absent the injunction. *Id.* at 101. Similarly, here, the court finds that Denali's close familial relationship with CEO Hodes enabled Denali to commit Title VII violations that went unchecked, and would continue to enable violations. The fact that defendants have not terminated Denali despite her central role in the violations underscores the extent to which defendants are shortsighted with respect to Denali and her role in the company's Title VII violations.

In *KarenKim*, after the Second Circuit remanded the action, the district court enjoined the defendant from hiring the harasser and enjoined the harasser, Manwaring, from entering the defendant's premises. (*See* ECF No. 210-4, *KarenKim* Injunction at 4-5, 8-9.) Defendants' attempt to analogize

Denali's "consulting" services to Manwaring's ability to
continue selling produce to the defendant company is
unpersuasive. Manwaring verbally and physically sexually
harassed multiple of KarenKim's employees. *KarenKim*, 698 F.3d
at 94-95. Thus, banning him from the premises and from future
employment was sufficient to prevent future harassment of the
kind he previously committed; selling produce to the company
without entering the premises obviates the possibility that he
would interact with the defendant's employees in a capacity that
would enable further harassment.

In the instant action, the violative behavior is not
so neatly confined. Denali's actions that contributed to
defendants' Title VII violations came directly from her and
through other of defendants' employees, occurred in person,
telephonically, and over email, and impacted the nature of the
work and activities in which defendants' employees participated.
Therefore, cabining Denali's professional relationship with
defendants to certain tasks or business areas would not assure
that court she was sufficiently disabled in her ability to
commit violations similar to those which she previously
committed. For the above stated reasons and in the manner
proposed by plaintiffs, the court grants plaintiffs' request to
enjoin defendants from maintaining a professional relationship
with Denali.

### 3. Term-Limited Injunctive Relief

In addition to requesting a permanent injunction, plaintiffs request that the court order defendants to: provide antidiscrimination training to employees; revise their anti-discrimination policies; retain an outside monitor; comply with reporting requirements to ensure ongoing compliance with the law; and provide notice to employees regarding this action and its outcome. (ECF No. 210-1, Pl. Mem. Relief & Damages at 8; ECF No. 210-2, Proposed Order ¶¶ 4-28; ECF No. 217, Pl. Reply Relief & Damages at 6-10.) For the reasons discussed below, the court grants in part and denies in part plaintiffs' request.

#### a. Remedial Term

Plaintiffs request that any injunctive relief described above be ordered for five years. (ECF No. 210-1, Pl. Mem. Relief & Damages at 21-22.) Defendants argue that, to the extent the court grants an injunction, a five-year term is overbroad. (ECF No. 212, Def. Opp. Relief & Damages at 33.) The court disagrees. Although the jury found that defendants maintained a hostile work environment that spanned five years, and approximately six years have passed since the last documented violation, as plaintiffs note, there is no way of knowing if the discriminatory practices have ceased. Consequently, the court finds that a five-year term is

appropriate.  The injunctive relief provided for below is
subject to a five-year term.

          b.  <u>Outside Monitor</u>

      Plaintiffs request that the court appoint an outside
monitor whose duties would consist of antidiscrimination and
antiharassment training, complaint processing, reviewing
employee terminations and separations for evidence of religious
discrimination, monitoring compliance with the court's order,
and drafting semi-annual reports summarizing compliance.  (ECF
No. 210-2, Proposed Order ¶¶ 4-11; ECF No. 210-2, Proposed Order
¶¶ 6-8, 26-28.)  Defendants object to the appointment of an
outside monitor in general and, if the court finds the reporting
requirements assigned to plaintiffs' proposed outside monitor
are necessary, defendants argue that a new human resources
director and/or defense counsel, BakerHostetler, specifically
Amy Traub, can perform those tasks.  (ECF No. 212, Def. Opp.
Relief & Damages at 23.)

      The court finds that an outside monitor is
appropriate.  It is within the court's power to appoint a third-
party monitor to oversee an injunction where, as here, there has
been a finding of Title VII violations.  *See United States v.
City of New York*, 717 F.3d 72, 97 (2d Cir. 2012).  Despite
BakerHostetler's qualifications, it would be inappropriate for
BakerHostetler to perform compliance and reporting functions,

further detailed below, in light of BakerHostetler's longstanding and present role as counsel for defendants in this action and risk of conflicts with its clients.  (*See* ECF entry dated November 11, 2014 (ordering stipulation substituting BakerHostetler, and, specifically, Amy Traub, as counsel for defendants).)  Further, the court finds that defendants' suggestion of hiring a new director of human resources, who has not previously worked for defendants is insufficient given that upper management has remained the same since the Title VII violations transpired and will have ongoing influence and authority over the Human Resources Director.  Therefore, the court grants plaintiffs' request to appoint an outside monitor.[4]

c.  <u>Antidiscrimination Policies</u>

Plaintiffs request that the court order defendants to revise their EEO policies with respect to religious discrimination and harassment.  (ECF No. 210-2, Proposed Order ¶¶ 12-18.)  Defendants argue that their current policy, established on December 14, 2017, is "robust" and plaintiffs' proposed revisions are overbroad and unnecessary.  (ECF No. 212, Def. Opp. Relief & Damages at 29-33.)  Of plaintiffs' requested revisions, defendants specifically object to the following:

---

[4] The court incorporates the concessions plaintiffs made in their reply memorandum of law regarding the deadline by which defendants must comply with selecting an outside monitor and notifying the outside monitor of receipt of complaints and terminations.  (*See* ECF No. 217, Pl. Reply Relief & Damages at 10 n.17.)

(a) including a detailed explanation of religious discrimination with examples from the instant action; (b) including a definition of hostile work environment and examples thereof; (c) including an anonymous vehicle for employee complaints; (d) including the EEOC's contact information; (e) rewriting the complaint procedure to identify numerous avenues for making complaints, such as bypassing supervisors, and explaining that complaints may be formal or informal; and (f) striking the portion of defendants' current EEO policy titled "False Accusation and Information." (*Id.*)

As a general matter, the court finds defendants' argument that there is no "evidence in the record that indicates Defendants' policies were not sufficient to put employees on notice that discrimination and harassment were prohibited" or that employees were not given an avenue to report complaints regarding discrimination and harassment to be unpersuasive and inconsistent with the record. (*See* ECF No. 212, Def. Opp. Relief & Damages at 30.) Defendants' employee handbooks from 2007, 2011, and 2012 do not discuss workplace harassment in any form nor do they provide a clear and effective avenue for reporting discrimination, even though they note that employees may do so. (*See* Jt. Ex. 10, Defendants' 2011 Employee Handbook at 8; Jt. Ex. 11, Defendants' 2012 Employee Handbook at 7; Jt. Ex. 53, Defendants' 2007 Employee Handbook at 8.)

Trial testimony also illustrates the shortcomings of defendants' policies. At trial, claimant Safara testified that she was not aware whether an anti-discrimination policy existed at defendants' company, even though one did in fact exist at the time. (Trial Tr. at 1173-74; Jt. Ex. 53, 2007 Handbook.) Similarly, Denali testified that she had never read the employee handbook and was not aware of any workplace policies or practices regarding religious discrimination or harassment.[5] (Trial Tr. at 2351.) Claimant Benedict testified that although she was aware that a complaint procedure existed for reporting complaints, she "felt like it would be futile" to report. (Trial Tr. at 677.)

The court finds reliable testimony that defendants inconsistently distributed the employee handbooks. Testimony from Denali, Ontaneda, and Safara demonstrates defendants' failure to distribute handbooks. (Trial Tr. 175, 1173-74, 2351.) Additionally, COO Bourandas testified that there was a practice in which employees signed and returned an acknowledgment form upon receipt of an employee handbook, but she herself noted that defendants "weren't [] diligent in

---

[5] Although defendants dispute that Safara never received an employee handbook, they do not dispute that Denali did not. (ECF No. 212, Def. Opp. Relief & Damages at 30 n.15.) Instead, they attempt to minimize this failure by quoting Denali's testimony that she was aware that workplace religious discrimination and harassment are unlawful. (*Id.*) This argument falls flat, particularly in light of Denali's substantial role in creating and maintaining a hostile work environment.

getting people to sign it and [] give it back."  (Trial Tr. at
1753.)

Defendants also argue that claimants' lack of
complaints regarding defendants' policies demonstrate that the
policies do not need revision.  (ECF No. 212, Def. Opp. Relief &
Damages at 30.)  Not only is this argument unpersuasive and
illogical, but it misses the point – what is relevant is that,
to the extent defendants even had relevant policies, their
employees were unaware of it and/or felt uncomfortable utilizing
those policies.

Having found defendants' general objections to
revising their EEO policies unpersuasive, the court addresses
defendants' specific objections in turn.  First, given the
unique nature of the religious discrimination at issue in this
action, the court finds it appropriate that defendants be
required to include examples of religious discrimination from
this action in their EEO policies.  This is especially important
given that the specific type of religious discrimination at
issue in this action – reverse religious discrimination – is not
addressed by defendants' current policies.

For similar reasons, the court finds it appropriate
that defendants include in their EEO policies a definition of
hostile work environment, including, but not limited to, hostile
work environment based on religion, which includes examples from

this action.  Defendants' unsupported argument that a definition
of hostile work environment might chill employee complaints is
entirely unpersuasive, especially when combined with the other
changes required by the Injunctive Order described herein.  (*See*
ECF No. 212, Def. Opp. Relief & Damages at 31 ("A definition of
a hostile work environment may actually give an employee the
impression that he or she is not permitted to report one-off
comments but instead must wait until the harassment is
sufficiently severe or pervasive.").)  Moreover, defendants'
current harassment policy merely references religion-based
harassment, a reference which is further minimized by the
handbook's detailed discussion of sexual harassment.  (ECF No.
213-1, Defendants' Dec. 2017 Handbook at 9-10.)  Thus, the court
finds it appropriate to order defendants to revise their anti-
harassment and anti-discrimination policies to address more
directly the violations uncovered by this action.

Defendants argue that plaintiffs' request for an
"anonymous vehicle" for complaints is overbroad and "almost
impossible" due to the small size of the company.  (ECF No. 212,
Def. Opp. Relief & Damages at 32.)  The small size of
defendants' company, which was no more than 20 employees between
2007 and 2012 does not obviate the need for an anonymous
reporting system.  (*See* ECF No. 145, Joint Amended Pre-Trial
Order ¶ 23; Trial Tr. at 1678.)  If anything, the intimate

nature of defendants' workplace, which has historically included family members and close friends, weighs in favor of providing an anonymous reporting vehicle. Although it may require innovative measures to implement an effective procedure, that is not reason enough to deny plaintiffs' request. Thus, the court grants plaintiffs' request that defendants revise their anti-discrimination policy to include a procedure for filing complaints anonymously that will be subject to the EEOC's approval.

Defendants' objection to including contact information for the EEOC in its antidiscrimination policy is also unpersuasive. They argue that the contact information is unnecessary because "employees were well aware that an EEOC investigation was ongoing, and even received letters from the EEOC regarding the claims, still they did not find it necessary to report any harassment or discrimination to the EEOC." (ECF No. 212, Def. Opp. Relief & Damages at 32 (citation omitted).) However, the letter to which defendants cite was addressed to Sandra Benedict, who subsequently became a claimant in this action, demonstrating the very utility of providing employees with information about and how to contact the EEOC. Therefore, the court grants plaintiffs' request that defendants include the EEOC's contact information in their EEO policies.

Plaintiffs seek a revision to defendants' EEO policies to include "a clearly-defined complaint process that provides a number of accessible avenues by which complaints can be made, makes clear that employees may bypass their immediate supervisors and speak to the Outside Monitor (in the case of religious harassment or discrimination), human resources personnel, or other managers, supervisors, and executives outside the employee's chain of command, and assures that Defendants will accept any and all complaints from employees who wish to file complaints, whether formally or informally." (ECF No. 210-2, Proposed Order ¶ 16(a).) Defendants contend that their current policy, issued on December 14, 2017, satisfies these requirements. (ECF No. 212, Def. Opp. Relief & Damages at 31-32.) The court agrees that defendants' revised policy complies with plaintiffs' request, and therefore plaintiffs' request is denied, except to the extent that defendants shall amend Section 3.3 of their employee handbook to clarify and add that employees may make complaints concerning conduct on the part of supervisors, managers, contractors, and third party consultants, and that complaints regarding religious or other discrimination or harassment may also be raised with the Outside Monitor. (*See* ECF No. 213-1, Defendants' Dec. 2017 Handbook 10-11.)

Finally, plaintiffs object to a subsection of the section on reporting discrimination in defendants' handbook titled "False Accusations and Information," which provides:

> The Company recognizes that false accusations under this policy and the providing of false information in an investigation can have a serious effect on innocent persons. Thus, while the Company encourages the reporting of unwelcome conduct perceived to be a violation of this policy, if the Company determines that a person has intentionally provided false information in making a complaint or in an investigation under this policy, the Company will take appropriate corrective action, up to and including termination of employment.

(*Id.* at 11.) Plaintiffs argue that this subsection will have a chilling effect on employees and, therefore, should be removed. (ECF No. 210-1, Pl. Mem. Relief & Damages at 17.) The court agrees. Even though the policy provides that corrective action will only be taken if a person "intentionally" provides false information, it is unclear who determines what information or accusations are considered "false" or intentional, and therefore allows, among other things, that the very person who was accused may have the authority to determine the veracity of the complaint. This scenario is especially problematic given the facts of the instant action, which involve upper management creating, maintaining, or contributing to Title VII violations which upper management adamantly denied occurred, in part because of the unusual nature of the religious discrimination at hand. Therefore, the court grants plaintiffs' request that

defendants be ordered to remove the subsection titled "False Accusations and Information" from their employee handbook.

### d. Antidiscrimination Training

Plaintiffs request that the court order defendants to conduct certain religious discrimination and harassment training.  Specifically, plaintiffs request that for the term of this injunction:

- All trainings will be conducted at defendants' expense by the Outside Monitor or another third-party approved by the EEOC.

- Within thirty (30) days of this order and annually thereafter, defendants will provide all supervisory, management, and human resources personnel (including Tracy Bourandas, Robert Hodes, April Levine, and Sharon Ali) at least four (4) hours of live training on the following subjects: the rights of employees and the obligations of employees under Title VII and the NYSHRL, with a detailed explanation of discrimination, including religious discrimination, religious harassment, hostile work environments based on religion, and defendants' obligation to address discriminatory and harassing conduct on the part of alleged third-parties and consultants; the contents of defendants' anti-discrimination policy, as revised (see below); the procedure for investigating and responding to employee complaints, and engaging in corrective action in a competent and legally-appropriate manner; the right of employees to engage in protected activity free of retaliation or reprisal; and the content and requirements of the court's order for injunctive relief. Defendants will provide training to all new employees within thirty (30) days of their hire or promotion, and annually thereafter.

- Within thirty (30) days of this order and annually thereafter, defendants will provide all non-management and non-supervisory employees (including consultants and independent contractors) at least two (2) hours of live training on the following subjects: the rights of

employees and obligations of employers under Title VII and the NYSHRL generally and with a detailed explanation of religious discrimination, religious harassment, hostile work environments based on religion, and defendants' obligation to address discriminatory and harassing conduct on the part of alleged third-parties and consultants; the contents of defendants' anti-discrimination policy, as revised; the procedure for making internal complaints of discrimination and harassment; the procedure for making external complaints, including to the EEOC and state and local agencies; the right of employees to engage in protected activity free of retaliation or reprisal; and the content and requirements of the court's injunctive order.

- Defendants must provide the EEOC with proposed written materials and a training outline for approval within fourteen (14) days of the first training session and confirm that the EEOC-approved training was provided, and every training session thereafter if any changes are made to the materials or the outline. If the EEOC disapproves of the proposed training materials, the EEOC will work with the Outside Monitor to produce suitable training materials.

- Defendants must maintain attendance sheets identifying each person who attended each training session, and must forward a copy of the attendance sheets to the EEOC within fourteen (14) days of each training session.

(ECF No. 210-2, Proposed Order ¶¶ 19-23.)

Defendants contend that, to the extent the court issues injunctive relief, they "would agree to conduct anti-harassment training based upon religion for its managers" and "non-managerial employees," but that plaintiffs' request is otherwise overbroad.  (ECF No. 212, Def. Opp. Relief & Damages at 25-27.)  Specifically, defendants argue that plaintiffs' request is too broad because it seeks training regarding

42

employees' rights under Title VII and the NYSHRL, but this action only involved violations regarding religion. (ECF No. 212, Def. Opp. Relief & Damages at 25-26.) The court is troubled by the fact that defendants have never provided any anti-discrimination training to their employees and disagrees with defendants insofar as defendants seek to limit court-ordered training to religious discrimination and harassment. The training must advise employees of the protected classes (race, sex, national origin, color, religion, and sexual preference) under Title VII and the NYSHRL. *See EEOC v. DCP Midstream*, 608 F. Supp. 2d 107, 113 (D. Me. 2009) (limiting training requirement to illegal employment practice (retaliation) found by the jury but not to protected class (race) on which violation was based). Thus, the court grants plaintiffs' request that defendants be required to provide trainings to employees on employees' rights under Title VII and the NYSHRL.

Defendants also argue that four hours of training is too long for managerial employees and two hours of training is too long for non-managerial employees; instead, defendants propose that one hour and a half hour, respectively, are appropriate. (ECF No. 212, Def. Opp. Relief & Damages at 25-26.) The court agrees that the length of the trainings plaintiffs seek is too long. Instead, the court orders that

43

defendants shall provide all supervisory, management, and human resources personnel with at least two (2) hours of live-training and all non-management and non-supervisory employees (including consultants and independent contractors) at least one (1) hour of live-training. *See E.E.O.C. v. Boh Bros. Const. Co., LLC*, No. 09-cv-6460, 2011 WL 3648483, at *3 (E.D. La. Aug. 18, 2011) (ordering Title VII annual training "of not less than two-hours' duration" for all employees), *vacated sub nom. E.E.O.C. v. Boh Bros. Constr. Co.,* 689 F.3d 2458 (5th Cir. 2012), *on reh'g en banc,* 731 F.3d 444 (5th Cir. 2013), and *aff'd in part, vacated in part sub nom E.E.O.C. v. Boh Bros. Constr. Co.,* 731 F.3d 444 (5th Cir. 2013); *DCP Midstream*, 608 F. Supp. 2d at 113 (ordering one-hour training for management, supervisory, and non-management employees).

Defendants also contend that requiring them to provide training materials for the trainings discussed above within fourteen (14) days of this order is too onerous. (ECF No. 212, Def. Opp. Relief & Damages at 27 n.13.) Because the court finds that the EEOC should receive a copy of any anti-religious-discrimination training materials at least fourteen (14) days prior to any such training, the court orders that defendants shall provide the above-described trainings within sixty (60) days of this order, as opposed to the thirty days requested by plaintiffs.

Finally, defendants argue that requiring defendants to provide the above-described training to new employees within thirty (30) days of hire is too restrictive, and annual training is sufficient. (ECF No. 212, Def. Opp. Relief & Damages at 26-27.) The court disagrees. Timely anti-discrimination and anti-harassment training for new employees is important, and if defendants only offer annual training to new employees, an employee could be employed for almost an entire year before receiving the training, depending on when he or she is hired. Therefore, the court requires defendants to provide the above-described training to new employees within thirty (30) days of being hired.

e. <u>Notice</u>

Plaintiffs request that the court order defendants to comply with notice requirements, specifically:

> Within fourteen (14) days of the entry of this Order, or within fourteen (14) days of hire in the case of new employees, Defendants must provide employees with a Notice Letter advising them of this action, the verdict against Defendants, the provisions of this Order, and contact information for the Outside Monitor and the EEOC. The Notice Letter must be signed by either Defendants' Chief Executive Officer or Chief Operating Officer. . . . Each employee given a copy of the Notice Letter must sign an acknowledgment of receipt. Defendants will maintain such acknowledgements for the duration of this Order.

And:

> Within fourteen (14) days of the entry of this Order, Defendants must post a Posted Notice in their break

room advising employees of this action, the verdict
against Defendants, the provisions of this Order, and
the contact information for the Outside Monitor and
the EEOC.  The Posted Notice will be laminated, appear
on EEOC letterhead, and be printed on poster size
stock of 8" x 24."  . . .  The Posted Notice must
remain on display in the workplace for the duration of
this Order.

(ECF No. 210-2, Proposed Order ¶¶ 26-27.)  Plaintiffs argue that

the posting requirements serve various functions, including

educating employees about their rights and the terms of the

court's order, alerting employees to available complaint

mechanisms, advising personnel of their obligation to maintain a

workplace free from religious discrimination, and securing

compliance with the court's order.  (ECF No. 217, Pl. Reply

Relief & Damages at 10.)

        Defendants argue that the requested notice is

unnecessary given that only upper management, i.e., Hodes,

Bourandas, Denali, and Levine, and not "rank and file

employees," were charged with committing acts in violation of

Title VII and because anti-discrimination training would serve

the same purpose as any notice.  (ECF No. 212, Def. Opp. Relief

& Damages at 27-29.)  Moreover, defendants argue that, to the

extent the court finds notice appropriate, including the jury

award in such notice is inappropriate given the applicable

statutory caps, discussed below, and because the award "[will]

in no way [] assist in preventing future violations." (*Id.* at 28-29.)

The court finds that both the Notice Letter and the Posted Notice are appropriate, even though defendants' employees will receive anti-discrimination training, because defendants continue to employ individuals who contributed to defendants' Title VII violations. *See DCP Midstream*, 608 F. Supp. 2d at 112 (granting plaintiffs' request that defendants post a remedial notice detailing the verdict and the order providing injunctive relief, as well as requiring defendants to conduct Title VII training and distribute retaliation policies and procedures); *cf.* ECF No. 210-4, *KarenKim* Injunction at 4-5, 8-9 (denying the plaintiffs' request to include posting requirement where the individual largely responsible for the violative conduct was no longer employed by the defendant and defendant was enjoined from re-hiring, employing, or compensating him, or allowing him onto the defendant's premises).

Nonetheless, the court finds that including the amount of the jury award in the notice is unnecessary, especially given that the jury awarded damages that are subject to statutory caps and that defendants intend to move for remittitur. Including the jury award in the notice, therefore, would be not only misleading but also possibly confusing. Additionally, consistent with defendants' deadline for selecting an Outside

Monitor, defendants have thirty (30) days from the date of this order to comply with the notice requirements.  Subject to the above modifications and consistent with the nature of the relief the court grants, plaintiffs' request regarding posting and notices is granted.

### f.  Reporting Requirements

Plaintiffs request injunctive relief requiring defendants to provide to the EEOC and the outside monitor every six months written certification that defendants have complied with the terms of the court's injunctive order; a spreadsheet identifying all employees, consultants, and contractors retained or employed by defendants during the relevant period and providing certain information about those individuals; and copies of all attendance records for trainings and acknowledgment forms confirming employee receipt of defendants' notice letter and anti-discrimination policy, both discussed above.  (ECF No. 210-2, Proposed Order ¶ 26.)  Plaintiffs also request that the court order defendants to retain and preserve all documents and records related to relief under or defendants' compliance with the court's injunctive order.  (*Id.* ¶ 27.)  Defendants object.  (ECF No. 212, Def. Opp. Relief & Damages at 25.)  The court finds that plaintiffs' proposed reporting requirements are narrowly tailored and not onerous.  Therefore,

the court adopts plaintiffs' proposed reporting requirements in
their entirety.

## II.  Plaintiff-Intervenor Faith Pabon's Back Pay and Prejudgment Interest

The parties agree that Pabon is entitled to back pay
and prejudgment interest, but they disagree as to two elements
of the back pay calculation.  Below, the court first addresses
the parties' disputes regarding back pay and then provides the
applicable method for determining prejudgment interest on that
award.

### A.  Back Pay

Back pay is available under Title VII and the NYSHRL
for individuals who were wrongfully terminated.  *DeCurtis v.
Upward Bound Int'l., Inc.*, No. 09-cv-5378 (RJS), 2011 WL
4549412, at *3 (S.D.N.Y. Sept. 27, 2011) (citing 42 U.S.C. §
2000e-5(g)(1) and N.Y. Exec. Law § 297(4)).  The purpose of back
pay is "to restore the employee to the status quo [s]he would
have enjoyed if the discriminatory discharge had not taken
place."  *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 166 (2d Cir.
1998) (citation and internal quotation marks omitted).  A
plaintiff is ordinarily "entitled to an award of back pay from
the date of her termination until the date of judgment," and the
award usually consists of "lost salary, including anticipated
raises, and fringe benefits."  *Saulpaugh v. Monroe Cmty. Hosp.*,

4 F.3d 134, 144-45 (2d Cir. 1993). Uncertainties in calculating back pay awards should be resolved in the employee's favor. *Malarkey*, 983 F.2d at 1214-15.

Ms. Pabon is entitled to back pay from the date of her termination, March 19, 2012, through approximately September 2013, when she stopped working due to illness. (ECF No. 210-1, Pl. Mem. Relief & Damages at 24 n.44 (agreeing to limit Pabon's back pay claim up to her last date of employment subsequent to her employment with defendants); *see also* Trial Tr. at 1020.) The parties agree that Pabon is entitled to a back pay award of at least $39,101.47, consisting of: $46,311.66 for lost salary (based on her salary of $30,874.38 at the time of her termination) from March 19, 2012 through September 2013; *plus* lost benefits in the amount of $839.65 for gym membership (valued at $119.95 per month and available until January 2013), $128.34 for a vision and dental plan (valued at $7.13 per month), and $211.32 for long-term disability insurance, life insurance, and for accidental death and dismemberment insurance (valued at $11.74 per month); *less* Pabon's interim earnings in the amount of $8,389.50. (*See* ECF No. 210-1, Pl. Mem. Relief & Damages at 22-25; ECF No. 212, Def. Opp. Relief & Damages at 33-34; ECF No. 217, Pl. Reply Relief & Damages at 10-11.)

The parties dispute two issues regarding back pay: (1) whether Ms. Pabon is entitled to back pay for lost raises;

and (2) the value of Ms. Pabon's 401k benefit.  With respect to raises, plaintiffs argue that Ms. Pabon is entitled to an award that accounts for a 10% annual salary raise.  (ECF No. 210-1, Pl. Mem. Relief & Damages at 23-24; ECF No. 217, Pl. Reply Relief & Damages at 10-11.)  In support, they cite to Ms. Pabon's trial testimony that she received 10% annual raises (Trial Tr. at 1016-1017), Ms. Honohan's testimony that raises were "performance based" (Trial Tr. at 179), and testimony that Ms. Pabon performed well (Trial Tr. at 2236, 2456).  (ECF No. 210-1, Pl. Mem. Relief & Damages at 23-24; ECF No. 217, Pl. Reply Relief & Damages at 10-11.)  Defendants argue that Ms. Pabon's award should not include a 10% raise because Pabon received a raise four months prior to her termination and because employees were not guaranteed annual raises.  (ECF No. 212, Def. Opp. Relief & Damages at 33-34.)

The court finds that Ms. Pabon is entitled to a back pay award that accounts for a 10% annual salary raise. Ms. Pabon testified that she received 10% annual raises throughout her employment with defendants.  (Trial Tr. at 1028, 1217.)  Moreover, although defendants argue that employees were not guaranteed raises, trial testimony demonstrated that many employees received annual raises ranging from 6% to 20%, and they occasionally received more than one raise in a single year. (*See* Trial Tr. at 180 (Honohan received a 7.9% raise in 2007 and

a 10% raise in 2011), 307-08 (Honohan's raises ranged from 5% to 10%), 463 (Ontaneda received a raise of around 7% after every review), 473-75 & 516 (Ontaneda received two 6% raises one year); 1217 & 1398 (Diaz received annual raises, including one 20% raise), 1446-47 & 1456 (Maldari received raises, including one 12-13% raise), 1616 (Pennisi received "regular raises" after every review).)  Additionally, any uncertainty ought to be resolved in Ms. Pabon's favor.  *See Malarkey*, 983 F.2d at 1214-15.  Therefore, the court finds that Ms. Pabon's claim to a 10% annual salary raise is grounded in evidence and warranted as part of her back pay calculation.  Accordingly, Pabon is entitled to $4,631.17 for her 10% salary increase.

As for Ms. Pabon's 401k, plaintiffs argue that Ms. Pabon is entitled to an award equaling a match of 6% of Ms. Pabon's salary because defendants matched contributions up to 6% and Ms. Pabon was contributing 6% to her 401k at the time of her termination.  (ECF No. 210-1, Pl. Mem. Relief & Damages at 23-24; ECF No. 217, Pl. Reply Relief & Damages at 11.) Defendants argue that Ms. Pabon is only entitled to an award that equals what Ms. Pabon was contributing at the time of her termination, $148.08 per month.  (ECF No. 212, Def. Opp. Relief & Damages at 34.)  Ms. Pabon's monthly 401k contribution of $148.08 equaled 5.76% of her annual salary at the time of her termination.  Accordingly, she is entitled to back pay for her

lost 401k benefits in the amount of 5.76% of her salary.  Thus, Ms. Pabon is entitled to $2,639.76 in back pay for her lost 401k benefits.

Based on the foregoing, Ms. Pabon's total back pay award amounts to $46,372.40.

B.    Pre-Judgment Interest

Pre-judgment interest on back pay awards is an element of complete compensation.  *Loeffler v. Frank*, 486 U.S. 549, 558 (1988).  "Title VII authorizes a district court to grant pre-judgment interest on a back pay award to discourage employers from attempting to purposely delay paying back wages."  *Joseph v. HDMJ Restaurant, Inc.*, 970 F. Supp. 2d 131, 151 (E.D.N.Y. 2013) (collecting cases).  The court should apply "the federal interest rate based on the average rate of return on one-year Treasury bills for the relevant time period between the time the claim arises until the entry of judgment pursuant to 28 U.S.C. § 1961(a)."  *Levy v. Powell*, No. 00-cv-4499 (SJF), 2005 WL 1719972, at *3 (E.D.N.Y. July 22, 2005).  Prejudgment interest should be calculated from the time the claim arises through the date of judgment as follows:

> First, the [back pay] award[] should be divided pro rata over the appropriate time period.  Second, once the award is divided, the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961 will be applied.  Third and finally, in order to guarantee complete compensation to the plaintiff, the interest will be compounded annually.

*Id.* (alterations in original) (citation and internal quotation marks omitted); *see also Joseph*, 970 F. Supp. 2d at 151-52 (collecting cases).

The parties agree that Pabon is entitled to prejudgment interest calculated in the manner described above. (*See* ECF No. 210-1, Pl. Mem. Relief & Damages at 25; ECF No. 212, Def. Opp. Relief & Damages at 34; Pl. Reply Relief & Damages at 11.)  The court also agrees.  The Clerk of Court is directed to use this methodology to calculate the interest on the back pay award.  Specifically, the Clerk of Court should divide the back pay award of $46,372.40 pro rata from March 19, 2012 to the date of judgment and apply the average annual United States Treasury bill rate of interest referred to in to 28 U.S.C. § 1961(a) from 2012 to 2018; the interest should be compounded annually.

### III.  <u>Compensatory and Punitive Damages</u>

Title VII caps compensatory and punitive damages awards based on an employer's size.  42 U.S.C. § 1981a(b)(3). Because defendants had more than 14 and fewer than 100 employees during the relevant period, here compensatory and punitive damages under Title VII are capped at $50,000 per claimant.  *Id.* The NYSHRL allows for and does not cap compensatory damages for employment discrimination, N.Y. Exec. Law § 297(4)(c)(iii), but it does not allow for punitive damages, *Tse v. UBS Financial*

*Services, Inc.*, 568 F. Supp. 2d 274, 309 n.24 (S.D.N.Y. 2008)
(citing *Thoreson v. Penthouse, Int'l, Ltd.*, 80 N.Y.2d 490, 494
(N.Y. 1992)).

The plaintiff-intervenors – Ontaneda, Pabon, and
Pennisi – all brought claims pursuant to Title VII and the
NYSHRL. Therefore, their compensatory damage awards are not
capped, but their punitive damages awards are capped at $50,000.
The remaining claimants – Benedict, Diaz, Honohan, Josey,
Maldari, Pegullo, and Safara – brought claims pursuant only to
Title VII. Therefore, each of their combined compensatory and
punitive damages is capped at $50,000. Without prejudice to
defendants' right to move for remittitur following the entry of
judgment, the parties agree that judgment should be entered
against defendants as follows:

- Ontaneda: $640,000 (consisting of $590,000 in
  compensatory damages and $50,000 in punitive damages);

- Pennisi: $298,000 (consisting of $248,000 in
  compensatory damages and $50,000 in punitive damages);

- Pabon: $490,000 (consisting of $440,000 in compensatory
  damages and $50,000 in punitive damages);

- Diaz: $50,000 (consisting of $40,000 in compensatory
  damages and $10,000 in punitive damages);

- Pegullo: $50,000 (consisting of $40,000 in compensatory
  damages and $10,000 in punitive damages);

- Benedict: $50,000 (consisting of $50,000 in compensatory
  damages);

- Honohan: $50,000 (consisting of $50,000 in compensatory damages);

- Josey: $50,000 (consisting of $50,000 in compensatory damages);

- Maldari: $50,000 (consisting of $50,000 in compensatory damages); and

- Safara: $50,000 (consisting of $50,000 in compensatory damages).

(*See* ECF No. 210-1, Pl. Mem. Relief & Damages at 25-27; ECF No. 212, Def. Opp. Relief & Damages at 35-36; ECF No. 217, Pl. Reply Relief & Damages at 10.)  The court agrees.  Judgment should be entered as described above without prejudice to defendants' right to move for remittitur.

## IV.  <u>Attorney's Fees and Costs</u>

### A.  <u>Plaintiff-Intervenors' Attorney's Fees</u>

Plaintiffs move for attorney's fees for plaintiff-intervenor's counsel, Anthony Mango ("Mango").  Although defendants agree that plaintiffs are entitled to Mango's fees, they object to Mango's requested hourly fee as excessive and they argue that the total requested amount should be reduced due to the fact that plaintiffs did not prevail on all of their claims.  For the reasons discussed below, plaintiffs' motion is granted in part and denied in part.

*1. Hourly Fee*

a. <u>Legal Standard</u>

Under Title VII, "the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee[.]" 42 U.S.C. § 2000e-5(k). The "typical formulation" of a "prevailing party" is that plaintiffs may be considered such for attorney's fees purposes "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 & n.7 (1983) (discussing prevailing party in the context of 42 U.S.C. § 1988 but noting the attorney's fee provision in that statute is patterned on Title VII) (citation and internal quotation marks omitted); *see also Lyte v. Sara Lee Corp.*, 950 F.2d 101, 103 (2d Cir. 1991) (explaining Title VII and 42 U.S.C. § 1988 prevailing party fee provisions are construed in the same fashion). "[A] prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417 (1978) (emphasis omitted).

If attorney's fees are warranted, they are determined using the lodestar method, which entails "multiplying the number of attorney hours reasonably expended by a reasonable hourly rate." *Munson v. Diamond*, No. 15-cv-425 (DAB) (BCM), 2017 WL

4863096, at *10 (S.D.N.Y. June 1, 2017) (citing *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999)).  The burden is on the party seeking attorney's fees to provide sufficient evidence to support the hours worked, nature of the work performed, and rates claimed.  *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *see also N.Y. State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1147-48 (2d Cir. 1983).  The presumptively reasonable fee is that which "a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively."  *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 112, 118 (2d Cir. 2007), *amended on other grounds,* 522 F.3d 182 (2d Cir. 2008)).  Courts employ the "forum rule," which provides that courts "should generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee."  *Arbor Hill*, 493 F.3d at 119 (citation and internal quotation marks omitted); *see also Blum*, 465 U.S. at 895.  In assessing the reasonableness of a fee, the court may also consider "the type of case, the nature of the litigation, the size of the firm, and the expertise of its attorneys."  *Barbu v. Life Ins. Co. of N. Am.*, No. 12-cv-1629 (JFB) (SIL), 2015 WL

778325, at *3 (E.D.N.Y. Feb. 24, 2015) (citation and internal quotation marks omitted).

      b.  <u>Application</u>

The parties do not dispute, and the court agrees, that plaintiff-intervenors are the "prevailing party" and, as such, are entitled to reasonable attorney's fees. (ECF No. 211-1, Memorandum of Law in Support of Plaintiffs' Motion for Attorneys' Fees and Costs ("Pl. Fees & Costs Mem.") at 2-4; ECF No. 215, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Attorneys' Fees and Costs ("Def. Opp. Fees & Costs Mem.") at 7; ECF No. 218, Plaintiffs' Reply Brief in Support of Plaintiffs' Motion for Attorneys' Fees and Costs ("Pl. Reply Fees & Costs Mem.") at 2.) Plaintiff-intervenors argue that they are entitled to fees for 466.5 hours worked by their counsel, Mango, which defendants and the court agree is a reasonable number of hours given the nature and history of this case. (ECF No. 211-1, Pl. Fees & Costs Mem. at 7; ECF No. 211-3, Mango's Invoices; ECF No. 215, Def. Opp. Fees & Costs Mem. at 7.) However, defendants argue that the hourly rate plaintiffs request, $475 per hour for Mr. Mango is not reasonable. (ECF No. 215, Def. Opp. Fees & Costs Mem. at 9-12.)

The court agrees that Mr. Mango's requested hourly rate of $475 is unreasonable. As noted above, a reasonable rate is generally one which comports with the hourly rates in the

59

district in which the reviewing court sits. *Arbor Hill*, 493 F.3d at 119; *see also Blum*, 465 U.S. at 895. Courts in the Eastern District of New York award hourly rates ranging from $200 to $450 per hour for partners. *See Isigi v. Dorvilier*, No. 16-cv-2218 (FB)(SMG), 2018 WL 1598613, at * 6 (E.D.N.Y. Mar. 14, 2018), *report and recommendation adopted*, 2018 WL 1597386 (E.D.N.Y. July 12, 2018); *see also D'Annunzio v. Ayken, Inc.*, No. 11-cv-3303 (WFK) (WDW), 2015 WL 5308094, at *4 (E.D.N.Y. Sept. 10, 2015) (describing the typical hourly rate for partners as between $200 and $450); *Morales v. B&M Gen. Renovation Inc.*, No. 14-cv-2790, 2016 WL 1266624, at *11 (E.D.N.Y. Mar. 9, 2016) ("[T]he prevailing hourly rate for partners in this district is between $300 and $400[.]"), *report and recommendation adopted*, 2016 WL 1258482 (E.D.N.Y. Mar. 29, 2016); *but see McLaughlin v. IDT Energy*, No. 14-cv-4107 (ENV) (RML), 2018 WL 3642627, at *17 (E.D.N.Y. July 30, 2018) (finding, in relevant part, rates typically awarded in this district to be "$550 for partners/equity owners with more than thirty years of experience, $500 for partners/equity owners with more than fifteen years of experience, $450 for partners/equity owners with more than ten years of experience").

Courts have noted that an hourly rate of $450 or higher is reserved for special circumstances such as lawyers with extensive experience who might be considered experts and/or

leaders in their areas of practice. *See, e.g.*, *Remache v. Mac Hudson Grp.*, No. 14-cv-3118 (AMD) (RML), 2018 WL 4573072, at *19 (E.D.N.Y. Sept. 7, 2018) ("[H]ourly rates higher than $350 are generally reserved for law firm partners, unusually expert litigators, or other special circumstances"), *report and recommendation adopted*, 2018 WL 4568860 (E.D.N.Y. Sept. 24, 2018); *see also Medina v. Donaldson*, No. 10-cv-5922 (VMS), 2015 WL 77430, at *6 (E.D.N.Y. Jan. 6, 2015) ("The highest rates in this district are reserved for expert trial attorneys with extensive experience before the federal bar, who specialize in the practice of civil rights law and are recognized by their peers as leaders and experts in their fields.") (citation and internal quotation marks omitted); *Anderson v. Cty. of Suffolk*, No. 09-cv-1913 (GRB), 2016 WL 1444594, at *4, 9 (E.D.N.Y. Apr. 11, 2016) ("Recent court decisions have awarded $400.00 to $450.00 per hour for the most experienced trial attorneys.").

In support of their request for a $475 hourly fee for Mango, plaintiffs cite to Mango's professional experience, which includes 24 years of practice (including labor and employment law), being a partner at Mango & Iacovelli, LLP (established in 1996), litigation experience in the Eastern and Southern Districts of New York, experience as co-counsel representing intervening parties in suits initiated by the EEOC, and speaking on continuing legal education ("CLE") panels in the area of

employment law.  (ECF No. 211-2, Mango Decl. ¶ 8.)  Plaintiffs also cite to Mango's representation of plaintiff-intervenors, which has spanned seven years, from preliminary investigations through trial and the instant motions.  (*Id.* ¶ 6.) Additionally, Mango charges his clients an hourly fee of $475. (*Id.* ¶ 9.)  Plaintiffs, however, fail to provide persuasive legal support for their argument that $475 is a reasonable hourly fee, even for someone with Mango's resume.  Of the cases to which plaintiffs cite that ostensibly support a rate of $475, two are from the Southern District and one, an Eastern District case, was vacated and remanded by the Second Circuit for relying on cases from the Southern District for determining reasonable fees.  (*See* ECF No. 211-1, Pl. Fees & Costs Mem. at 6.)  Thus, the court does not rely upon those cases in determining the applicable reasonable fee for Mango.

Based on Mr. Mango's professional experience and his role in the instant litigation, a reasonable hourly fee for Mr. Mango is $400.  Weighing in favor of awarding Mr. Mango a fee on the higher end of the fee scale is his title as a partner at a law firm, his 24 years of experience, which includes employment law experience, his speaking engagements on CLE panels, and his experience in federal court.  On the other hand, in his 24 years of experience, Mango has served as counsel in the Eastern District in only fifteen actions, including the

instant action.  Moreover, according to Mango's biography on his law firm's website, his practice is not exclusively or primarily focused on employment law.  (*See* ECF No. 216-1, Declaration of Patrick M. Muldowney ("Muldowney Decl."), Exhibit A.)  Instead, in addition to employment law, Mango's practice includes commercial and civil litigation, real estate, corporate/business law, litigation/dispute resolution, securities law, and entertainment law.  (*Id.*)  Plaintiffs have not provided the court with a breakdown of how Mango's practice is distributed across these areas or how many cases similar to the instant action he has handled.  Additionally, Mango's law firm is small; it is comprised only of Mango and the other named partner.  (*See* ECF No. 216-1, Muldowney Decl., Exhibit B.)  Mango's role in the instant action also weighs in favor of a lower fee.  Though he has been involved in the case from the very beginning, his role at trial was limited – he conducted direct examination of only two plaintiff-intervenors and did not conduct any cross-examinations, argue any motions, or deliver the opening statement or closing argument.

Although Mango's resume is impressive in its own right, it is not comparable to those of attorneys who have been awarded fees at the high rate that Mango requests.  *See, e.g.*, *D'Annunzio*, 2015 WL 5308094, at *4 (awarding an hourly rate of $450 to lead trial counsel with "24 years of litigation

experience," 18 of which were "devoted to litigating civil rights and employment discrimination actions"); *see also Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 262-63 (E.D.N.Y. 2014) (awarding $425 hourly fee to solo practitioner with 33 years of experience who tried approximately 500 employment discrimination cases); *Anderson*, 2016 WL 1444594, at *4 (denying request for $500 hourly fee and awarding $450 hourly fee instead to "experienced civil rights attorney" with 30 years of experience who "unquestionably" qualifies as an "expert trial attorney[] with extensive experience before the federal bar" and specializes in civil rights law). Given Mango's experience and areas of practice and that he did not act as lead counsel at trial, a reasonable hourly fee for Mango is $400. *See, e.g.*, *D'Annunzio*, 2015 WL 5308094, at *4 (awarding $400 hourly fee to law firm partners with 17 years of experience who worked on "hundreds of discrimination cases" but did not act as lead trial counsel).

### 2. Fee Adjustment for Limited Success

#### a. <u>Legal Standard</u>

Once the court determines a lodestar figure, the court may, in its discretion, increase or decrease that amount based upon the prevailing party's level of success. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *Separ v. Nassau Cnty. Dept. of Social Servs.*, 327 F. Supp. 2d 187, 190 (E.D.N.Y. 2004). The party advocating for a departure from the lodestar figure bears

the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee. *United States Football League v. National Football League*, 887 F.2d 408, 413 (2d Cir. 1989), *cert. denied,* 493 U.S. 1071 (1990).

In *Hensley*, the Supreme Court set forth an analytic framework for determining whether partial success requires a reduction from the lodestar figure. 461 U.S. at 434-37; *see also Grant v. Martinez*, 973 F.2d 96, 101 (2d Cir. 1992). First, the court determines whether the plaintiff failed to succeed on any claims wholly unrelated to the claims on which the plaintiff succeeded. *Hensley*, 461 U.S. at 434-35. Hours spent on such unsuccessful claims should be excluded. *Id.* Next, the court determines whether any unsuccessful claims were interrelated with successful claims. *Id.* at 436. If such unsuccessful claims exist, the court must determine whether the level of success warrants a reduction in the fee award. *Id.* Despite promulgating this framework, the Supreme Court advised that "[t]here is no precise rule or formula" for adjusting the lodestar amount to account for limited success and the court should instead "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at 435-37. In the same vein, *Hensley* provides that if a plaintiff has obtained "excellent

results," the court should not reduce the lodestar figure.  *Id.*
at 435.

b.  <u>Application</u>

In the instant action, all of plaintiff-intervenors'
claims were interrelated and based on a common core of facts.
Therefore, the court skips step one of the *Hensley* framework.
Defendants contend that plaintiff-intervenors achieved "partial
success" under *Hensley*'s second step because, of the eighteen
claims plaintiff-intervenors originally asserted, ten were
dismissed at summary judgment, one was withdrawn prior to trial,
three were successful at trial, and four were unsuccessful at
trial.  (ECF No. 215, Def. Opp. Fees & Costs Mem. at 12-14.)
They argue that, as a result, Mango's fees should be reduced "by
at least 50%."  (*Id.*)  The court disagrees.

Here, although plaintiff-intervenors did not prevail
on every claim they advanced, they achieved very favorable
results, including a jury award of $2,809,000 in compensatory
and punitive damages, reduced as described above, and court-
ordered injunctive relief, described above.  Plaintiff-
intervenors' withdrawal of a single claim prior to trial and the
court's and the jury's rejection of others do not require the
court to reduce the lodestar amount, especially given that the
claims were pleaded and tried in good faith and with material
support in the record.  For example, the withdrawn claim was a

plaintiff-intervenor's hostile work environment claim, and the jury ultimately decided unanimously in plaintiffs' favor with respect to all remaining hostile work environment claims. *See Green v. Torres*, 361 F.3d 96, 99-100 (2d Cir. 2004) ("[We] specifically note that we are not endorsing a pleading judgment rule, or implying that fees may permissibly be reduced in every civil rights case where the plaintiff voluntarily abandons claims prior to a decision on the merits."); *see also Hensley*, 461 U.S. at 435 ("Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.").

In contrast to the cases cited by defendants, plaintiff-intervenors succeeded on claims that encompass the core issues in this litigation and were interrelated with unsuccessful and withdrawn claims and they were awarded significant damages and injunctive relief as a result. For example, defendants cite *Separ*, in which the court reduced the plaintiffs' attorneys' fees by 40% because the plaintiffs "failed to submit any material evidence in support of" several causes of action and the claims submitted to the jury were each "factually distinguishable." 327 F. Supp. 2d at 192. Defendants also rely on *Hine v. Mineta*, in which the court reduced the lodestar figure by 60% because the plaintiff

succeeded on only one of three claims and received a sliver of the damages sought. 253 F. Supp. 2d 464, 467 (E.D.N.Y. 2003). For the reasons discussed above, these cases are distinguishable from the instant action and do not support defendants' request for a 50% reduction to the lodestar figure. Therefore, the court denies defendants' request to reduce attorney's fees on the basis of plaintiff-intervenors' partial success.

Consistent with the above, Mango is awarded $186,600 in attorney's fees.

B.    Plaintiff-Intervenors' and EEOC's Costs

*1. Legal Standard*

Pursuant to Federal Rule of Civil Procedure 54(d)(1), "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d)(1). Section 1920 of Title 28 of the United States Code and Local Rule 54.1(c) identify those items which are taxable as costs. 28 U.S.C. § 1920; Local R. Civ. P. 54.1(c). Section 1821 of Title 28 of the United States Code provides the per diem, mileage, and subsistence fees allowed for witnesses. 28 U.S.C. § 1821.

The decision to award costs is within the discretion of the court. *Dattner v. Conagra Foods, Inc.*, 458 F.3d 98, 100 (2d Cir. 2006). Initially, "[t]he burden is on the prevailing party to establish to the court's satisfaction that the taxation

of costs is justified." *John & Kathryn G. v. Bd. of Educ. of Mount Vernon Pub. Sch.*, 891 F. Supp. 122, 123 (S.D.N.Y. 1995). Failure to adequately document costs may result in the denial or reduction of those costs. *Baker v. Power Securities Corp.*, 174 F.R.D. 292, 294-95 (W.D.N.Y. 1997). However, once "the prevailing party demonstrates the amount of its costs and that they fall within an allowable category of taxable costs, *see* Local Rule 54.1(a), that party enjoys a presumption that its costs will be awarded." *Patterson v. McCarron*, No. 99-cv-11078 (RCC), 2005 WL 735954, at *1 (S.D.N.Y. Mar. 30, 2005).

   2. *Application*

   Pursuant to Federal Rule of Civil Procedure 54, Local Rule of Civil Procedure 54.1, and 28 U.S.C. §§ 1821 and 1920, the EEOC seeks costs for claimants in the amount of $50,345.69[6] and Mango seeks costs and disbursements for plaintiffs in the amount of $400.[7]  (ECF No. 219, Revised EEOC Bill of Costs; ECF No. 211-4, Mango's Bill of Costs.)  Specifically, the EEOC requests the following:  $34,370.44 in "[f]ees for printed or electronically recorded transcripts necessarily obtained for use

---

[6] Plaintiffs originally sought costs in the amount of $52,201.14.  (ECF No. 211-1, Pl. Fees & Costs Mem. at 9; ECF No. 211-5, EEOC Bill of Costs.)  However, through the course of briefing the instant motion, plaintiffs ultimately submitted a Revised Bill of Costs, claiming $50,345.68.  (ECF No. 219, Revised Bill of Costs; *see also* ECF No. 218, Pl. Reply Fees & Costs Mem.)  Therefore, the court considers the requested costs $50,345.69, as listed in the Revised Bill of Costs.

[7] Plaintiffs originally sought $759 in costs associated with Mango's lodging, but they have since withdrawn that request for costs.  (ECF No. 218, Pl. Reply Fees & Costs Mem. at 2 n.1.)

in this case"; $1,596.85 in "[f]ees and disbursements for
printing"; $6,043.79 in "[f]ees for witnesses"[8]; and $8,334.61 in
"[f]ees for exemplification and the costs of making copies of
any materials where the copies are necessarily obtained for use
in the case." (ECF No. 219, Revised EEOC Bill of Costs at 1.)
Mango seeks costs in the amount of $400 for fees of the Clerk,
to which defendants do not object and which the court grants.
(ECF No. 211-4, Mango Bill of Costs.) Of those enumerated
costs, defendants argue that the EEOC is not entitled to:
$16,154.40 in costs for daily transcripts and real time
transcription at trial; $1,596.85 in copying costs; and
$6,043.79 in witness fees. (ECF No. 215, Def. Opp. Fees & Costs
Mem. at 14-24; *see also* ECF No. 219, Revised EEOC Bill of
Costs.) The court addresses each in turn.

      a. <u>Transcript Fees</u>

      Plaintiffs request costs for the pre-trial conference
transcript, real time transcripts from *voir dire*, and daily
trial transcripts from trial. (ECF No. 218, Pl. Reply Fees &
Costs Mem. at 6-9.) Defendants argue that plaintiffs' requests
should be denied because real time costs are not recoverable and
because the court did not require the parties to order the pre-

---

[8] In the Revised Bill of Costs, this cost is split between witness costs and
"other costs." (ECF No. 219, Revised Bill of Costs at 1.) However, the
"other costs" consist of witness fees. Thus, the court groups the two
categories of costs together as witness fees.

trial transcript or daily trial transcripts.  (ECF No. 215, Def.
Fees & Costs Mem. at 16-18.)

Plaintiffs' request for $256.20 in real-time
transcript costs is denied.  (*See* ECF No. 219-1, EEOC Revised
Bill of Costs Documentation at 2.)  First, plaintiffs have
failed to provide the court with case law supporting their
contention that real-time transcript costs qualify as taxable
costs.  *Cf. Internet Law Library, Inc. v. Southridge Capital
Mgmt. LLC*, No. 01-cv-877 (JSR), 2010 WL 3290965, at *7 (S.D.N.Y.
Aug. 11, 2010) (finding real-time deposition transcripts not
taxable costs); *In re Omperazole Patent Litig.*, Nos. 00-cv-6749
(BSJ), 03-cv-6057 (BSJ), 2012 WL 5427849, at *4 (S.D.N.Y. Nov.
7, 2012) (same).  Second, even if real-time transcript costs are
taxable, plaintiffs have failed to persuade the court that here
the real time transcripts "were necessary, as opposed to merely
convenient or helpful" to their ability to conduct *voir dire*,
especially given that there were three to four lawyers
participating in the process.  *See AIG Global Sec. Lending Corp.
v. Banc of Am. Sec. LLC*, No. 01-cv-11448 (JGK), 2011 WL 102715,
at *2 (S.D.N.Y. Jan. 6, 2011) (denying request for real time
transcripts).

Plaintiffs' request for costs of the final pre-trial
conference and daily trial transcripts is otherwise granted.  It
is within a court's discretion to award costs for a transcript

that was "necessarily obtained for use in the case." 28 U.S.C. § 1920(4); *see also* Local Civ. R. 54.1(c)(1) (identifying transcripts "necessarily obtained for use" in court as taxable costs). In determining whether transcripts were necessary pursuant to 28 U.S.C. § 1920(4), the court assesses whether they provided more than "mere convenience" for counsel. *Gallela v. Onassis*, 487 F.2d 986, 999 (2d Cir. 1973). In deciding whether a daily transcript was necessary, courts have considered, among other things: "(1) the length and complexity of the trial; (2) the need for daily transcripts to examine witnesses; (3) the need for daily transcripts for summation; and (4) whether the credibility of the witnesses was crucial in the case." *Close-Up Int'l., Inc. v. Berov*, No. 02-cv-2363 (DGT), 2007 WL 4053682, at *10 (E.D.N.Y. Nov. 13, 2007).

Here, the trial lasted nearly three weeks and involved over twenty witnesses (including two who testified via deposition); twenty-one separate claims covering four different types of claims, i.e., wrongful termination on the basis of rejection of defendants' religion and on the basis of the claimant's religion, retaliation, and hostile work environment, for which the court provided jury instructions allowing four distinct legal theories of liability; motions *in limine* and other pretrial decisions issued in a Memorandum and Order as well as orally at the final pre-trial conference and during

trial; and two oral applications and arguments made by
defendants for judgment as a matter of law pursuant to Federal
Rule of Civil Procedure 50.  Additionally, plaintiffs submit
that they utilized the daily transcripts for their preparation
and execution of this action at trial, including during multiple
witness examinations, summations, and to rebut defendants' Rule
50 motions.  (ECF No. 218, Pl. Reply Fees & Costs Mem. at 8.)
Although the court did not specifically order the parties to
obtain trial transcripts, the court nonetheless finds that the
use of daily transcripts throughout the three week trial
provided more than "mere convenience" for the parties and was
necessary for the effective litigation of the action.  *See,
e.g.*, *Houston v. Cotter*, 234 F. Supp. 3d 392, 414 (E.D.N.Y.
2017) (awarding daily transcript as taxable cost in eight-day
trial with one plaintiff); *see also Karibian v. Columbia Univ.*,
1997 WL 2538, at *2 (S.D.N.Y. Jan. 3, 1997) (awarding costs of
transcripts because it was "entirely reasonable" for defendant
to consider them necessary given the length of trial, necessity
of transcripts for preparing for witness examinations, and in
light of extensive post trial briefing).

        Consistent with the above, the court awards plaintiffs
$34,114,24 in costs for transcript fees.

b. <u>Printing and Copying Fees</u>

Plaintiffs seek costs for printing in the amount of $1,596.85 and for copies in the amount of $8,334,61. (ECF No. 219, Revised EEOC Bill of Costs at 1.) These costs include printing and copying exhibits and deposition transcripts. (ECF No. 218, Pl. Reply Fees & Costs Mem. at 11-12; ECF No. 219-1, EEOC Revised Bill of Costs Documentation at 36-40.) Defendants object to plaintiffs' request, although their objection is not entirely clear. They state that they object to plaintiffs' copying costs, but in their briefing defendants cite the dollar amount associated with defendants' printing costs. (*See* ECF No. 215, Def. Opp. Fees & Costs Mem. at 18-20.) Rather than guess the nature of defendants' intended objection, the court grants plaintiffs' request for costs as to printing and copying based on plaintiffs' articulation and documentation of these costs. (*See* ECF No. 218, Pl. Reply Fees & Costs Mem. at 11-12; ECF No. 219, Revised Bill of Costs at 36-40.)

c. <u>Witness Fees</u>

Plaintiffs seek $6,043.79 in costs associated with witness fees. (ECF No. 219, Revised EEOC Bill of Costs.) Local Civil Rule 54.1 provides that fees and travel expenses for testifying witnesses are taxable, consistent with 28 U.S.C. 1821, which establishes the terms of costs for mileage and subsistence. Local Civ. R. 54.1(c)(3). However, "[n]o party to

the action may receive witness fees, travel expenses, or subsistence." *Id.* First, defendants argue that plaintiffs' requests for costs pertaining to the seven EEOC claimants who testified should be denied because the court previously held that those claimants were parties for the purposes of Federal Rule of Evidence 801. (ECF No. 215, Def. Opp. Fees & Costs Mem. at 21; *see also* Final Pretrial Conference Tr. at 26-29.) Defendants' attempt to stretch the court's narrow ruling is unpersuasive and unsupported. The EEOC is not a "proxy" for the employee claimants nor does the EEOC "stand in the employee's shoes." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 288, 305 (2002). Likewise, EEOC claimants do not qualify as parties. Thus, Local Civil Rule 54.1 does not preclude awarding plaintiffs from obtaining costs associated with the claimants' testimony.

Plaintiffs' requested witness costs include $5,023.82 in subsistence (including food and lodging) costs and $1,019.97 in mileage costs with respect to claimants Josey, Safara, Honohan, Diaz, Benedict, Pegullo, and Maldari. (ECF No. 219, Revised EEOC Bill of Costs.) Defendants object entirely to plaintiffs' request for subsistence costs for claimants Honohan, Diaz, Benedict, Pegullo, and Maldari because they all reside

within an hour and a half of the courthouse.[9]  (ECF No. 215, Def.
Opp. Fees & Costs Mem. at 22-23.)  They also object to
plaintiffs' requested subsistence and mileage costs for Safara
and Josey, both of whom live outside of the tri-state area,
insofar as they exceed the permissible rates and are
insufficiently documented.  (*Id.* at 23-24.)

Section 1821 of Title 28 of the United States Code
provides that "[a] subsistence allowance shall be paid to a
witness when an overnight stay is required at the place of
attendance because such place is so far removed from the
residence of such witness as to prohibit return thereto from day
to day."  28 U.S.C. § 1821(d)(1).  "A subsistence allowance for
a witness shall be paid in an amount not to exceed the maximum
per diem allowance prescribed by the Administrator of General
Services."  28 U.S.C. § 1821(d)(2).  In April 2018, the relevant
per diem lodging rate was $253, and meals and incidentals rates
were $74 for a single calendar day of travel that was neither
the first nor last day of travel, and $55.50 each for the first
and last day of travel.  *See Per Diem Rates for New York-FY
2018*, effective October 2017 – September 2018, *available at*
https://www.gsa.gov/travel/plan-book/per-diem-rates/per-diem-
rates-

---

[9] During the relevant period, Honohan, Diaz, Pegullo, and Maldari all resided
in Long Island, New York, and Benedict resided in Morris Plains, New Jersey.
(*See* ECF No. 219, Revised EEO Bill of Costs.)

lookup/?action=perdiems_report&state=&fiscal_year=2018&zip=11201
&city=.

"A witness who travels by common carrier," shall
"utilize . . . the most economical rate reasonably available"
and shall furnish "[a] receipt or other evidence of actual
cost[.]" 28 U.S.C. § 1821(c)(1). Witnesses who travel by
privately owned vehicle shall be provided a "travel allowance
equal to the mileage allowance" prescribed pursuant to 5 U.S.C.
§ 5704, and witnesses who travel shall also be paid in full for
any taxi fares between lodging and carrier terminals, normal
travel expenses within and outside the judicial district, and
parking fees (upon presentation of a valid parking receipt). 28
U.S.C. § 1821(c)(2)-(4). In April 2018, the relevant per diem
privately owned automobile mileage rate was $0.545 per mile.
*See Per Diem Rates for New York-FY 2018*, effective January 1,
2018, *available at* https://www.gsa.gov/travel/plan-
book/transportation-airfare-rates-pov-rates/privately-owned-
vehicle-pov-mileage-reimbursement-rates.

With respect to claimants Honohan, Diaz, Benedict,
Pegullo, and Maldari, plaintiffs' request for subsistence costs
is denied. Given the proximity to the courthouse of these
claimants' residences, and especially in light of the fact that
many jurors traveled just as far if not farther than those
witnesses, the court finds that an overnight stay was not

required.  *See Palm Bay Int'l, Inc. v. Marchesi Di Barolo S.P.A.*, 285 F.R.D. 225, 236 (E.D.N.Y. 2012) (denying subsistence costs where witness lived in Northern New Jersey).  Defendants do not object to any of plaintiffs' requested mileage costs for these claimants, as stated in the Revised Bill of Costs.  Thus, plaintiffs are entitled to costs for mileage, taxi fares, parking, and other local transportation for claimants Honohan, Diaz, Benedict, and Maldari.  (*See* ECF No. 218, Pl. Reply Fees & Costs Mem. at 10 n.5 (withdrawing request for cost of Pegullo's carfare).)  Based on the documentation plaintiffs provided to the court, which does not include receipts, the court cannot award a specific amount of costs aside from mileage costs.  Thus, the court awards $40.11 in mileage costs for Honohan, $41.86 in mileage costs for Benedict, and $64.53 in mileage costs for Maldari, and denies plaintiffs' request for travel costs as to Diaz.  (ECF No. 219-1, EEOC Revised Bill of Costs Documentation at 4-12, 16-21.)

The court finds that claimants Safara and Josey, who traveled from Texas and Virginia respectively, are entitled to subsistence and travel costs within the statutory limits.  The costs for these claimants' mileage and lodging are sufficiently documented and within the approved rates, and the court therefore awards those costs in the amounts of $253 in lodging and $20.38 in mileage for Safara, and $506 in lodging and $19.08

in mileage for Josey.  (ECF No. 219, Revised EEOC Bill of Costs;

ECF No. 219-1, EEOC Revised Bill of Costs Documentation at 13-

15, 22-24, 31, 35.)  The other requested costs for these

claimants, including parking, airfare, taxis, and meals, are

insufficiently documented because plaintiffs have only submitted

spreadsheets and vouchers documenting general costs without

itemized receipts or other proof of itemized costs, and are

therefore denied.  *See* 28 U.S.C. § 1821(c)(1) (requiring "[a]

receipt or other evidence of actual cost" for common carrier

costs); *id.* § 1821(c)(3) (requiring "a valid parking receipt"

for parking fees); *In re Omeprazole Patent Litig.*, 2012 WL

547791, at *5 (denying costs for airfare where requesting party

failed to provide a "receipt or other evidence of actual cost");

*Baker v. Power Securities Corp.*, 174 F.R.D. 292, 294-95

(W.D.N.Y. 1997) (denying request for travel expenses that were

listed on a billing statement but not otherwise documented).

        For the reasons stated and consistent with the above,

the court awards costs of $44,991.11 to the EEOC and $400 to

Mango and denies plaintiffs' request for travel costs for Diaz

and subsistence and travel costs as to Safara and Josey.  The

court grants, plaintiffs' request for printing and copying

costs.

**CONCLUSION**

For the foregoing reasons and in the manner stated, plaintiffs' motions for injunctive relief, attorney's fees, and costs are granted in part and denied in part. Specifically, the court orders: (1) injunctive relief, as provided above; (2) plaintiff-intervenor Pabon shall be awarded $46,372.40 in back pay with prejudgment interest calculated consistent with this order; (3) judgment consisting of compensatory and punitive damages shall be entered against defendants as to the claimants, without prejudice to defendants' right to move for remittitur; (4) Mango shall be awarded $186,600 in attorney's fees and $400 in costs; and (5) the EEOC shall be awarded $44,991.11 in costs. The Clerk of Court is directed to enter judgment consistent with this order.

**SO ORDERED.**

Dated:    December 28, 2018
          Brooklyn, New York

_____    /s/
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York
