UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

        Plaintiff,

     -against-

UNITED HEALTH PROGRAMS OF AMERICA,
INC., and COST CONTAINMENT GROUP, INC.,

        Defendants.

--------------------------------------X

**MEMORANDUM AND ORDER**

14-CV-3673 (KAM)(JO)

**MATSUMOTO, United States District Judge:**

        Plaintiff United States Equal Employment Opportunity Commission ("EEOC") commenced this action against defendants United Health Programs of America, Inc. ("UHP"), and Cost Containment Group, Inc. ("CCG") (collectively, "defendants"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") on behalf of a group of defendants' former employees – Danielle Diaz, Jennifer Honohan, Regina Maldari, Cynthia Pegullo, Elizabeth Safara, Sandra Benedict, and Karen Josey (the "claimants"). Three claimants – plaintiff-intervenors Elizabeth Ontaneda, Francine Pennisi, and Faith Pabon ("plaintiff-intervenors," and, collectively with EEOC, "plaintiffs") – intervened in this action, seeking relief pursuant to Title VII and the New York State Human Rights Law ("NYSHRL"). The case

1

was tried for three weeks and submitted to a jury, which
returned a verdict partially in plaintiffs' favor and partially
in defendants' favor, and awarded plaintiffs a total of
$5,102,060 in compensatory and punitive damages on April 15,
2018.  Presently before the court are defendants' motions for
judgment as a matter of law and for a new trial or, in the
alternative, for remittitur (the "Motion").  For the reasons
discussed below, defendants' motions are denied.

**PROCEDURAL HISTORY**

        The court presumes familiarity with the factual and
legal background of this matter, as recited in its summary
judgment Memorandum and Order, *EEOC v. United Health Programs of
Am., Inc.*, 213 F. Supp. 3d 377 (E.D.N.Y. 2016) ("*Onionhead I*"),
motions *in limine* Memorandum and Order (ECF No. 131, Memorandum
and Order re Motions *in Limine*), and December 28, 2018 post-
trial Memorandum and Order (ECF No. 224), and provides
procedural history only as necessary to resolve the instant
motions.

        In their submissions, plaintiffs claimed that they
were subjected to, *inter alia*, religious discrimination, reverse
religious discrimination, retaliation, and a hostile work
environment in defendants' workplace in violation of Title VII
and NYSHRL.  In the fall of 2007, defendants' CEO, Robert Hodes,
hired his aunt, Denali Jordan, who introduced religious and

2

spiritual practices and teachings to the workplace.[1]  Defendants'
supervisors and officers, including Denali, imposed certain
practices and beliefs, often referred to as "Onionhead" and
"Harnessing Happiness," on plaintiffs.[2]  On September 30, 2016,
the court granted claimants' motion for partial summary judgment
on the discrete issue of whether certain practices and beliefs
(referred to herein as "Onionhead" and "Harnessing Happiness")
constitute a religion for purposes of Title VII, and granted in
part and denied in part defendants' cross-motion for summary
judgment.  Specifically, the court denied defendants' motion for
summary judgment on plaintiffs' reverse religious discrimination
claims and hostile work environment claims premised on reverse
religious discrimination.  *Onionhead I, Inc.*, 213 F. Supp. 3d at
398-402.

On April 2, 2018, the parties began a three-week jury
trial on plaintiffs' claims that defendants had subjected nine
claimants to a hostile work environment based on employer-
imposed religious practices, subjected eight claimants to
disparate treatment (including wrongful termination) based on

---

[1] As discussed in the court's Memorandum and Order dated December 28, 2018,
COO Bourandas introduced Denali as a "boss[]," whom the claimants understood
to exercise influence over hiring, discipline, and terminations.  Denali also
exercised supervisory authority and managerial responsibility at defendants'
company.  (ECF No. 224, Memorandum and Order at 12-15, 17.)
[2] The events underlying this action involve both Onionhead and Harnessing
Happiness.  The court refers to the programs collectively as Onionhead or
Onionhead/Harnessing Happiness, except where the distinction is relevant.

3

claimants' resistance or objections to defendants' religious practices, and subjected one claimant to disparate treatment (including wrongful termination) and retaliation based on that claimant's personal religious beliefs.  For the purposes of trial and based on the court's Memorandum and Order on summary judgment, the parties stipulated that certain of defendants' alleged practices were religious, including, among other things: texts, beliefs, concepts, and practices concerning Onionhead, including Onionhead workshops; statements by Chief Executive Officer ("CEO") Hodes and his aunt, Denali Jordan ("Denali"), that employees are "chosen"; praying in the workplace; and emails referencing God, divine power, spirits, spirituality, and demons.  (ECF No. 184, Jt. Stip. Regarding Practices Deemed Religious; Trial Tr. at 15-16.)

On April 25, 2018, the jury returned a unanimous verdict in favor of all plaintiffs on all of their hostile work environment claims under Title VII and the NYSHRL, and plaintiff-intervenor Pabon's wrongful termination claim under Title VII and the NYSHRL.  The jury returned a verdict in favor of defendants on the remainder of the claims.  The jury awarded plaintiffs a total of $5,102,060, consisting of compensatory and punitive damages.  The jury awarded a total of $3,011,000 in compensatory damages as follows: $225,000 to Benedict; $190,000 to Diaz; $570,000 to Honohan; $180,000 to Josey; $308,000 to

4

Maldari; $590,000 to Ontaneda; $180,000 to Pegullo; $248,000 to

Pennisi; $80,000 to Safara; and $440,000 to Pabon.  The jury

awarded a total of $2,091,060 in punitive damages as follows:

$400,000 to Diaz; $900,000 to Ontaneda; $160,000 to Pegullo;

$381,000 to Pennisi; and $250,000 to Pabon.  (ECF No. 207, Ct.

Ex. 9, Verdict Form.)

 In the court's December 28, 2018 Memorandum and Order,

the court noted:

> Title VII caps compensatory and punitive damages
> awards based on an employer's size.  42 U.S.C. §
> 1981a(b)(3).  Because defendants had more than 14
> and fewer than 100 employees during the relevant
> period, here compensatory and punitive damages
> under Title VII are capped at $50,000 per claimant.
> *Id.*  The NYSHRL allows for and does not cap
> compensatory damages for employment
> discrimination, N.Y. Exec. Law § 297(4)(c)(iii),
> but it does not allow for punitive damages, *Tse v.*
> *UBS Financial 55 Services, Inc.*, 568 F. Supp. 2d
> 274, 309 n.24 (S.D.N.Y. 2008) (citing *Thoreson v.*
> *Penthouse, Int'l, Ltd.*, 80 N.Y.2d 490, 494 (N.Y.
> 1992)).
>
> (ECF No. 224, Memorandum and Order dated 12/28/18
> 54.)

 Furthermore, the court noted that plaintiff-intervenors

– Ontaneda, Pabon, and Pennisi – who had brought claims pursuant

to Title VII and the NYSHRL, had uncapped compensatory damage

awards but punitive damages awards capped at $50,000.  (*Id.* at

55.)  The remaining claimants – Benedict, Diaz, Honohan, Josey,

Maldari, Pegullo, and Safara – had brought claims pursuant only to Title VII. Thus, each of their combined compensatory and punitive damages must be capped at $50,000. (*Id.*) Without prejudice to defendants' right to move for remittitur following the entry of judgment, the parties agreed that judgment should be entered against defendants as follows:

- Ontaneda: $640,000 (consisting of $590,000 in compensatory damages and $50,000 in punitive damages);

- Pennisi: $298,000 (consisting of $248,000 in compensatory damages and $50,000 in punitive damages);

- Pabon: $490,000 (consisting of $440,000 in compensatory damages and $50,000 in punitive damages);

- Diaz: $50,000 (consisting of $40,000 in compensatory damages and $10,000 in punitive damages);

- Pegullo: $50,000 (consisting of $40,000 in compensatory damages and $10,000 in punitive damages);

- Benedict: $50,000 (consisting of $50,000 in compensatory damages);

- Honohan: $50,000 (consisting of $50,000 in compensatory damages);

- Josey: $50,000 (consisting of $50,000 in compensatory damages);

- Maldari: $50,000 (consisting of $50,000 in compensatory damages); and

- Safara: $50,000 (consisting of $50,000 in
  compensatory damages).

(ECF No. 210-1, Pl. Mem. Relief & Damages 25-27; ECF No. 212,
Def. Opp. Relief & Damages 35-36; ECF No. 217, Pl. Reply Relief
& Damages 10.)  The court agreed, and ordered that judgment be
entered as described above without prejudice to defendants'
right to move for remittitur.  (ECF No. 224, Memorandum and
Order dated 12/28/18 at 56.)

On December 28, 2018, the court granted EEOC's motion
to stay the action until the federal government shutdown was
concluded, or for thirty days, whichever was earlier, and
ordered that any additional motions, including those made
pursuant to Federal Rules of Civil Procedure 50 and 59, must be
filed within 28 days of the lifting of the stay.  (Dkt. Order
dated 12/28/18.)  On January 29, 2019, the court issued a docket
order reminding the parties that the stay was lifted as of
January 28, 2019, per the court's docket order dated December
28, 2018, and directed the parties to file any post-trial
motions within 28 days of the lifting of the stay.  (Dkt. Order
dated 1/29/19.)  On March 21, 2019, the EEOC requested the
court's permission to file an opposition memorandum up to 10
pages in excess of the court's 30-page limitation.  (ECF No.
233, Letter Motion to File Excess Pages, dated 3/21/19.)  On
March 22, 2019, defendants objected to the EEOC's request to

file extra pages.  (ECF No. 234, Opposition re Letter Motion for Leave to File Excess Pages, dated 3/22/19.)  By docket order dated March 22, 2019, the court granted the EEOC's request for an additional 10 pages for its response, and also granted defendants an additional 10 pages for their reply.  (Dkt. Order dated 3/22/19.)

Defendants subsequently renewed their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 ("Rule 50") and moved, in the alternative, for a new trial; alternatively, defendants moved for remittitur pursuant to Federal Rule of Civil Procedure 59 ("Rule 59"). (ECF No. 235, Defendants' Motion for Judgment as a Matter of Law and for a New Trial or, in the Alternative, for Remittitur ("Def. Mot."); ECF No. 236, Defendants' Memorandum in Support re Motion for Judgment as a Matter of Law and for a New Trial or, in the Alternative, for Remittitur ("Def. Mem.").)[3]  EEOC filed its opposition to the motion.  (ECF No. 237, Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Judgment as a Matter of Law and for a New Trial or, in the Alternative, for Remittitur ("Pl. Mem.").)  Defendants filed a reply memorandum.  (ECF No. 238, Defendants' Reply Memorandum in

---

[3] As defendants noted in their opening memorandum: "Defendants do not seek to alter the [court's December 28, 2018] Order with respect to Intervenors as a result of a confidential settlement between Defendants and Intervenors." (Def. Mem. 1 n. 1.)

Support re Motion for Judgment as a Matter of Law and for a New Trial or, in the Alternative, for Remittitur ("Def. Rep.").)

In their memoranda, defendants have asserted that (i) no reasonable jury could have found for Benedict or Josey on their hostile work environment claims; (ii) the evidence does not support the garden variety emotional distress damages awarded to claimants; and (iii) no reasonable jury could have found punitive damages for Diaz or Pegullo, or the weight of the evidence does not support such a finding.  (*See generally* Def. Mem.)  Conversely, the EEOC has asserted that (i) the evidence supports the jury's finding that defendants' workplace was objectively hostile based on religion, and that Benedict and Josey subjectively perceived defendants' workplace as hostile based on religion; (ii) the compensatory damages awarded to the claimants are reasonable and thus not excessive; and (iii) the jury's award of punitive damages is supported by the evidence. (*See generally* Pl. Mem.)

**LEGAL STANDARD**

I.  **Motion for Judgment as a Matter of Law under Rule 50 or for a New Trial under Rule 59**

"If a party believes that 'a reasonable jury would not have a legally sufficient evidentiary basis' to find for its adversary on a particular issue, it may move for judgment as a matter of law during trial under Federal Rule of Civil Procedure 50(a) and renew the motion after trial under Rule 50(b)."

*Cangemi v. Town of E. Hampton*, 374 F. Supp. 3d 227, 232
(E.D.N.Y. 2019) (citing Fed. R. Civ. P. 50 (a)-(b)).  "In ruling
on the renewed motion, the court may: (1) allow judgment on the
verdict, if the jury returned a verdict; (2) order a new trial;
or (3) direct the entry of judgment as a matter of law."  Fed.
R. Civ. P. 50(b).

        "When evaluating a motion under Rule 50, courts are
required to consider the evidence in the light most favorable to
the party against whom the motion was made and to give that
party the benefit of all reasonable inferences that the jury
might have drawn in [its] favor from the evidence."  *ING Glob.
v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d
Cir. 2014) (citation and internal quotation marks omitted).
"The court cannot assess the weight of conflicting evidence,
pass on the credibility of the witnesses, or substitute its
judgment for that of the jury, and must disregard all evidence
favorable to the moving party that the jury is not required to
believe."  *Id.* (citation and internal quotation marks omitted);
*see also This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir.
1998) ("A district court may not grant a motion for a judgment
as a matter of law unless the evidence is such that, without
weighing the credibility of the witnesses or otherwise
considering the weight of the evidence, there can be but one
conclusion as to the verdict that reasonable [persons] could

have reached.") (internal quotation marks and citation omitted). The same standard that applies to a pretrial motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50.  *Id.*

A court may grant a Rule 50 motion only if "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010), or after "viewing the evidence in the light most favorable to the non-movant, [it] concludes that a reasonable juror would have been compelled to accept the view of the moving party."  *Jackson v. Tellado*, 295 F. Supp. 3d 164, 170 (E.D.N.Y. 2018) (citing *Cash v. Cty. Of Erie*, 654 F.3d 324, 333 (2d Cir. 2011)).

A party "fil[ing] a renewed motion for judgment as a matter of law . . . may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  "The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Fed. R. Civ. P. 59(a); *Newton v. City of New York*, 171 F. Supp. 3d 156, 164 (S.D.N.Y. 2016).

"The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive." *Lawson v. Cty. of Suffolk*, 920 F. Supp. 2d 332, 339 (E.D.N.Y. 2013).

In some respects, the standard for a Rule 59 motion is less onerous for the movant. "In contrast to a Rule 50 motion for a new trial, a Rule 59(a) motion for a new trial 'may be granted even if there is substantial evidence supporting the jury's verdict.'" *Greenaway v. Cty. of Nassau*, 327 F. Supp. 3d 552, 560 (E.D.N.Y. 2018) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)). "Moreover, a trial [court] is free to weigh the evidence [itself], and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp.*, 163 F.3d at 134.

The Second Circuit, however, has stated that "[a] trial court should not grant a motion for a new trial unless it is 'convinced that the jury . . . reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018) (citing *Amato v. City of Saratoga Springs*, N.Y., 170 F.3d 311, 314 (2d Cir. 1999)). "A court considering a Rule 59 motion . . . should only grant such a motion when the jury's verdict is egregious . . . and should

12

rarely disturb a jury's evaluation of a witness's credibility."
*DLC Mgmt. Corp.*, 163 F.3d at 134 (citations and internal
quotation marks omitted).

## DISCUSSION

### I.  The Trial Evidence Supports the Jury's Finding that Defendants Subjected Benedict and Josey to a Hostile Work Environment.

Under Title VII, a hostile work environment is one
form of disparate treatment on the basis of 'race, color,
religion, sex, or national origin.'" *Raniola v. Bratton*, 243
F.3d 610, 617 (2d Cir. 2001).  "Whereas other disparate
treatment claims may scrutinize discrete harms such as hiring or
discharge, a hostile work environment claim analyzes a workplace
environment as a whole to discover whether it is abusive."  *Id.*
(internal quotation marks and citation omitted).  "Conduct that
is not severe or pervasive enough to create an objectively
hostile or abusive work environment – an environment that a
reasonable person would find hostile or abusive – is beyond
Title VII's purview."  *Harris v. Forklift Sys., Inc.*, 510 U.S.
17, 21-22 (1993).  Under the standard of reasonableness, the
harassment must be "of such quality or quantity that a
reasonable employee would find the conditions of her employment
altered for the worse[.]"  *Torres v. Pisano*, 116 F.3d 625, 632
(2d Cir. 1997).  "Likewise, if the victim does not subjectively

perceive the environment to be abusive," there is no cognizable hostile work environment claim under Title VII. *Id.*

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The "court may not . . . consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence[.]" *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).

The court is to focus on the totality of the circumstances and the nature of the environment itself. *Raniola*, 243 F.3d at 617. Thus, an individual plaintiff who experiences a hostile work environment need not be the target of other instances of hostility to support her claim if the plaintiff has knowledge of hostility directed at other employees and of the general hostile work environment. *Whidbee*, 223 F.3d at 63; *Kaytor*, 609 F.3d at 547.

There is abundant evidence in the trial record supporting the jury's finding that defendants "create[d] an objectively hostile or abusive work environment" on the basis of religion. *Harris*, 510 U.S. at 21. Upon "looking at all the

14

circumstances," *Harris*, 510 U.S. at 23, as opposed to a "piecemeal" review of the record, *Kaytor*, 609 F.3d at 545, and considering the evidence in the light most favorable to claimants, the court finds that a reasonable jury would not have been compelled to find in defendants' favor with respect to claimants Benedict's and Josey's hostile work environment claims.  Even weighing the evidence under Rule 59, the court cannot find that the jury reached an egregious or seriously erroneous result in crediting Benedict's and Josey's testimony regarding the hostile work environment during their employment by defendants.  As described in detail below, and as discussed in footnote three, Benedict and Josey offered testimony that the jury found credible, regarding the hostile work environment, and that was consistent with the trial record as a whole and with the verdict.  Thus, the court respectfully **denies** defendants' motion for judgment as a matter of law or for a new trial with respect to Benedict's and Josey's hostile work environment claims.

   a. <u>Severity and Pervasiveness of Onionhead Practices in the Workplace</u>

         The record is replete with examples of the severity and pervasiveness of Onionhead's religious practices and imagery, in the workplace, the unreasonable interference with the employees' work and the alteration of work conditions for

the worse.[4]  (Tr. 203-05 (candles burned daily after Denali
arrived and instructed employees to not use overhead lighting);
Tr. 218 (encountering angels, Buddha statues, incense, and
religious texts "every day"); Tr. 250 (Onionhead logo was
erected on external façade of the CCG building); Tr. 380-81
(Denali instructed employees not to use overhead lights because
"demons come through the overhead lights"); Tr. 690-91 (employee
directed to light candles "to keep the bad spirits away" and to
"keep the place pure" as well as to put on "meditation music"
every day); Tr. 1221-1233 (use of "universal truth cards,"[5]
Onionhead characters, and receiving Onionhead-related gifts
during the holidays).)  Plaintiff notes that Onionhead became
"intertwined with the very fabric of the company, and was an
inescapable part of the work environment," (Pl. Mem. 7.), as
employees were instructed to wear Onionhead pins every day, use
Onionhead cards with "teachings," and Onionhead posters,

---

[4] As the court has previously determined, Onionhead practices were religious
in nature for purposes of Title VII.  (ECF No. 88, Memorandum and Order dated
9/30/16, 36-43.)  The court specifically found that references to God,
spirituality, demons, Satan, divine destinies, miracles, "higher guidance
teachings," and a grail were religious references.  (*Id.* at 36.)  The court
also found that documentary evidence, including the Onionhead dictionary and
the *Onionhead Keys and Codes to Living Good* - which reference divinity,
spirituality, souls, and heaven – were religious in nature.  (*Id.* at 36-40.)
The court further found that the religiosity of Onionhead and Harnessing
Happiness was underscored by Denali's frequent references to God and
spiritual matters in the workplace, as well as defendants' instruction to
employees to pray at work.  (*Id.* at 40-43.)
[5] Josey testified regarding the feeling cards: "Each card was an emotion and .
. . on one side there was like a face and it kind of showed what that face
looked like, and then on the back, it gave a blurb as to . . . how [to]
identify[] the emotion and how to cope[.]"  (Tr. 878; Jt. Ex. 4.)

banners, flags, and pictures, including an Onionhead character
with angel wings, filled the workplace.  (Tr. 232-33 (employee
described "little pictures all around the office of Onionhead
[and] pins that were in a glass bowl in the reception area that
[employees] were encouraged to wear"); Tr. 428-30 (employees
instructed to wear Onionhead pins); Tr. 611 (Onionhead pins,
flags, books, and "universal truth cards" were "all over the
offices"); Tr. 703 (employees reported to Denali regarding
compliance with pin-wearing); Tr. 810-11 (Onionhead pins were
displayed in reception and wearing them was a mandatory
practice); Tr. 858 (employees required to wear Onionhead pins);
1230 (flaming chalice with angel wings depicted on Harnessing
Happiness catalog); Tr. 1240 (use of Onionhead truth and feeling
cards and an Onionhead dictionary in mandatory workshop meetings
with the COO and managers).)

     After Denali's arrival at the workplace in 2007, she
implemented changes that altered working conditions and "turned
[the office] into almost like a mosque or a church . . . [with]
incense burning away, like you would smell if you walked into a
religious building, or the way you have that music, that organ
soft music, with the religious statues and the candles and the
dim lighting . . . . And then the ways that, every time you did
talk to [Denali] there was talk of God or love or spirits, and
then there was the prayer."  (Tr. 1177.)  Further, defendants

transformed the office utility closet into a "sanctuary" or "meditation room" filled with religious symbols, rosary beads, pictures of angels, spiritual books, and other religious material. (Tr. 1471; 1487-88.)

Moreover, defendants required their employees to attend regular Onionhead workshops during the workday led by COO Tracy Bourandas and/or Denali. (Tr. 270-71, 275, 712-13, 879, 881, 884, 1233-35.) The Onionhead workshops took place in the conference room, featuring dim light, candles, and instrumental "spa-type" music. (Tr. 271.) One Onionhead workshop, the "Keys and Codes to Living Good Workshop," ran weekly from December 2010 through December 2011. (Tr. 270-72.) The employees were required to attend the Keys and Codes to Living Good Workshop, which used Onionhead/Harnessing Happiness materials, provided by COO Bourandas and Denali, describing Keys and Codes as "part of the divine plan from the beginning of time. Every sacred tribe and religion have codes hidden within their scripts, books and scrolls. It was and still is a way to integrate our heavenly nature into our human nature." (Tr. 272.) Employees were instructed to read passages from the Onionhead/Harnessing Happiness workshop materials and then answer questions relating to their personal lives. (Tr. 272-73.) As claimant Honohan testified, the Onionhead workshops "felt like forced therapy." (*Id.*) As claimant Diaz testified, the Onionhead workshop

18

readings "were always spiritually involved.  They would want to know your inner-most emotional feelings.  It was a lot about family and how you're feeling, absolutely nothing [to] do with your actual jobs."  (Tr. 1238.)  In one-on-one meetings and group Onionhead workshops led by Denali, employees were required to hold hands and close their eyes while Denali led them in prayer, hug and kiss Denali and/or their coworkers, and tell their coworkers "I love you."  (Tr. 226, 613, 882-83, 1156-62, 1258.)

In addition, the jury heard testimony that the spiritual and religious changes implemented by Denali adversely affected the workplace environment.  (Tr. 729 ("[W]hen [Denali] brought Onion[head] into the business, everything just became so psychotic. . . . It wasn't a normal workplace."); 883 ("I don't just hug people that I don't know that well. It was just weird. It wasn't a normal work setting."); 1145 (the changes ushered in by Denali "had a negative impact on our workplace and on the people that worked there because you could see how things started to decline internally once all of that started, and it wasn't the same as it was"); 1158 ("I didn't like [having to pray with Denali or hold hands.]  It was something that made me very uncomfortable and it almost made the workplace feel hostile, in the sense that I was beginning to dislike being there very much."); 1176 ("[T]he whole atmosphere was different

19

when [Denali] was there and it wasn't in a good way."); 1178 ("It was hostile and the people weren't the same, and it just wasn't the same company").)

Defendants have urged the court to disregard the other claimants' testimony in determining whether the trial evidence supports that Benedict and Josey experienced a hostile work environment, even though the other claimants' testimony is generally consistent with Benedict's and Josey's testimony. (Def. Reply 2-3.)

First, defendants assert that Benedict's and Josey's employment did not overlap with all of the other claimants' employment.  (Def. Reply 3 n. 2.)  There was, however, substantial overlap in employment periods with nearly half of the other claimants: Pegullo's employment partially overlapped with Josey's employment; Josey's employment partially overlapped with Benedict's employment; Diaz's and Honohan's employment overlapped with Benedict's and Josey's employment; and, contrary to defendants' assertion, intervenor Pabon's employment overlapped with both Benedict's and Josey's employment.  (ECF No. 175, Second Am. Joint Pre-Trial Order 15-17.)   The trial testimony of Pabon, Pegullo, Diaz, and Honohan is clearly probative of "the overall hostile or abusive environment" experienced by Benedict and Josey, and the court may appropriately consider Pabon's, Pegullo's, Diaz's, and Honohan's

20

testimony regarding the working environment in determining whether to grant defendants' motions for judgment as a matter of law or for a new trial, pursuant to Rule 50 and Rule 59. *Whidbee*, 223 F.3d at 71.

Second, defendants have not articulated any factual or legal basis why trial testimony from the other claimants or intervenors were not properly considered by the jury as probative and corroborating evidence of the hostile work environment experienced by Benedict and Josey.  Defendants assert that "Plaintiff offers absolutely no evidence that Benedict and Josey can or do base their HWE claims upon harassing behavior directed at others that they either witnessed or learned second-hand."  (Def. Reply. 3.)  Defendants' position, however, conflicts not only with the weight of the trial evidence, but also with the weight of Second Circuit precedent.  *See generally Whidbee*, 223 F.3d at 71 ("[I]ncidents of harassment that occurred outside the presence of the plaintiffs" are probative of "persistently offensive conduct [that] created an overall hostile or abusive environment [that] exacerbated the effect of the harassment [plaintiff] experienced individually") (internal quotation marks and citation omitted); *Kaytor*, 609 F.3d at 547 (emphasizing that other instances of hostility not directly experienced by plaintiff, but of which plaintiff was aware, can support a plaintiff's hostile work

21

environment claim); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150-51 (2d Cir. 1997) ("The propriety of the court's exclusion of . . . evidence of sexual harassment not witnessed personally by [plaintiff] is . . . questionable. Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant."); *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) ("The mere fact that Schwapp was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim. Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment."). A plaintiff "need not be the target of other instances of hostility in order for those incidents to support her [hostile work environment] claim." *Whidbee*, 223 F.3d at 63. To the extent that the other claimants' testimony provides a more complete picture of the pervasive nature of the hostile work environment experienced by Benedict and Josey, the jury and the court properly considered all of the claimants' and intervenors' testimony.

Defendants also contend that Benedict's and Josey's claims do not meet the threshold of objectively or subjectively

severe or pervasive conduct to create a hostile work environment.  (Def. Mem. 5, 9.)

### i.    Benedict

Benedict, who worked for defendants in the Caring for Children Globally project from approximately September 2011 until May 2012, testified that, for the duration of her employment by defendants,[6] Onionhead's religious practices and paraphernalia permeated the workplace on a continuing basis. Defendants' offices featured Onionhead religious literature and symbols, including Onionhead posters, pins, literature, flags and banners, and universal truth cards throughout Benedict's employment.  (Tr. 610-11, 638.)  Benedict was required to attend, at Denali's instruction, between one and three of the above-described Onionhead workshops during the workday, every time Denali and Benedict were in the office together, despite Benedict being "very uncomfortable" while working in defendants' premises.  (Tr. 611-12 (testifying that her attendance at the Denali-led Onionhead workshops was "not at all" voluntary); 614 (responding that she complied with Denali's instruction that she attend the Onionhead workshops); 600, 617, 643 (while working

---

[6] As plaintiff correctly clarifies, Benedict's exposure was more substantial than defendants seemingly had mischaracterized in their opening brief.  (Def. Mem. 10.)  Benedict testified at trial that she was physically in the defendants' office for one week per month, or for approximately 35 days over the nine months of her employment, and most frequently when Denali was present.  (Tr. 585-86, 596, 643.)

23

daily at home, Benedict communicated regularly with Denali, reporting by telephone or email every day.)   At the Onionhead workshops, Benedict testified that Denali would typically lead the employees through their "usual kind of hand-holding prayer . . . candles . . . a running fountain . . . . So [the employees] would start with a prayer, most often, holding hands, and kind of sat at attention for the session."   (Tr. 613.)

Benedict also testified that Denali suggested to her "several times that [she] get guidance from the universe and talk to God."   (Tr. 654-55.)   In addition, Denali frequently pried into issues in Benedict's personal life.   (Tr. 616-19.) Benedict explained that she never told Denali that such discussions regarding her personal life made her uncomfortable because Denali was her boss and "it was really difficult to reason with Denali because . . . what she said, in her mind, came from the heavens.   So it would be like arguing with God or the universe[.]"   (Tr. 616-18.)   Benedict also testified that she had attended regular Onionhead meetings at CEO Robert Hodes' house in the evenings, that the material and content used at the meetings were the same as in the Onionhead workshops that occurred in the office, and that such meetings involved prayer.[7] (Tr. 620-21.)

---

[7] Defendants assert that "Benedict and Josey have not proven that actual prayer occurred during the meetings they attended."   (Def. Reply 6.)   This assertion is contradicted by ample trial evidence from multiple witnesses

Benedict testified that Denali's imposition of spirituality in the office and her daily work life made her feel as if she were being indoctrinated "into the fold" or "cult," and that she incurred Denali's anger by attempting to challenge her. (Tr. 622-24, 631.) For weeks, Denali criticized Benedict's ex-husband and obtained a photo of Benedict's daughter; Denali then stated that her nephew, Robert Hodes, defendants' CEO, was the father of Benedict's daughter because they were "connected" and, in Denali's view, shared the same hair color and curly hair. (Tr. 609-10.) Benedict found this particularly upsetting and felt that it crossed a boundary, so she attempted to extract herself from Denali. (*Id.*)

### ii. Josey

Josey, who worked for UHP from approximately March 2011 until November 2011, offered testimony similar to others that the office environment was permeated with a religious, spiritual atmosphere: "very dim-lit [with] no overhead lighting," there were "desk lamps like that you would have in your living room," and Onionhead materials that were more appropriate for church or an intimate setting with friends. (Tr. 869, 879, 906-07.) Approximately three months into her

---

that prayer occurred in defendants' workplace. Though defendants correctly note that some of Benedict's trial testimony contained purported admissions, *see* Def. Mem. 10-11, as discussed herein, there is also substantial evidence upon which a reasonable jury could conclude that Benedict perceived her environment to be abusive and hostile.

employment, Josey received Onionhead materials from COO
Bourandas, including a workbook for the workshops, two boxes of
truth and feeling cards, and an Onionhead/Harnessing Happiness
dictionary.  (Tr. 874-878; Pl. Ex. 1 (truth cards); Jt. Ex. 4
(feeling cards).)  Like Benedict, Josey also attended multiple
Onionhead workshops during her employment at UHP because she
understood that attendance and participation were mandatory.[8]
(Tr. 880-882.)  She testified feeling like if she did not "drink
the cool aid [sic] . . . you were an outsider."  (Tr. 917-18.)
At each Onionhead workshop, Josey, like other employees, was
given homework assignments to complete before the next Onionhead
workshop, on her own time.  (Tr. 880; Jt. Ex. 6.)  Josey
testified that she "thought [attending the Onionhead workshops]
was a waste of my time.  It wasn't related to work and I wasn't
being paid to do anything outside of working hours, so . . . I

---

[8] Defendants further assert that "Plaintiff [] presents no evidence that any
such participation in Onionhead generally or the workshops specifically were
mandatory for Benedict and Josey."  (Def. Reply 6.)  Defendants have
highlighted what they perceive to be countervailing evidence to Benedict's
and Josey's testimony in the record, but ultimately the jury assessed the
witnesses' credibility at trial, and weighed the evidence finding in favor of
plaintiff, claimants, and intervenors.  *Reeves v. Sanderson Plumbing Prods.,
Inc.*, 530 U.S. 133, 150-51 (2000) (for Rule 50 purposes, "Credibility
determinations, the weighing of the evidence, and the drawing of legitimate
inferences from the facts are jury functions, not those of a judge.")
(internal quotations and citation omitted); *Dunlap-McCuller v. Riese Org.*,
980 F.2d 153, 158 (2d Cir. 1992) ("[T]he jury is empowered and capable of
evaluating a witness's credibility, and this evaluation should rarely be
disturbed.").  As the court noted in its Memorandum and Order concerning the
parties' motions for summary judgment: "It is an affirmative
misrepresentation of the evidence to argue that the workshops were
'indisputably' voluntary."  (ECF No. 88, Memorandum and Order dated 9/30/16
at 80, n. 23.)

felt that it should have been optional.  I shouldn't have [had] to fill out any extra work.  I didn't have time to do it."  (Tr. 881.)  Josey testified that the Onionhead workshops led by Denali were "way more intense, emotionally – [] very mentally draining" compared to the Onionhead workshops led by COO Bourandas.  (Tr. 882.)

Further, Josey testified that with Denali-led Onionhead workshops, "[W]e would hug each other goodbye, say we love you.  We would have . . . a moment of, I guess, prayer or meditation.  We would hold hands like in a circle and then we would leave."  (*Id.*)  When asked how she felt about having to hug her coworkers and tell them "I love you," Josey testified: "It was uncomfortable but, you know, it was like okay, it's only a few minutes, let's get this over with . . . . I don't just hug people that I don't know that well.  It was just weird.  It wasn't a normal work setting."  (Tr. 883.)  Josey further testified that she didn't like having to conform to those practices, and that she didn't want to do them.  (*Id.*)  Josey also testified that she "didn't feel comfortable having these open discussions and [felt] obligated to discuss my personal business in a setting where I wouldn't [normally]. . . . The crying and all of that stuff, it really made me feel uncomfortable, and then I'd have to go back to my desk and perform my job like none of that just happened."  (Tr. 885.)

On one occasion, following a fight with her husband, Josey was ushered, crying, into the meditation room by Denali, *i.e.* their second meeting since Josey commenced her employment at UHP.  April Levine had previously informed Josey that the purpose of the meditation room was "meditation" and "prayer." (Tr. 896.)  Denali asked Josey what had transpired earlier, and told Josey: "[Y]ou need to leave your husband. . . . Do you understand what I'm saying to you."  (Tr. 896-97.)  Josey further testified: "[Denali] was giving me a directive.  She wasn't saying, well, maybe you guys – if you guys can't work it out, you know, maybe you should consider leaving," and Denali told her several times during that conversation to leave her husband.  (Tr. 897.)  Josey reported feeling "very offended" and "very taken aback" by Denali's comments and became "very guarded, very aware and careful" of the things she said at work. (Tr. 898-99.)  She also testified: "I felt very vulnerable because there was just too much of my life that people at work . . . knew now" and that the atmosphere that resulted from the Onionhead workshops where people shared their personal feelings partly contributed to the work environment that caused her to feel "vulnerable," as though there were "no boundaries as to where your work life began and your personal life ended."  (Tr. 899.)

After Josey's second meeting with Denali, she expressed her discomfort and disagreement with the workplace culture, but was warned by unspecified individuals "to not do that out loud, to be very careful who heard [her] say that." (Tr. 900.)  She testified that, had she been given the choice or felt that she had the choice to attend the Onionhead workshops, she would not have attended them; that she did not use the materials she was given during the Onionhead workshops because she did not want to; and she was given Onionhead pins that everybody wore, but she did not wear them after the first day. (Tr. 902.)  Josey referenced a horror film to describe her experience at defendants' workplace.  (Tr. 917-18.)

At one particular Onionhead workshop, Josey observed that Denali appeared to have a "disappointed" reaction upon learning that Josey was still with her husband and that she could "tell by the look on [Denali's] face [that] she's not happy."  (Tr. 904.)  Further, after Josey was fired, she testified that she had a telephonic conversation with Denali during which Denali stated: "I bet you'll learn your lesson this time . . . . [Y]ou didn't listen and you know these are the consequences."  (Tr. 914.)  Josey understood Denali to have been referring to their earlier conversation wherein Denali instructed Josey to leave her husband.  (Tr. 914-15.)

b. Sufficient Basis for Jury Verdict

29

Based on the record before the court, the court finds that there was more than sufficient evidence for the jury to conclude that Benedict and Josey experienced an objectively hostile work environment based on a workplace permeated with Onionhead's religious practices, and that Benedict and Josey subjectively perceived their work environment as hostile based on the same. *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997).

As discussed above, ample evidence in the record established that numerous religious images and practices permeated the office environment, and that employees were required to participate in such religious practices.  Among other things, defendants' office environment was cluttered with pervasive religious imagery, including rosary beads, Buddhas, and Onionhead/Harnessing Happiness literature, posters and banners; employees were given Onionhead feeling and truth cards and Onionhead workshop materials and instructed to use them; employees were strongly encouraged or instructed to wear Onionhead pins; employees were scheduled for attendance and participation at the Onionhead/Harnessing Happiness workshops, which employees understood were mandatory.  As further noted above, the Onionhead religion motivated certain idiosyncratic office practices, including the dismantling of overhead lights, use of candles, incense, and table lamps, hugging and kissing of

30

coworkers, praying and meditation, and coworkers being directed to say "I love you." All of these practices, taken together, could be found to have "unreasonably interfere[d] with an employee's work performance" and altered the conditions of an employee's work environment for the worse. *Harris*, 510 U.S. at 23; *Torres*, 116 F.3d at 632.

Defendants have asserted that "discomfort or finding something strange, or even inappropriate or offensive, is not sufficient to support a hostile work environment claim." (Def. Mem. 5.) The Second Circuit has, however, implicitly rejected this argument, in reversing the granting of summary judgment on hostile work environment claims where the plaintiffs had alleged that the defendants' conduct caused plaintiffs to feel "uncomfortable." *See Redd v. New York Div. of Parole*, 678 F.3d 166, 169, 171-72 (2d Cir. 2012); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 601 (2d Cir. 2006).

Defendants have cited *Kunzler v. Canon, USA*, 257 F. Supp. 2d 574, 583 (E.D.N.Y. 2008), arguing that "feelings of discomfort cannot support a hostile work environment claim." (Def. Mem. 5.) Plaintiff has responded that this case is inapposite because the plaintiff in *Kunzler* cited only a single line from his deposition testimony stating he was "made uncomfortable" by the supervisor's advances toward a customer. (Pl. Mem. 11.) This court agrees with plaintiff that *Kunzler*

31

provides scant, if any, support for defendants' position, and
further notes that, critically, the *Kunzler* court found that the
supervisor's harassment of a *non-employee* customer "does not
amount to conduct that violates Title VII." *Kunzler*, 257 F.
Supp. 2d at 582.

Similarly, defendants' citation to *Lewis v. Eric
County Medical Center Corp.* is unpersuasive. In that case, the
court found that two isolated comments were insufficient to
establish a racially-based hostile work environment where the
comments were "not explicitly racist." *Lewis*, 907 F. Supp. 2d
336, 348 (W.D.N.Y. 2012). By contrast, Benedict's and Josey's
hostile work environment claims are not founded upon a few
isolated remarks over many months, but rather upon a pervasive
daily presence of religiously-based employment conditions and
conduct, religious imagery, and religious practices that would
cause a reasonable employee to find that the conditions of her
employment were altered for the worse. *Torres v. Pisano*, 116
F.3d 625, 632 (2d Cir. 1997). Moreover, contrary to defendants'
position, the Second Circuit has made clear that even a single
severe incident could create a hostile work environment "even in
isolation, unrepeated and unaccompanied by other conduct."
*Schiano*, 445 F.3d 597 (2d Cir. 2006).

Defendants had previously conceded that coercion is
not an element of a hostile work environment claim. (Tr. 1729.)

Nevertheless, the court notes that there is abundant evidence that coercion of defendants' employees existed regarding their participation in Onionhead/Harnessing Happiness, and religious practices associated with those two programs were mandatory and were widely perceived to be mandatory.  The claimants consistently testified that, if they did not appear to agree to participate in those religious practices, they could suffer termination or other adverse consequences.  (Tr. 203-05, 273, 428-30, 611-12, 614, 703.)

Considering the evidence in the light most favorable to plaintiff under Rule 50, the court finds that there was a legally sufficient basis for a reasonable jury to find for claimants Benedict and Josey on their hostile work environment claims, and thus, defendants' Rule 50 motion for judgment as a matter of law on Benedict's and Josey's hostile work environment claims is denied.  *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).  Additionally, because the jury's finding for Benedict and Josey was neither a "seriously erroneous result," nor effectuated a "miscarriage of justice," the court also denies defendants' motion for a new trial pursuant to Rule 59.  *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018) (citing *Amato v. City of Saratoga Springs, N.Y.*, 170 F.3d 311, 314 (2d Cir. 1999)).

33

II.  **The Trial Evidence Supports the Jury's Award of Emotional Distress Damages for Benedict, Josey, Diaz, Honohan, Maldari, Pegullo, and Safara.[9]**

   a. Legal Standard on a Motion to Set Aside or Reduce a Jury's Damage Award

        It is well-settled that the trial court has discretionary authority to "overturn[] verdicts for excessiveness and order[] a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996).  Remittitur, "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial," is employed in two types of cases: "(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken . . . and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error[.]" *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984).  "Where there is no particular discernible error, [the Second Circuit has] generally held that a jury's damage award may not be set aside as excessive unless 'the award

_____

[9] Though it may not always be apparent from the trial record, the court notes that many of the claimants who testified showed signs of visible emotional distress on the stand.

is so high as to shock the judicial conscience and constitute a denial of justice.'" *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (citing *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998); *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) (same); *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990) (standard generally applies to "damage awards, whether compensatory or punitive").

In determining whether a compensatory damage award is excessive, courts consider "amounts awarded in other, comparable cases." *DiSorbo*, 343 F.3d at 183 (citing *Mathie v. Fries*, 121 F.3d 808, 813 (2d Cir. 1997); *Ismail*, 899 F.2d at 186 ("Reference to other awards in similar cases is proper."). Though "a review of comparable cases is appropriate, '[courts] need not average the high and low awards; [courts] focus instead on whether the verdict lies within [the] reasonable range.'" *Dancy v. McGinley*, 843 F.3d 93, 113 (2d Cir. 2016) (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) (internal quotation marks omitted). Each case should be examined "individually as a unique set of facts and circumstances." *Id.*

Title VII claimants may recover "compensatory damages . . . for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3); *Bergerson*

*v. New York State Office of Mental Health*, 652 F.3d 277, 286 (2d Cir. 2011).  Defendants assert that, in order to prove emotional distress damages, "something more than the subjective statements of the plaintiff is required."  (Def. Reply 14; *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002.)  Since *Patrolmen's Benevolent Association*, the Second Circuit has clarified, and numerous lower courts have acknowledged, that "testimony establishing . . . subjective distress," without more, is sufficient to establish garden variety emotional distress damages.  *Lore*, 670 F.3d at 177; *see also MacMillian v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012) (citing *Jowers v. DME Interactive Holdings, Inc.*, No. 00-CV-4753 (LTS)(KNF), 2006 WL 1408671, at *3, *12 (S.D.N.Y. May 22, 2006) ("A compensatory award for emotional distress in a discrimination action may be based on testimonial evidence alone and 'is not preconditioned on whether [the plaintiff] underwent treatment, psychiatric or otherwise.'"); *Ravina v. Columbia Univ.*, 2019 WL 1450449, at *11 (S.D.N.Y. Mar. 31, 2019) (noting that "garden variety" emotional distress awards are typically upheld where there is "evidence of mental suffering [that] is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms") (citation omitted).

"Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: 'garden-variety,' 'significant' and 'egregious.'"  *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (citation omitted).  A plaintiff may be able to establish emotional distress damages exceeding the "garden variety" category by showing, *inter alia*, that her emotional distress had "specific consequences [as corroborated by] medical evidence," or that the emotional distress "threatened Plaintiff's ability to earn a living and practice her profession." *Mugavero*, 680 F. Supp. 2d at 578; *see also Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 163 (2d Cir. 2014) (upholding emotional distress damages award of $1.32 million, where "years of grotesque psychological abuse [led] to a marked decline in [plaintiff's] mental health and well-being" and he was "hospitalized and diagnosed with, *inter alia*, post-traumatic stress disorder, depression, and panic disorder as a result of the harassment" that he endured).

Because plaintiff has not asserted that "significant" or "egregious" emotional distress damages are warranted for any of the seven claimants, nor presented corroborating medical evidence or testimony of more serious or lasting consequences (*e.g.*, inability to resume work), the present case seeks "garden variety" emotional distress damages, and the court therefore

reviews the compensatory damages awards with that understanding in mind.  The court identifies no error that caused the jury to award a quantifiable amount of damages that should be stricken. Instead, the court considers whether the jury's awards were "'intrinsically excessive,' in the sense of being greater than a reasonable jury could have awarded." *Shu-Tao Lin*, 742 F.2d at 49.

In the Second Circuit, "'garden variety' emotional distress claims generally merit $30,000 to $125,000 awards," and courts have declined to reduce even much higher emotional damages awards. *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 561 (S.D.N.Y. 2012) (internal quotations and citation omitted); *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d at 46 (declining to reduce emotional distress damages awards to between $5,000 and $35,000, where jury had awarded compensatory damages of $500,000, $400,000, and $100,000, where plaintiffs had testified to feeling disappointment, stress, anxiety, and experiencing nightmares); *Lore*, 670 F.3d at 177 ("This Court has . . . affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted only of 'testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress.' As well as awards of $175,000 each where in addition there were either physical sequelae – *i.e.*

secondary physical results or consequences – or professional treatment[.]") (internal quotation marks and citations omitted); *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010) (garden variety emotional distress claims "generally merit $30,000 to $125,000 awards").

Defendants argue that in "garden variety" cases, emotional distress damages in excess of $35,000 are inappropriate, citing *Moore v. Houlihan's Restaurant, Inc.*, No. 07-CV-3129, 2011 WL 2470023, at *6 (E.D.N.Y. May 10, 2011), and *Rainone v. Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005). Most recent cases in this district, including *Olsen*, have specifically discounted *Rainone* for being on the "low end of the range of damages": "[D]efendants rely on a 2005 case, *Rainone v. Potter* . . . . More recent cases find this range [for "garden variety" claims] to be significantly higher." *Olsen*, 615 F. Supp. 2d at 46, n. 4 (and noting that courts have upheld awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment); *see also Mugavero*, 680 F. Supp. 2d at 578 ("*Rainone v. Potter*. . . sets forth a substantially lower range for garden-variety emotional distress claims than more recent cases."). In *Rainone*, the court remitted the emotional distress damages from $175,000 to $50,000, which is the amount of the compensatory damages awards at issue here. *Rainone*, 388 F. Supp. 2d at 126

("There will be a new trial on damages, unless the plaintiff agrees to the reduction [from $175,000] to the sum of $50,000 for his emotional distress damages."). The court will not cap garden variety emotional distress damages at $35,000 on the basis of *Moore*, an outlier among recent cases in this circuit, and which cites to *Rainone* for its damages range, a case that courts have acknowledged is quite outdated and is now considered a lower-than-normal damages range.

b. Benedict and Josey

Defendants assert that Benedict and Josey did not prove that they were each subjected to a hostile work environment or, even if they did, they did not suffer emotional distress damages as a result. (Def. Mem. 16.) The jury found that Benedict and Josey had proved their hostile work environment claims, and awarded Benedict $225,000 in compensatory damages, and Josey $180,000 in compensatory damages, which the court subsequently reduced to $50,000 each. (ECF No. 224, Memorandum and Order dated 12/28/18 at 56.) As discussed *supra*, the court has found that Benedict and Josey have proved their hostile work environment claims with adequate evidence. As set forth below, the court finds that Benedict and Josey are entitled to "garden variety" compensatory damages for emotional distress under Title VII, 42 U.S.C. § 1981a(b)(3), and upholds their respective reduced damages awards of $50,000 each.

Although Benedict characterized working for CCG as "pleasant" when she "first began" working there, defendants have failed to explain why Benedict's purported admission regarding her initial experience in defendants' workplace negates her emotional distress damages resulting from worsening changes in the work environment.  (Def. Mem. 16.)  As defendants have acknowledged, Benedict's testimony establishes that she grew increasingly "uncomfortable" during her employment, as a result of what she perceived to be "inappropriate" workplace practices. Having an initial favorable impression of the company does not disqualify Benedict for emotional distress damages for subsequent occurrences, and to conclude otherwise would have the practical effect of disqualifying virtually all potential claimants who suffer emotional distress, after an initial period of relative job satisfaction.  Similarly, as to Josey's purported admission that she found the workplace "harmonious" when she first began working for UHP, the same logic applies; the court finds that Josey's initial perception of her employment with defendants does not negate her emotional distress damages.  (Def. Mem. 16; Tr. 872.)

As noted *supra*, Benedict testified to being made to feel "very uncomfortable" and having "mixed feelings" when she was required to attend, at Denali's instruction, Onionhead workshops during the workday, during which Denali would lead

employees through "hand-holding prayer." (Tr. 611-13.)
Denali's routine prying into Benedict's personal life, during
which Denali disparaged Benedict's ex-husband and often
suggested that Benedict "get guidance from the universe and talk
to God," also made Benedict uncomfortable, and she told some of
her former colleagues of her discomfort with Onionhead
practices. (Tr. 614, 616-19, 654-55, 676.) After Denali
commented to Benedict that CEO Rob Hodes was Benedict's
daughter's father, Benedict attempted to "shield the kids and .
. . didn't bring them around again." (Tr. 621.) Benedict
further voiced her discomfort with the prospect of moving to
Long Island and becoming "indoctrinated" or "get[ting] closer
with this family sort of cult." (Tr. 622, 624.) Moving to Long
Island, at Denali's behest, "was a boundary" that Benedict did
not feel comfortable crossing for the sake of the company. (Tr.
624.)

Defendants have also asserted that Josey testified at
her deposition, in March 2015, that she was not then
experiencing emotional distress. (Def. Mem. 16; Tr. 949.) As
noted above, Josey was terminated in November 2011. The fact
that Josey was not suffering lingering emotional distress or
trauma, over three years after her employment had ended, is not
probative of a lack of emotional distress at the time of her
employment, or shortly after her employment had ended, and

42

defendants have not cited any cases supporting their contention. Nor must Josey, or any claimant, proffer a medical diagnosis relating to alleged emotional distress in order to sustain "garden variety" emotional damages. *Mugavero*, 680 F. Supp. 2d at 578; *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 163 (2d Cir. 2014).

The trial evidence establishes "garden variety" emotional distress damages for Josey.  Perhaps most notably, Josey testified that the Onionhead workshops, which she abhorred attending and where she participated minimally, were emotionally "intense" and "very mentally draining."  (Tr. 882.)  Josey found the workplace practices of being directed to hug her coworkers and tell them "I love you" to be "uncomfortable," "weird," and not "normal."  (Tr. 883.)  Josey repeatedly described the Onionhead workshops as causing her to "feel uncomfortable" and struggle with "go[ing] back to my desk and perform[ing] my job like none of that just happened."  (Tr. 885.)  Josey also reported feeling "very offended," "very taken aback," and "vulnerable" as a result of Denali's personal comments, directing her to leave her husband.  (Tr. 898-99.)

After the jury awarded $225,000 in compensatory damages to Benedict, and $180,000 in compensatory damages to Josey, the court reduced the awards to $50,000 each.  (ECF No. 224, Memorandum and Order dated 12/28/18 at 56.)  As there is

sufficient evidence in the trial record supporting the award of emotional damages, and because $50,000 is toward the low end of garden variety emotional distress damages in this circuit, the court finds that the award of $50,000 each to Benedict and Josey does not shock the judicial conscience.  Accordingly, the court will not further reduce the awards for Benedict and Josey, and denies defendants' motions.  *See, e.g.*, *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 561 (S.D.N.Y. 2012).

   c. <u>Diaz</u>

        Defendants assert that Danielle Diaz's testimony does not support an emotional distress damages award of $50,000, and instead contend that the "appropriate value is $20,000 or less."[10]  (Def. Mem. 17-19.)  Defendants cite cases that are 19 and 25 years old, arguing that damages should be reduced to $20,000 from $50,000, where plaintiff's doctors relied on plaintiff's own "representation regarding her condition and the source of her distress" and offered "little evidence of her mental anguish."  As discussed above, a medical diagnosis, medical treatment, or third-party corroboration is not required to sustain garden variety emotional distress damages.  Further, more recent cases typically uphold damages of $30,000 to $125,000 for garden variety emotional distress claims.

---

[10] The court notes that Diaz's emotional distress damages award is comprised of $40,000 in compensatory damages and $10,000 in punitive damages.  (ECF No. 224, Memorandum and Order dated 12/28/18 at 56.)

There was ample trial evidence that Diaz suffered garden variety emotional distress damages as a result of the hostile work environment.  Diaz worked at CCG from July 2010 until December 2012 – approximately two and a half years.  (Tr. 1206.)  When Diaz interviewed with CCG, Diaz observed various Onionhead paraphernalia, signs, and practices, including the Onionhead building façade (Tr. 1203); Onionhead books and literature (Tr. 1203); "very dim" lighting from desk lamps and overhead lighting was off (Tr. 1204); and incense, candles, Buddha, and a lot of spiritual paraphernalia (Tr. 1204).  Diaz testified that she understood that she was terminated by defendants because "they found out [she] was speaking about the company . . . . [She was] warning new hires when they were coming in, be aware that this is a cult, there are certain things that you are going to have to agree to, otherwise, you're not going to be able to stay here."  (Tr. 1207.)

Diaz testified that, when she commenced training as a customer service representative at CCG, she was given Onionhead books, Onionhead universal truth cards, an Onionhead journal, and an Onionhead dictionary.  (Tr. 1208-09.)  Diaz further testified that she, like the other employees, was instructed by her supervisor that "every day [] we should go into the deck [of Onionhead universal truth cards] and pick out a card, and [the cards] were to remain at the desk with us," and all the customer

service representatives kept their Onionhead cards at their
desks, as they were instructed to do.  (Tr. 1211-12.)  Diaz
testified that she was instructed to use the Onionhead
dictionary, which described "different emotions," but that she
"didn't read the whole thing or try to go too in depth with it"
because it made her "very uncomfortable," and she would only
"look at it because we were told we had to, but [she] really
didn't want to take any of it in."  (Tr. 1213-14.)  Diaz
testified that Onionhead was "like a cult," "very spiritual,"
and "it wasn't something that [she was] used to[,] being a
Catholic."  (Tr. 1215.)  She also testified that Onionhead
"grab[bed] from all different religions . . . [t]here were
things that would have angel wings."  (*Id.*)  Diaz testified that
Onionhead "was just very confusing to me and right from the bat
it made me feel uncomfortable that I knew it was something I had
to deal with working there."  (*Id.*)

Diaz testified that Denali frequently changed the
Onionhead posters and banners pinned around defendants'
workplace.  (Tr. 1217.)  Diaz testified that she encountered
Denali "about every three weeks" at defendants' workplace, and
when Denali visited, Denali "would go to every employee and . .
. you would have to stand up.  Everyone would give her a hug and
a kiss, praise her . . . people [would be] following her
around[.]"  (Tr. 1218.)  Diaz testified that she felt like

46

hugging and kissing Denali, and telling Denali "I love you," were things she felt like she "had to do." (*Id.*)  Further, Denali "talked a lot about . . . different religions . . . Buddhism . . . planets aligning." (Tr. 1219.)  "[E]very time [Denali] came down, it was always something about God.  Again, she would mash a lot of religions together, so it would be God, it would be Buddha, it would be all different things together." (*Id.*)  Diaz testified that she was exposed to Onionhead "[e]very day that [she] was in the office," which made her feel "uncomfortable" because she "felt this was being forced on [her]." (Tr. 1227-28.)  Even when Denali wasn't in the office, she, or other supervisors, including April Levine and COO Bourandas, would send emails that "forced" Onionhead on the employees.  (Tr. 1228.)

Denali also vocalized the existence of spirits or demons in defendants' workplace, frequently moving employees around the office because she felt that "the right spirit wasn't there or there [were] demons in a certain area."  (Tr. 1219-20.) Diaz was moved "four or five times, maybe six, through the customer service pit and then into another area and then back into customer service [due to] whatever spirits [Denali] was feeling at the time or if there [were] demons in a certain area, she didn't like [me] sitting there so [I] must move here." (*Id.*)  Diaz testified that Denali called people "angels" and

47

said that there were "angels on the Harnessing Happiness book list."  (Tr. 1220.)

Diaz testified that the office was filled with spiritual and religious paraphernalia, "lots of fountains, "candles and incense," and that candles would be on in Denali's office all the time, even when she was not at defendants' workplace, because Denali had advised that "her spirit was still with us even if she wasn't physically present."  (Tr. 1221-22.) Candles were used in defendants' workplace until March 2012, when Denali emailed the employees that the candles were a fire hazard.  (Tr. 1222-23.)  CEO Hodes and COO Bourandas allowed Denali free rein to implement any religious practices she desired, depending on Denali's feelings about demons and spirits in defendants' office.  (Tr. 1251.)  When Denali was in the office, she regularly held private and group meetings with employees about religious and spiritual subjects, while "Buddhist-type chanting" music was being played.  (Tr. 1255-57.) Meetings would begin with all employees hugging and kissing Denali, and then Denali would lead the employees through prayer while holding hands.  (Tr. 1257-58.)

Like other employees, Diaz attended Onionhead workshops, which she understood to be mandatory.  Diaz was added to the workshops by COO Bourandas.  (Tr. 1235.)  Diaz further testified that she felt the workshops were "forced upon" her,

despite having never believed in the Onionhead teachings.  (Tr. 1237.)  The workshops were "always spiritually involved," and employees were instructed to utilize the Onionhead materials, including the Onionhead dictionary.  (Tr. 1238.)  The Onionhead workshops made Diaz "very uncomfortable," like a forced "therapy session" at which a number of employees, including Diaz, cried. (Tr. 1242-43.)  Diaz "despised" going to the weekly Onionhead workshops and "dread[ed]" emails from Bourandas instructing her to attend.  (Tr. 1244-45.)

All of the discomfort caused by the coercive religious and spiritual practices were heightened during a "spa weekend" in March 2012, which Denali planned for the female employees working in the customer service department.  (Tr. 1266.) Employees carpooled in a caravan to a retreat located in Connecticut.  Unbeknownst to Diaz, Denali had planned "spiritual events" for the weekend.  For example, Denali commanded employees to "pull[] angel cards," which were "like the Universal Truth cards" and depicted various angels on them (Tr. 1268.); hold hands in prayer (Tr. 1270); and Denali announced her intention that the spa weekend be a "spiritual kind of awakening" for the employees.  (Tr. 1269.)  One night, during the spa weekend, Denali gathered the employees around 10 p.m. and screamed at them for several hours for not participating in the spiritual activities as she had planned; no one was

permitted to leave during Denali's angry tirade.  (Tr. 1280-83.)
Diaz testified that, eventually "[e]very single person in the
circle had to say sorry to [Denali] and then it ended with us
all having to gather hands together and [at] Denali's request .
. . chant 'Love, love, love.'"  (Tr. 1283.)  The spa weekend
left Diaz feeling "duped," "in a daze," "emotionally spent" and
"violated."  (Tr. 1271, 1284, 1289.)  After witnessing Denali
fire Faith Pabon after the spa weekend, Diaz testified that she
felt "wrecked" and not "emotionally okay," and that she "broke
down emotionally."  (Tr. 1291-92.)  Diaz "dreaded" coming to
work, and witnessing Pabon's termination made her feel as though
she was on "shaky ground," and at the same time, she felt
increasingly "repulsed" by the Onionhead practices she
encountered every day.  (Tr. 1296-97.)  Diaz testified that she
saw multiple doctors between March 2012 and December 2012 for
rashes and was told that the rashes were stress-induced; she
also suffered from headaches and abdominal pain.  (Tr. 1298-99.)

Due to ample trial evidence of Diaz's emotional
distress, and because the $40,000 compensatory damages award –
which has already been greatly reduced from $190,000 - for
claimant Diaz does not shock the judicial conscience, the court
upholds her reduced compensatory damages award of $40,000.

   d. Honohan

The jury awarded claimant Honohan $570,000 in compensatory damages, which the court later reduced to $50,000. (ECF No. 224, Memorandum and Order dated 12/28/18 at 56.) Citing cases that are over 20 years old, defendants have asserted that Honohan's emotional distress damages award of $50,000 should be further reduced to $20,000.  (Def. Mem. 20.)

Honohan worked for defendants for almost 20 years, beginning in 1992, as an HR manager, accountant, and in a data entry role.  (Tr. 164.)  She testified that, until Denali arrived at defendants' workplace in 2007, Honohan loved her job, got along well with her coworkers, including COO Bourandos and CEO Hodes, and believed that she would retire from UHP.  (Tr. 180-84, 210-11, 346.)  Honohan understood Denali's role at defendants' workplace to be "spiritual advisor."  (Tr. 186.) During one of Honohan's first one-on-one interactions with Denali, Denali asked Honohan about her mother, whom she correctly guessed had passed away, and Denali acted like a spiritual medium, moving her hands back and forth in front of her body as though "she could feel . . . vibrations" and "speak with those who have passed on."  (Tr. 190-91.)

Honohan testified at length regarding the "unwelcome" worsening changes to her workplace environment after Denali joined, and how those changes made her "very unhappy."  (Tr. 201, 228-29.)  According to Honohan, "It was just completely

51

different [after Denali's changes] from the way things were before.  It was a happy environment before and I feel like it turned not happy after she came." (Tr. 228.)  Honohan testified that she understood Onionhead to be "a belief system that uses religious and spiritual references while talking about feelings and emotions." (Tr. 231.)  Like other employees, Honohan was instructed by Denali to wear Onionhead pins (Tr. 233); Honohan was instructed by Denali and COO Bourandas to use Onionhead universal truth and feeling cards (Tr. 234-37); Honohan "felt pressured" to use the Onionhead cards at workplace meetings, even though she otherwise would not have (Tr. 235-36).  As of 2010, Onionhead was a "daily" presence at defendants' workplace. (Tr. 248.)  Honohan observed a conspicuous Onionhead logo displayed on defendants' building's façade, which communicated "[w]hat a big presence Onionhead had at the office" (Tr. 250); Onionhead pins, Onionhead "pictures on the wall," Onionhead cards, and Onionhead literature (Tr. 250); Onionhead posters depicting angel wings coming out of the side of the character (Tr. 251); and Onionhead incorporated in employees' signature blocks (Tr. 251).

Additionally, the smell of incense at defendants' workplace was "overpowering" to Honohan (Tr. 204); the dim lighting strained Honohan's eyes and exacerbated her headaches (Tr. 333-34); Honohan felt that the Onionhead workshops were

"very forced and intrusive" (Tr. 278); and the forced human "prayer chains," where employees held hands from the entrance of the office to the back, made Honohan "cringe" (Tr. 227).  Prior to Denali's arrival, Honohan had never heard references to God, demons, angels, or participated in prayer, while at work.  (*Id.*)  When Denali visited defendants' workplace, approximately every four to six weeks, Denali had lots of interaction with employees: Denali would "go around to each and every person and say good morning and hug them and kiss them," say "I love you," and constantly talk about the "[u]niverse, paradigms, . . . God, different religions, Buddha," "spirits," "demons," "angels," "positive energy," and "negative energy."  (Tr. 224-25.)

In July 2009, Denali emailed defendants' employees to say she would be coming to defendants' workplace to do an Onionhead workshop, and if anybody wanted to sign up, they could do so on a strictly optional basis.  (Tr. 239.)  Because Honohan did not wish to participate, she did not sign up.  (Tr. 239-41.)  COO Bourandas, whose office shared a door with Honohan's office, mentioned to Honohan that she had not responded to Denali's email.  Honohan testified that Bourandas had said that Denali's email was "a test.  Everything is a test," *i.e.* "the workshop was not voluntary, [Denali] was trying to see who would participate and who wouldn't."  (Tr. 240-41.)

Although turnover at the company had historically been "[v]ery low" before Denali's arrival, (Tr. 229-30), after Denali was hired by her nephew, CEO Hodes, there was a "big turnover": Honohan recalled that she was aware of seven employees leaving the company.  (*Id.*)  Honohan was aware that multiple employees had left because they had been "uncomfortable with the direction the company was going and all the changes that Denali had made" and because "the environment just got so miserable" after Denali joined defendants' workplace.  (*Id.*)  Honohan testified that she believed "nobody was safe," as anyone who opposed Denali's religious and spiritual practices "could lose their job at any time." (Tr. 231, 280.)  Particularly after the termination of her longtime coworkers, plaintiff-intervenors Pennisi and Ontaneda, Honohan testified that she felt "[d]efeated," "[d]isappointed," and "[s]ad."  (Tr. 265.)  Honohan began experiencing work-related nightmares as a result of the workplace stress.  (Tr. 304.)

Due to ample trial evidence of Honohan's emotional distress, and because the $50,000 compensatory damages award – which has already been significantly reduced from $570,000 - for claimant Honohan does not shock the judicial conscience, the court upholds her reduced compensatory damages award of $50,000.

    e. Maldari

The jury awarded claimant Maldari $308,000 in compensatory damages, which the court later reduced to $50,000. (ECF No. 224, Memorandum and Order dated 12/28/18 at 56.) Again, citing cases that are over 20 years old, defendants assert that Maldari's emotional distress damages award of $50,000 should be further reduced to $15,000.  (Def. Mem. 22.)

Maldari worked at defendants' workplace for approximately three years and eight months, from October 2004, until she was terminated in May 2008.  (Tr. 1438.)  Maldari worked as a customer service representative from 2004 to 2007, a licensed insurance agent, and a licensed sales agent.  (Tr. 1440-42.)  Prior to late 2007, when Hodes hired Denali, Maldari was "happy" to be working at defendants' workplace and "enjoyed" what she was doing.  (Tr. 1444.)  Maldari "saw opportunities," potential career advancements, and envisioned that she "could retire from someplace like [UHP]."  (*Id.*)  Maldari received numerous awards, positive performance reviews, and raises during her employment by defendants.  (Tr. 1445-57.)

Maldari testified that her sanguine outlook toward her employment changed in the fall of 2007, when Denali arrived and began "rolling out her religious practices."  (Tr. 1459.)  Denali's arrival brought about the creation of a "sanctuary" that featured candles, incense, dim lights, rosary beads, pictures of angels, and religious texts (Tr. 1471); the

55

discontinuance of the use of overhead lights due to "demons coming out of the [light] fixtures" (Tr. 1472-73); and suboptimal work conditions, where employees were given lamps and forced to work under "[v]ery dark" conditions, which caused Maldari to strain her eyes while working at her computer and which caused her to suffer headaches (Tr. 1472-73).

Maldari testified that she "felt like it was becoming a hostile environment" because the religious practices were interfering with her ability to get work done, and she felt "very uncomfortable" with defendants' requests, including that Maldari bring "an overnight bag to keep in the office," and participate in a human prayer chain "to rid the negative energy and the demons out of the building." (Tr. 1474-75.) As Maldari testified, Denali was "always saying strange things . . . in the office, religious comments, spewing out comments" regarding how the employees "were all her angels" and "the angels were flying or the demons were flying when she was upset." (*Id.*) Denali also spoke of God and other religious subjects "[j]ust about every time [Maldari] saw her," declaring that God loves and/or forgives the employees, and told the employees to "cleanse" their "souls." (Tr. 1459-60.) Maldari also testified that Denali called her "one of her three Marys," which Maldari understood to be a religious reference to "Mary, Jesus's mother" and "Mary Magdalene." (Tr. 1460.)

Denali's religious proclamations, her practice of kissing and hugging the employees, instructing them to do the same, and telling employees "I love you," made Maldari so uncomfortable that she strived to avoid interactions with Denali.  (Tr. 1462-64.)  Maldari testified that she felt Denali's religious practices were being "forced on [her] and it was just bizarre."  (Tr. 1463.)  Further, Maldari testified that Denali "would put her hand on my head and she would pray" at scheduled work meetings, or at impromptu meetings; such meetings featured "angelic music" (Tr. 1479) and "always ended with [employees] holding hands and [Denali] would put her hand on my head and say a prayer and we'd have to say I love you to each other."  (Tr. 1463-64.)

Maldari further testified that she made it clear that she was not receptive to Denali's religious practices, through her words, body language, and actions.  (Tr. 1464-65.)  Maldari complained to her supervisors and managers, as well as Denali, about Denali's religious practices, which made her "upset," "uncomfortable," and "scared."  (Tr. 1464-70.)  Maldari testified: "Because I was not receptive to Denali and the practices that she was putting in place in the office," she was warned by an office manager that she "better get on board . . . attend the meetings [with Denali]" or she would "be terminated next."  (Tr. 1504-05.)  As a result of this warning, Maldari was

57

"out of [her] mind scared," "had a lot of anxiety," "wasn't sleeping well," suffered nightmares, and was worried.  (Tr. 1506-08.)

Due to ample trial evidence of Maldari's emotional distress, and because the $50,000 compensatory damages award – which has already been markedly reduced from $308,000 - for claimant Maldari does not shock the judicial conscience, the court upholds her reduced compensatory damages award of $50,000.

f. <u>Pegullo</u>

The jury awarded claimant Pegullo $180,000 in compensatory damages and $160,000 in punitive damages, which the court later reduced to $40,000 in compensatory damages and $10,000 in punitive damages.  (ECF No. 224, Memorandum and Order dated 12/28/18 at 56.)  Defendants have asserted that Pegullo's emotional distress damages award of $40,000 should be further reduced to $10,000 because they allege that Pegullo's testimony is "conclusory" and "uncorroborated."  (Def. Mem. 23-24.)  The court disagrees with defendants' characterization and notes that there is substantial evidence in the trial record as to the detrimental impact of defendants' hostile work environment on Pegullo.

Pegullo worked at defendants' workplace from April 2004 until 2007, when she briefly left and later rejoined the company in April 2008, before being terminated in April 2011.

(Tr. 680-84, 719, 736.)  During her first stint at defendants'
workplace, Pegullo worked in customer service and provider
relations, and during the second stint, Pegullo resumed her
employment as a receptionist.  (Tr. 680-82.)  From her first
encounter with Denali in 2008, Pegullo was awestruck by the
"wizard type, kind of Gandolf-looking" figure that was Denali;
Pegullo described Denali as "very charismatic" with a "strong
personality," and Pegullo initially was "drawn" to Denali.  (Tr.
686-87.)  Pegullo understood that Denali's role at defendants'
company was that of a "spiritual advisor."  (Tr. 687.)  Pegullo
testified that Denali would visit defendants' workplace "very
often," and that each time Denali came, Pegullo would converse
"the whole day" with her, discussing both personal and
professional matters.  (Tr. 688.)

Pegullo testified that Denali implemented various
changes in the workplace by "br[inging] Onionhead into the
business [with] dim lights and fountains, candles."  (Tr. 690.)
Pegullo's job responsibilities also changed, as Pegullo was
tasked with lighting candles in Denali's office, even when
Denali was not physically present, "to keep the bad spirits away
. . . to keep the place pure [of evil]" and of incorporating
"fountains and meditation music" in Denali's office and in CEO
Hodes' office.  (*Id.*)  In addition, whenever an employee was
fired or left, Pegullo was tasked by Denali with "spiritual[ly]

cleansing" the office, eliminating any "bad energy" in that
particular office.  (Tr. 697-98.)  Moreover, whenever Denali or
CEO Hodes would visit New York, Pegullo was instructed to "clean
up their house and cleanse it," which entailed "go[ing] to each
room [of Hodes's home] and . . . light[ing] up candles and . . .
do[ing] some chanting [and] praying[.]"  (Tr. 699-701.)

          As a sign of Denali's trust in Pegullo, Denali
requested that Pegullo "be [Denali's] eyes and ears" at
defendants' workplace and report to Denali if she "saw something
that wasn't right."  (Tr. 702.)  As defendants' receptionist,
Pegullo sat at the front desk with Onionhead pins, and, if
someone wasn't wearing their Onionhead pins, Pegullo was to
report back to Denali regarding the employees' noncompliance.
(Tr. 702-03, 708.)  Pegullo also observed Onionhead universal
truth cards at employees' desks (Tr. 708-09) and attended
Onionhead meetings and workshops, which she testified were
mandatory (Tr. 710, 713).  Unlike the other claimants whose
damages are at issue, Pegullo was highly influenced by Denali,
to the point that she "became a different person" and "became
like [Denali.]"  (Tr. 717.)  Pegullo testified that the emails
she sent, while under Denali's influence, were clearly
"different," as Pegullo had begun "following [Denali's] ways,
the way she was thinking . . . [and] becoming more like her[.]"
(Tr. 720-22.)  Pegullo was so influenced by Denali that she gave

Denali another name, "Eden."  Denali, in turn, renamed Pegullo,
"Leah."  Both names were Biblical references.  (Tr. 722.)

Pegullo testified that, in December 2010, Pegullo
received an email from Denali stating that "Rob was not able to
control his business, his company, and he was, it was something
about being demonic and . . . they were going to take over his
business[.]"  (Tr. 724-75.)  It was around December 2010 that
Pegullo began to recognize that she was being "brainwashed,"
"controlled" and manipulated at work.  (Tr. 743, 778-79, 819,
854.)  Pegullo felt that the workplace is not supposed to be
"totally God this and God that, God bless you, I love you."
(Tr. 744.)

In April 2011, with a group of other employees,
Pegullo complained to CEO Hodes about Denali that "when [Denali]
brought Onion[head] into the business, everything just became so
psychotic . . . . It wasn't a normal workplace."  (Tr. 729-30.)
At the meeting, Pegullo also showed Hodes Denali's email, and
later that day, Pegullo was fired.  (Tr. 730.)  Pegullo further
testified that, as of the date of trial, she was "still mentally
disturbed [by] what happened to me.  I became, like, an
instrument to [Denali, who] manipulated me."  (Tr. 743.)

Defendants' contention, that Pegullo "only experienced
emotional distress from the work environment for a total of four
months," unfairly minimizes the "profound effect" that Denali

61

had on Pegullo's life, which caused her to feel manipulated, controlled, and brainwashed.  (Def. Mem. 23; Pl. Mem. 35.) Further, as plaintiff's memorandum noted, claimant Diaz's testimony corroborates Pegullo's testimony regarding Pegullo's unhappiness with Denali's religious practices.  As Diaz testified, Pegullo warned Diaz "to be careful" about Denali because Pegullo was terminated by defendants after trying to get Denali out of the office.  (Tr. 1253-55.)

Based on ample trial evidence of Pegullo's emotional distress, and because the $40,000 compensatory damages award – which has already been significantly reduced from $180,000 – for claimant Pegullo does not shock the judicial conscience, the court upholds her reduced compensatory damages award of $40,000.

g. Safara

The jury awarded claimant Safara $80,000 in compensatory damages, which the court later reduced to $50,000 in compensatory damages.  (ECF No. 224, Memorandum and Order dated 12/28/18 at 56.)  Defendants have asserted that Safara's emotional distress damages award of $50,000 should be further reduced to $10,000.  (Def. Mem. 25.)

Defendants apparently argue that Safara's damages award should be reduced because her exposure to defendants' office and Denali was allegedly limited.  (Def. Mem. 24-25 (Safara spent approximately four hours per workday at

62

defendants' office and did not always overlap with Denali's presence at the office).)  Further, defendants have asserted that Safara's testimony "does not detail the duration, magnitude, or physical manifestation of her alleged emotional distress."  (Dem. Mem. 25.)  Defendants have also asserted that "Safara admitted that the work environment was 'fantastic' from when she started until right before she left in August 2008." (Def. Mem. 24.)

As plaintiff's memorandum correctly notes, defendants' last assertion mischaracterizes the trial record.  Safara testified: "Initially, UHP was a fantastic place to work . . . . Everyone got along."  (Tr. 1133.)  Safara had "every intention [of] staying there for as long as [she] could."  (Tr. 1134.) This changed in "late 2007 into '08," after Denali joined defendants' company, bringing Onionhead with her, and causing defendants' workplace to become "very uncomfortable to work in and there [were] a lot of things going on that [Safara] did not agree with or . . . felt were not right."  (Tr. 1134.)

For instance, Safara noticed that defendants' workplace was suddenly populated with Buddha statues, burning candles, and burning incense.  (Tr. 1136-40.)  Safara testified that these changes were "distracting," particularly because the overhead lights were "shut off [because] softer lighting was more of a positive spiritually."  (Tr. 1140.)  As Safara

testified, her "understanding was that [the overhead lights were
moved and lamps were introduced] to bring the good vibes and the
positive spirits," and to push away "demons and negative
spirits." (Tr. 1142.) Further, Safara testified that "soft,
almost church-like music . . . would play softly in the
background throughout the office." (Tr. 1143.)

Safara testified that the changes she observed after
Denali's arrival disturbed her: "[T]hey were not welcoming
changes. I almost felt like it was being pushed on us to be or
to think a certain way . . . I thought it was pretty
bothersome." (Tr. 1144-45.) Safara felt "very uncomfortable"
in defendants' workplace. She testified that all of the
religious symbols were reminiscent of "being in a church" and it
was "bringing religion into [the workplace] and pushing that
specifically on you." (Tr. 1145.) "Any time" one had a
conversation with Denali, spiritual subjects came up, including
discussion of "angels or spirits or positive . . . light or
negative energy or demons [or] God." (Tr. 1155.)

As Safara testified, the changes that came about after
Denali's arrival "had a negative impact on our workplace and on
the people that worked there because you could see how things
started to decline internally once all of that started, and it
wasn't the same as it was." (*Id.*) Safara perceived Denali's
religious and spiritual discussion as "very cult-like, in the

sense that she always was pushing her beliefs onto us."  (tr. 1155-56.)  Safara testified that she tried to ignore Denali's emails about spirituality because "everyone can have their own religious opinions . . . and their own beliefs, but to push yours on someone else I don't agree with that."  (Tr. 1156.) Safara also testified that Denali routinely instructed employees to engage in hand-holding prayer, in both individual and group meetings.  (Tr. 1156-57.)  When such workplace prayers occurred, Safara testified that she "would sit there and not participate" because it made her "very uncomfortable and it almost made the workplace feel hostile[.]"  (Tr. 1157-58.)

Safara further testified that she attended three or four individual meetings with Denali, which she was instructed to do by COO Bourandas.  (Tr. 1160-61.)  Denali's references to God at the workplace made Safara "very angry."  (Tr. 1167.) Safara testified that Denali conducted herself "like a pastor or a priest of a church," except "she was like that for the company."  (Tr. 1177.)  Safara testified: "[E]verything in the office turned into almost like a mosque or a church[] . . . in the way how you have the incense burning away, like you would smell if you walked into a religious building, or the way you have that music, that organ soft music, with the religious statues and the candles and the dim lighting, and then the way she overall looked herself."  (*Id.*)  Additionally, "every time

65

[one] did talk to [Denali], there was talk of God or love or spirits, and then there was the prayer."  (*Id.*)

In August 2008, Safara quit her employment because she "couldn't do it anymore" because she "hate[d]" her job and felt "miserable," causing her to be "cranky" when she got home at night.  (Tr. 1177-78.)  Like Pegullo, Safara testified that her work experience at defendants' workplace affected her emotionally, causing her to lose trust in people and not interact with coworkers outside of work anymore.  (Tr. 1180.) In addition, she has "closed [her]self off . . . from getting to know [her new] coworkers," turning down invitations to social events, such as holiday parties, because she felt "it's not worth getting emotionally involved in things anymore."  (*Id.*)

Due to ample trial evidence of Safara's emotional distress, and because the $50,000 compensatory damages award – which has already been reduced from $80,000 – for claimant Safara does not shock the judicial conscience, the court upholds her reduced compensatory damages award of $50,000.

III. **The Trial Evidence Supports the Jury's Award of Punitive Damages for Diaz and Pegullo.**

The jury awarded claimant Diaz $400,000 in punitive damages and awarded claimant Pegullo $160,000 in punitive damages.  On December 28, 2018, the court reduced their respective punitive damages awards to $10,000 each, in

accordance with the statutory maximums prescribed under Title VII.  (ECF No. 224, Memorandum and Order dated 12/28/18 at 56; 42 U.S.C. § 1981a(b)(3)(A).)

   a. <u>Legal Standard</u>

        Title VII provides for the recovery of punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."  *Kolstad v. ADA*, 527 U.S. 526, 535 (1999).  A Title VII plaintiff may prevail by showing that the employer discriminated in the face of a "perceived risk" that its actions may violate federal law.  *Kolstad*, 527 U.S. at 536, 539.  Punitive damages are not justified if "the employer is unaware of the relevant federal prohibition or discriminates with the distinct belief that its discrimination is lawful, where the underlying theory of discrimination is novel or otherwise poorly recognized, or where the employer reasonably believes that its discrimination satisfies a bona fide occupational qualification defense or

other statutory exception to liability." *Kolstad*, 527 U.S. at 427.

Defendants incorrectly assert that "[p]unitive damages are reserved for egregious cases." (Def. Mem. 26.) As the United States Supreme Court has held, "[A]n employer's conduct need not be independently 'egregious' to satisfy § 1981a's requirements for a punitive damages award, although evidence of egregious misconduct may be used to meet the plaintiff's burden of proof." *Kolstad*, 527 U.S. at 546; *see also Luciano v. Olsten Corp.*, 110 F.3d 210, 219-20 (2d Cir. 1997) ("We find nothing in the language of [42 U.S.C. § 1981a(b)] to support the Company's argument that there must also be a finding that the defendants' conduct was 'extraordinarily egregious.'")

As the Second Circuit has further held, Title VII's statutory damages cap is *not* reserved for "the most egregious cases of employment discrimination." *Luciano*, 110 F.3d 219-22. Rather, the jury is to determine the amount of punitive damages "without being influenced by the statutory caps," and only after the jury has made its determination will the district court "reduce[] the award to ensure that it conforms with subsection (b)(3)," as necessary. *Id.*

b. Diaz and Pegullo Are Entitled to Punitive Damages

In arguing for remittitur of the punitive damage awards of $10,000 for Diaz and Pegullo, respectively, defendants

point to the existence of "an anti-harassment policy . . . which was periodically updated," and further assert that "neither [Diaz nor Pegullo] complained about being required to participate in . . . any alleged religious activity to any supervisor."  (Def. Mem. 27-29.)

The Supreme Court has noted that an employer's "written policy instituted in good faith" could "go[] a long way towards dispelling any claim about the employer's 'reckless' or 'malicious' state of mind."  *Kolstad*, 527 U.S. at 544 (1999) (internal citation omitted); *see also Cioffi v. New York Cmty. Bank*, 465 F. Supp. 2d 202, 212 (E.D.N.Y. 2006) (affirmative defense to punitive damages under Title VII may be established if employer shows it has made "good faith efforts to enforce an anti-discrimination policy").  Here, defendants have not presented evidence that they engaged in good-faith efforts to enforce their anti-discrimination policy in the workplace. *Cioffi v. New York Cmty. Bank*, 465 F. Supp. 2d 202, 213 (E.D.N.Y. 2006) ("An employer's written anti-discrimination policy, by itself, is not enough . . . [A]n employer must show good faith efforts to enforce its anti-discrimination policy").

As the court summarized in its December 28, 2018 Memorandum and Order, defendants' anti-discrimination practices and policies were "lackluster": defendants' "dissemination of those policies was inconsistent"; "defendants never conducted

employee trainings regarding those policies or advis[ed] employees about what they should do if they believed they were being discriminated against or harassed"; and those policies "fail[ed] to address harassment in the workplace."  (ECF No. 224, at 21-22; Tr. 2016.)  In addition, the employee handbooks from 2007, 2011, and 2012 did not "discuss workplace harassment in any form nor d[id] they provide a clear and effective avenue for reporting discrimination."  (ECF No. 224, at 34.)

At trial, several claimants testified that they were either unaware of defendants' anti-discrimination policy, or that they believed that it would have been futile to report discrimination to management because "the people that were exposing me to Onionhead and Denali's practices were [the] managers: [COO] Tracy [Bourandas], [CEO] Rob [Hodes], [supervisor] April [Levine], [and the CEO's aunt] Denali [Jordan]."  (Tr. 676, 1173-74, 1313, 1424.)  There is also trial evidence showing that, when claimants *did* complain to management, their complaints were ignored.  For instance, when certain claimants complained to COO Bourandas of certain religious practices implemented by Denali, including the burning of incense and the use of Onionhead/Harnessing Happiness materials, she allowed the complained-about practices to continue and continued to engage Denali's services and enforce Denali's authority and practices.  (ECF No. 224, at 23; Tr.

70

1956-57, 1960, 1974.)  As the court previously noted, CEO Hodes and COO Bourandas "were both made aware of employees' complaints and concerns regarding Denali and the practices she implemented, and they failed to take responsive or corrective action," and they "again failed to take action in the wake of receiving letters from [plaintiff-intervenors' counsel] and the EEOC on behalf of claimants raising issues pertaining to religious discrimination and hostile work environment.  (ECF No. 224, at 22-23.)  To the extent that defendants took remedial action in response to complaints of religious discrimination, it was "minimal and ineffective."  (*Id.*)  Defendants' own policies and inaction demonstrate their knowledge of the unlawfully discriminatory hostile work environment that they created and implemented in the face of a perceived legal risk.

Defendants have also asserted that punitive damages are not warranted because "management did not view any of their actions as discriminatory or in potential violation of federal law," and because "the theory of discrimination is novel" or "poorly recognized."  (Def. Mem. 28.)  In response, plaintiff contends that, "[w]hile Onionhead may be 'novel,' the underlying theory of discrimination in this case –that employees cannot be forced to participate in religious activities as a condition of their employment- is not."  (Pl. Mem. 38.)  Plaintiff also cites a Ninth Circuit decision, *EEOC v. Townley Engineering and*

*Manufacturing Company*, which noted that "[p]rotecting an employee's right to be free from forced observance of the religion of his employer is at the heart of Title VII's prohibition against religious discrimination."  859 F.2d 610, 620-21 (9th Cir. 1988).  The court agrees with plaintiff that a reverse religious discrimination case, while somewhat less commonplace than a typical religious discrimination case involving an employee's religious practice, cannot be characterized as a "novel" theory.  Moreover, the court has previously found that Onionhead's teachings and practices were religious for purposes of Title VII.  *Onionhead I*, 213 F. Supp. 3d 377 (E.D.N.Y. 2016).

As ample trial evidence demonstrated, employees were subjected to religious practices associated with Onionhead and Harnessing Happiness: they were "preached at; [] forced to work by lamp lighting because of demons allegedly coming out of the overhead light fixtures; [] required to participate in meetings that were personal and spiritual in nature and where employees engaged in prayer; [] described as angels; [] moved to different offices to get rid of bad energy and demons; [and were] subjected to discussions of religion in the workplace."  (*Id.* at 18-19; Tr. 1219-20, 1462-64, 1469-73, 1476.)

As summarized above, there is sufficient trial evidence that "defendants' highest-ranking officials, Bourandas

72

and Hodes, as well as individuals with supervisory authority, Levine and Denali, were aware of and perpetrated practices that created, contributed to, and maintained a hostile work environment." (ECF No. 224, at 17.)  As the court previously noted in its December 28, 2018 Memorandum and Order, in addition "to hiring and giving Denali authority within defendants' company, members of defendants' management team directly encouraged, contributed to, and engaged in the Title VII violations by participating in and authorizing the enforcement of religious practices in the workplace." (*Id.* at 15.)  For example, Bourandas enforced employee participation in Onionhead workshops, conducted workshops herself, and distributed Onionhead materials to employees. (*Id.* at 15-16.)  Denali, too, enforced employee participation in Onionhead by requiring that employees wear Onionhead pins and use universal truth and feeling cards (Tr. 233-37.), and non-compliance with Onionhead practices was reported back to Denali by trusted subordinates like Pegullo (Tr. 702-03, 708).

Considering the evidence in the light most favorable to Diaz and Pegullo, a reasonable jury would not have been compelled to find in defendants' favor regarding punitive damages.  Even weighing the evidence under Rule 59, the court cannot conclude that the jury's verdict was seriously erroneous

or a miscarriage of justice. Accordingly, the court upholds the punitive damages award of $10,000 each to Diaz and Pegullo.

## CONCLUSION

For the foregoing reasons, the court respectfully (i) **denies** defendants' motions for judgment as a matter of law or for a new trial with respect to Benedict's and Josey's hostile work environment claims; (ii) **denies** defendants' motion for a new trial or for remittitur with respect to the compensatory damages awards for Benedict, Diaz, Honohan, Josey, Maldari, Pegullo, and Safara; and (iii) **denies** defendants' motions for judgment as a matter of law, for a new trial, or for remittitur, with respect to Diaz's and Pegullo's punitive damages awards. **SO ORDERED.**

Dated:      March 6, 2020
            Brooklyn, New York

_____/s/_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York